23-006960-AW FILED IN MY OFFICE   Cathy M. Garrett   WAYNE COUNTY CLERK   6/1/2023 12:52 PM   Carla Keefe

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE**

KATHRYN TEETS, LISA BECK,
and MELISSA WAARA,

      Plaintiffs,

      -vs-

WYANDOTTE PUBLIC SCHOOL
DISTRICT, CITY OF WYANDOTTE,
WYANDOTTE BOARD OF EDUCATION,
WYANDOTTE CITY COUNCIL, ROBERT A.
DESANA, T-MOBILE CENTRAL LLC,
DR. CATHERINE M. COST, KENNETH
LAUB, JESUS PLASENCIA,
GREGORY J. MAYHEW, MICHAEL
SWIECKI, CYNTHIA KINNEY,
STEPHANIE MIELLO, KATHRYN
BEDIKIAN, DANA BROWNING,
ROBERT KIRBY, PATRICK SUTKA,
THERESA CRNKOVICH, KATHLEEN
KANE, CAROLYN MARTINEZ, FRANK
TARNOWSKI, and KELLY WEBBER,

      Defendants.

Case No.           -AW
Hon.

*Trial by Jury Demanded on*
*all Issues so Triable*

_____/

CASTMORE LAW, PLLC
Joshua Castmore (P76326)
Attorneys for Plaintiffs
2475 8th St.
Wyandotte, MI 48192
(313) 608-4511

LAW OFFICE OF ROBERT J. BERG PLLC
Robert J. Berg
Attorneys for Plaintiffs
17 Black Birch Ln.
Scarsdale, NY 10583
(914) 422-9455
(Admitted only in New York and New Jersey;
motion for *pro hac vice* admission to be filed promptly)

_____/

**<u>PLAINTIFFS' COMPLAINT</u>**

There is no pending or resolved civil action
arising out of the same transaction or occurrence
alleged in this complaint

NOW COME Plaintiffs, KATHRYN TEETS, LISA BECK, and MELISSA WAARA, by

and through their attorneys, CASTMORE LAW, PLLC, and LAW OFFICE OF ROBERT J.

BERG PLLC, and for their Complaint state as follows:

## INTRODUCTION: WE ARE WYANDOTTE!

1.  *We are Wyandotte!*  This is the oft-said rallying cry of the 28,000 residents of this tightly-knit

    Downriver community, located ten miles southeast of the City of Detroit on the banks of the

    Detroit River. Residents love their historic and safe city, with its thriving downtown,

    accessible waterfront, excellent public school system, and generally well-run municipal

    services. Kids who grow up in Wyandotte often return as adults to raise a new generation, in

    the same city where their parents, relatives, and friends still live.

2.  For many decades, residents have stepped up to serve as elected officials of the City

    government and the Wyandotte Board of Education to ensure that both governmental entities

    continue to provide the excellent municipal and educational services that residents expect and

    which make the City of Wyandotte such a desirable place to live, work, and raise a family.

    For the most part, these elected officials have succeeded. The City and School District have

    usually operated to the considerable satisfaction of most residents.

3.  The public's trust in their elected officials' (fellow residents') prudent oversight over City and

    School District affairs over the decades though has led to a certain public laxity. As a result,

    City Council meetings and Wyandotte Public School Board meetings, until very recently,

    have been largely non-newsworthy, quiet, and routine, and without much citizen scrutiny and

active participation. The business of the City and the School District has generally been carried out in traditional mundanity.

4. Unfortunately, about five years ago, T-Mobile US, presently the second largest wireless telecommunications provider in the United States, through its wholly-owned affiliate, T-Mobile Central LLC (collectively, "T-Mobile"), successfully schemed to take unfair advantage of the unsophisticated elected School Board members of the Wyandotte Public School District and the School District Superintendent and Business Manager. In August 2017, T-Mobile approached Ken Laub, Business Manager of Wyandotte Public Schools, and asked him whether the District was interested in leasing space on the rooftop or smokestack of Wyandotte Elementary School on which T-Mobile would erect a wireless communications facility to further T-Mobile's wireless network in the area. In exchange, T-Mobile offered the District a monthly lease payment of $1,000 plus $150 per month for utilities, for a lease that would be non-cancellable by the District but renewable at T-Mobile's option for thirty years.

5. The District's Business Manager quickly conferred with Bernie Bowers, District Director of Operations, and Dr. Catherine Cost, the Superintendent of Schools. For some mind-boggling reason, these top-most leaders of the School District, entrusted with the highest fiduciary responsibilities and duties to protect the lives and well-being of students, faculty, staff, and visitors to the District schools, jumped on this substantially below-market, onerous lease, with its absurd 30-year, non-cancellable term. They whole-heartedly embraced the concept of installing a massive array of powerful wireless radiation-emitting antennas on the roof of an elementary school, in close proximity to classrooms, and overlooking the school playground. And after they buttoned up the lease agreement, the pliable and non-questioning School Board

3

speedily approved the lease, in a likely "Guinness Book of World Records" elapsed time of 48 seconds, at the June 19, 2018 School Board meeting.

6.  Having hornswoggled the School District, T-Mobile managed to dupe the City Engineer, Gregory Mayhew, into illegally issuing it a building permit and Certificate of Occupancy, allowing T-Mobile to install a huge and hideous array of wireless antennas atop the smokestack of the beloved Washington Elementary School, smack in the middle of a single-family residentially-zoned neighborhood.

7.  The City Engineer illegally issued the permit and the Certificate of Occupancy in an *ultra vires* act because the City's zoning ordinance expressly forbids wireless communications facilities from being located in residential zoning districts, except for municipally-owned or controlled properties. The City Engineer erroneously based his issuance of the permit and the Certificate of Occupancy on his ill-founded belief that the exemption from local zoning provided under MCL 125.3514 applies to T-Mobile's wireless communications facility.

8.  However, MCL 125.3514, by its express terms, very plainly exempts from local zoning control only those new wireless communications facilities which are to be collocated on an existing wireless communications support structure or in an existing equipment compound. It should have been crystal clear to the City Engineer -- and T-Mobile knew full well -- that T-Mobile intended to place its new wireless communications equipment on a smokestack structure that was barren of any existing wireless communications facilities.

9.  T-Mobile thus knew that its new wireless installation was not going to be a collocation on an existing wireless communications support structure or in an existing equipment compound. T-Mobile recognized -- and in any event, is charged with knowing -- that MCL 125.3514 would not apply to its wireless facility at Washington Elementary School. T-Mobile

understood (or is charged with knowing) that the City of Wyandotte's zoning ordinance prohibits this facility at the Washington Elementary School site. Yet T-Mobile either allowed or encouraged the City Engineer to issue it the illegal permit and Certificate of Occupancy anyway.

10. Whether as a result of ineptitude, inattention, disinterest, or malfeasance, this City's elected officials, both in City government and on the School Board, have failed to exercise their fiduciary duties to residents by "green lighting" T-Mobile's illegal and dangerous wireless project. As a result, beginning in September 2022, T-Mobile has knowingly used the illegal permit and Certificate of Occupancy, and has constructed the illegal wireless communications facility that now sits atop the smokestack at Washington Elementary School and is ready to be activated within days. T-Mobile has announced its intention to turn on the facility and begin transmitting on or about June 9, 2023.

11. Yet when called out by their constituents earlier this year -- after T-Mobile had essentially completed construction on the wireless facility and affected residents expressed their panic and terror that the facility would be activated imminently -- nearly all of the elected officials cowardly lashed back at residents and at the other branch of government. The Mayor blames the School District. The Superintendent blames the City government. Both wrongly assert that "their hands are tied" because they erroneously contend that federal law preempts them from interfering with T-Mobile's ability to locate the wireless communications facility on the school grounds. No elected Board member has had the guts to stand up to protect Wyandotte residents against T-Mobile's patently illegal wireless installation. City and school officials have publicly trembled, making ridiculous, "red herring," and utterly baseless but damaging statements that the City and/or the School District will likely be successfully sued by T-

5

Mobile for "millions of dollars" should either government order T-Mobile to remove its illegal facility from Washington Elementary School.

12.   Public pressure finally forced the School Board to take some action, and Dr. Cost "resigned" from her position as Superintendent on April 5, 2023, effective that date, after she and the District signed a severance agreement. The current School Board members finally realized that Dr. Cost had seriously damaged the District by championing the tower and partnering the District with T-Mobile to place the wireless facility on top of the smokestack at Washington Elementary School for a piddling $1,000 per month payment, while saddling the District with a non-terminable 30-year-long lease that exposed very vulnerable young children to dangerously high levels of continuous wireless radiation exposure in their classrooms and on the playground. Still, the School Board and the new interim Superintendent have failed to take the necessary step to terminate the illegal lease between T-Mobile and the District.

13. For his part, the City Engineer, Gregory Mayhew, who illegally issued T-Mobile the building permit and Certificate of Occupancy in an *ultra vires* act on June 9, 2022, conveniently "retired" earlier this Spring after the community revolted.

14. Faced with chicken-hearted and lily-livered elected and appointed City and School District officials who will not enforce the law and are afraid to stand up to a foreign-government-owned corporate bully, the good citizens of Wyandotte have no choice but to choose "self-help." Plaintiffs bring this action to rectify the wrongs that T-Mobile has wrought upon this community with its illegal wireless communications facility installed on the smokestack of the Washington Elementary School. Unless enjoined by this Court, T-Mobile will begin transmitting noxious, dangerous wireless radiation from the antennas atop the Washington Elementary School continuously all day, every day at a site where young children study and

play during their most important developmental years. This facility is barred under the lawful zoning ordinance enacted by the City of Wyandotte, and no wrongfully, illegally City-issued permit or Certificate of Occupancy renders the presence and operation of the wireless facility at this site lawful. T-Mobile's wireless communications facility located on the Washington Elementary School constitutes a nuisance *per se*, and this Court must order the City to take immediate action to compel the School District, as landlord, and T-Mobile, as tenant, to shut it down and remove it.

## PARTIES

15. Plaintiff Kathryn Teets ("Teets") is a resident of the City of Wyandotte, and she has resided in the City for over 13 years. Teets resides and does business within the jurisdiction of this Court.

16. For the past 8 years, Teets and her husband have owned their own home, located at 2511 15th Street, in Wyandotte, just north of Vinewood Street, and which is located less than 400 feet from where T-Mobile has installed its illegal wireless communications facility on top of the smokestack at Washington Elementary School. The backside of Teets' house and the backyard have a direct line of sight to the smokestack and to the T-Mobile wireless communications facility atop thereof. Teets is the mother of one student, nine years old, who attends Washington Elementary School. Teets is a registered nurse, and works at a nearby hospital. Teets volunteers as a medic for the DJFL-Wyandotte Indians. Teets' husband suffers from juvenile diabetes. He has had the illness for the past 40 years. Because Teets is a medical professional, she has studied the medical and scientific literature on the effects of wireless radiation exposure on the human body. Teets understands from her review of an abundance of peer-reviewed published medical and scientific studies that exposure to wireless radiation

from cell towers, wireless communications facilities, and wireless devices can cause or exacerbate serious diseases or medical problems in humans. She is also knowledgeable that children are developing physically at a rapid pace and their bodies are different and more susceptible to toxicants and radiation than adults. Moreover, she understands that the scientific literature shows that wireless radiation exposure can cause or exacerbate diabetes. Teets is very concerned and disturbed that T-Mobile and Wyandotte Public Schools intend to activate T-Mobile's wireless communications facility and begin transmitting wireless radiation which will invade and permeate her nearby property on or about June 9, 2023. Teets' reasonable and rational fear about this unconsented invasion of this toxic radiation on her property has seriously injured her enjoyment of her property, and she expects the operation of this wireless facility from this location will severely negatively depress the value of her property. Yet because of her valid and reasonable health concerns for herself and her family, Teets fears she will have to sell her property and move from her beloved neighborhood in order to safeguard her family's health. Teets also fears for the health and safety of her stepchildren who reside less than 500 feet from the T-Mobile wireless facility on the opposite side of the school.

17. Plaintiff Lisa Beck ("Beck") is a resident of the City of Wyandotte, and resides at 2387 17th Street. Beck's home is slightly more than one block away from Washington Elementary School. Beck grew up in Wyandotte and attended Wyandotte Public Schools. Beck's father served on the School Board for about 13 years, and he also served on the City Council. Beck graduated in 2002 from Roosevelt High School. Beck then left to attend college, married, and moved with her husband to his various military postings before returning to Wyandotte in 2011 and buying a house. Beck and her two sons live in Wyandotte full-time, while her

husband serves our country in the military. Beginning in 2017, Beck started working for Washington Public Schools, initially as a lunch aide, and then as an instructional aide.

18. Beck's youngest son was born with and suffers from cystic fibrosis. This son is a student at Washington Elementary School. Beck is very deeply involved in her kids' lives and health. Although the Beck family hates that Mr. Beck's military service requires him to be posted away from Wyandotte, Mr. Beck's military health insurance extends the crucial lifeline to provide Beck's son with the extraordinarily expensive, specialized, comprehensive medical care and treatment that the complex syndrome cystic fibrosis requires. Moreover, the Becks need to remain in Wyandotte because the boys don't not want to move anymore, and Beck must remain close to family if her youngest son should need a hospital stay.

19. Cystic fibrosis (CF) is a genetic condition that affects a protein in the body. People who have cystic fibrosis have a faulty protein that affects the body's cells, tissues, and the glands that make mucus and sweat. Mucus is normally slippery and protects the linings of the airways, digestive tract, and other organs and tissues. People who have cystic fibrosis make thick, sticky mucus that can build up and lead to blockages, damage, or infections in the affected organs. Inflammation also causes damage to organs such as the lungs and pancreas. Cystic fibrosis, if not controlled, can lead to cancers of the digestive tract, diabetes, serious lung diseases and infections, heart failure, kidney failure, gastrointestinal diseases, and numerous other life-threatening complications. Because he suffers from cystic fibrosis, Beck's youngest son is particularly susceptible to having his health condition worsened by continuous exposure to wireless radiation transmitted from the T-Mobile wireless communications facility atop Washington Elementary School. In particular, exposure to wireless radiation at the levels transmitted by cell towers and other wireless facilities is known to create oxidative stress.

Oxidative stress, in turn, leads to inflammation in the body, which in a person suffering from cystic fibrosis, may trigger a cascade of catastrophic medical problems. Living in very close proximity to T-Mobile's wireless facility at Washington Elementary School and attending that school, and playing on its playground present a serious danger to Beck's youngest son's health.

20. Beck is very concerned and disturbed that T-Mobile and Wyandotte Public Schools intend to activate T-Mobile's wireless communications facility and begin transmitting wireless radiation which will invade and permeate her nearby property on or about June 9, 2023. Beck's reasonable and rational fear about this unconsented invasion of this toxic radiation on her property has seriously injured her enjoyment of her property, and she expects the operation of this wireless facility from this location will severely negatively depress the value of her property.

21. Plaintiff Melissa Waara ("Waara") has resided in the City of Wyandotte nearly her entire life. She moved to Wyandotte when she was 10 years old, left for college, and returned five years later in 2003. She has lived in Wyandotte for the twenty years since. And she has never wanted to live anywhere else. Waara, her husband, and her children live in a house that she and her husband purchased in 2009, located at 1457 Superior Boulevard. Their house is directly across the street from the front of Washington Elementary School to the south. Waara's house is directly in the line of sight of the T-Mobile wireless communications facility atop the smokestack on Washington Elementary School. Waara is the mother of two students at Washington Elementary School. Waara resides and does business within the jurisdiction of this Court. Waara's husband is a paramedic, and he works for the City of Wyandotte. Waara works remotely from home. Waara is very concerned and disturbed that T-Mobile and Wyandotte Public Schools intend to activate T-Mobile's wireless communications facility and

begin transmitting wireless radiation which will invade and permeate her nearby property on or about June 9, 2023. Waara's reasonable and rational fear about this unconsented invasion of this toxic radiation on her property has seriously injured her enjoyment of her property, and she expects the operation of this wireless facility from this location will severely negatively depress the value of her property.

22. Defendant Wyandotte Public School District ("Wyandotte Public Schools") is a public school district located in Wyandotte, Michigan consisting of four (4) elementary schools, one (1) middle school, one (1) high school, and three (3) center programs which provide services for special needs students from the Downriver area.

23. Defendant Wyandotte Public Schools is a Local School District pursuant to the Revised School Code, Act 451 of 1976.

24. Defendant Wyandotte Board of Education ("Board of Education") is comprised of seven (7) members, elected or appointed in accordance with the laws of the state of Michigan. The members of the Board of Education are Trustees who are State officers pursuant to Michigan law.

25. Defendant Dr. Catherine M. Cost ("Cost") is the former Superintendent of Wyandotte Public School District. Cost was the Superintendent of the District during the time period relevant to this Complaint. Cost is being sued in her official capacity and not in her personal capacity.

26. Defendant Kenneth Laub ("Laub") was the Business Manager for the District during the time period relevant to this Complaint. Laub is being sued in his official capacity and not in his personal capacity.

27. Defendant Michael Swiecki ("Swiecki") was the President of the Board of Education when the Board approved the resolution to enter into the lease between the School District and T-

Mobile Central to allow T-Mobile Central to install and operate a wireless communications antenna on the rooftop of Washington Elementary School. Swiecki is being sued in his official capacity and not in his personal capacity.

28. Defendant Cynthia Kinney ("Kinney") is a resident of the City of Wyandotte, and Kinney was the Vice President of the Board of Education when the Board approved the resolution to enter into the lease between the School District and T-Mobile Central to allow T-Mobile Central to install and operate a wireless communications antenna on the rooftop of Washington Elementary School. Kinney presently is the President of the Board of Education. Kinney is being sued in her official capacity and not in her personal capacity.

29. Defendant Stephanie Miello ("Miello") is a resident of the City of Wyandotte. Miello was the Treasurer of the Board of Education when the Board approved the resolution to enter into the lease between the School District and T-Mobile Central to allow T-Mobile Central to install and operate a wireless communications antenna on the rooftop of Washington Elementary School. Miello is being sued in her official capacity and not in her personal capacity.

30. Defendant Kathryn Bedikian ("Bedikian") is a resident of the City of Wyandotte. Bedikian was the Secretary of the Board of Education when the Board approved the resolution to enter into the lease between the School District and T-Mobile Central to allow T-Mobile Central to install and operate a wireless communications antenna on the rooftop of Washington Elementary School. Bedikian is being sued in her official capacity and not in her personal capacity.

31. Defendant Dana Browning ("Browning") is a resident of the City of Wyandotte. Browning was a Trustee of the Board of Education when the Board approved the resolution to enter into the lease between the School District and T-Mobile Central to allow T-Mobile Central to

install and operate a wireless communications antenna on the rooftop of Washington Elementary School.  Browning is currently a Trustee of the Board of Education. Browning is being sued in her official capacity and not in her personal capacity.

32. Defendant Robert Kirby ("Kirby") is a resident of the City of Wyandotte. Kirby was a Trustee of the Board of Education when the Board approved the resolution to enter into the lease between the School District and T-Mobile Central to allow T-Mobile Central to install and operate a wireless communications antenna on the rooftop of Washington Elementary School. Kirby is being sued in his official capacity and not in his personal capacity.

33. Defendant Patrick Sutka ("Sutka") is a resident of the City of Wyandotte. Sutka was a Trustee of the Board of Education when the Board approved the resolution to enter into the lease between the School District and T-Mobile Central to allow T-Mobile Central to install and operate a wireless communications antenna on the rooftop of Washington Elementary School. Sutka is being sued in his official capacity and not in his personal capacity.

34. Defendant Theresa Crnkovich ("Crnkovich") is a resident of the City of Wyandotte. Crnkovich is the current Vice President of the Board of Education. Crnkovich is being sued in her official capacity and not in her personal capacity.

35. Defendant Frank Tarnowski ("Tarnowski") is a resident of the City of Wyandotte. Tarnowski is a Trustee of the Board of Education. Tarnowski is being sued in his official capacity and not in his personal capacity.

36. Defendant Kathleen Kane ("Kane") is a resident of the City of Wyandotte. Kane is the current Secretary of the Board of Education. Kane is being sued in her official capacity and not in her personal capacity.

37. Defendant Carolyn Martinez ("Martinez") is a resident of the City of Wyandotte. Martinez is a Trustee of the Board of Education. Martinez is being sued in her official capacity and not in her personal capacity.

38. Defendant Kelly Webber ("Webber") is a resident of the City of Wyandotte. Webber is the current Treasurer of the Board of Education. Webber is being sued in her official capacity and not in her personal capacity.

39. Defendant City of Wyandotte ("City") is a Home Rule City in the State of Michigan organized pursuant to the Constitution and the laws of the State of Michigan. The City is a body politic with the capacity to sue and be sued pursuant to the terms of its Charter, the ordinances of the City, and the Constitution and the laws of the State of Michigan.

40. Defendant Robert A. DeSana ("DeSana") is the Mayor of the City of Wyandotte. Mayor DeSana is a life-long resident of the City, and he has served on the City Council from 1985 to 1991, and again since 2017, serving as Mayor Pro Tempore from 2020 to 2021, before becoming Mayor in 2021. Mayor DeSana's term as Mayor ends in 2025. Pursuant to Chapter V of the City of Wyandotte Code of Ordinances, "Duties of Elective Officers," Section 45 provides: "The mayor shall be the chief executive officer of the city... It shall be his duty to exercise supervision over the several departments of the city government and to see that the laws relating to the city and the ordinances and regulations of the council are enforced." At several City Council meetings during 2023, at which members of the public demanded that the City take action to enforce its zoning laws against the illegal T-Mobile wireless telecommunications facility being built on top of Washington Elementary School, Mayor DeSana has expressed his sympathies to the public, but wrongly has tried to "pass the buck" to the School District and to T-Mobile. Mayor DeSana falsely claims that the City's "hands

14

are tied," and that he and the City have no ability to take action to solve the issue, since T-Mobile has told him that it is unwilling to move the wireless telecommunications facility from the site. As demonstrated in this Complaint, the Mayor is wrong, both legally and morally. T-Mobile has illegally built this wireless facility in a single-family residential zone district where such facilities are not allowed under the City's zoning ordinance. The permit which the City issued to T-Mobile authorizing the building of this facility was issued illegally and *ultra vires* by Gregory Mayhew, the former City Engineer, and never had any legal validity under Michigan law. As the City's chief executive officer, Mayor DeSana has the legal duty under the City's ordinances to enforce the zoning code proscriptions against allowing such wireless facilities in residential zoning districts. Yet Mayor DeSana refuses to exercise his legal duty to enforce said provisions, which is why he is being sued herein. Mayor DeSana is being sued in his official capacity and not in his personal capacity.

41. Defendant Wyandotte City Council is comprised of six (6) individuals who are vested with the legislative authority of the City of Wyandotte.

42. Defendant Gregory Mayhew ("Mayhew") is the former Engineer for the City of Wyandotte. Mayhew is being sued in his official capacity and not in his personal capacity. On June 9, 2022, Mayhew illegally approved T-Mobile's application to install a T-Mobile antenna/radio on the smokestack of the Washington Elementary School, located at 1440 Superior Boulevard, Wyandotte, as well as ground equipment on a new 8-foot by 8-foot platform based upon plans submitted by Landtech, dated May 10, 2022, as shown on Index Sheet T-1. Mayhew illegally and in an *ultra vires* act approved Permit # J22-1480, and granted T-Mobile a Certificate of Occupancy for its illegal wireless communications facility and related equipment which T-Mobile subsequently installed at the site.

15

43. Defendant Jesus Plasencia ("Plasencia") is the new Wyandotte City Engineer, an appointed position within the City of Wyandotte. The City Engineer is responsible for issuing building permits within the City of Wyandotte. The City Engineer is a City code enforcement officer, and among his duties is the enforcement of the building code, the electrical code, and the zoning code, among other City codes and ordinances. Mr. Plasencia was hired to replace former City Engineer Mayhew who "retired" amidst the citizen uprising over the ongoing T-Mobile wireless antenna debacle which this lawsuit seeks to resolve. Mr. Plasencia is being sued in his official capacity and not in his personal capacity.

44. Defendant T-Mobile Central LLC ("T-Mobile Central") is a foreign limited liability company which does business in Wayne County, Michigan. T-Mobile Central is an operating company of T-Mobile US, Inc. ("T-Mobile US") which is a publicly-traded Delaware corporation, headquartered in Bellevue, Washington. T-Mobile US stock is actively traded on the NASDAQ over the counter stock market. T-Mobile US is the second largest provider of wireless communications services in the United States, serving 113.6 million customers in the United States, Puerto Rico and the U.S. Virgin Islands in 2022. T-Mobile US is an enormously powerful telecommunications company, generating nearly $80 billion in revenue in 2022, almost all in the United States. And yet, T-Mobile US is just one important cog in the global telecommunications machine of its giant parent and controlling shareholder, Deutsche Telekom, a worldwide publicly-traded behemoth which itself is controlled by the German government. Thus, T-Mobile Central is a regional U.S. operating entity run by one of the world's largest and most dominant telecommunications companies.

**JURISDICTION AND VENUE**

16

45. Venue is proper in this Court as Defendants reside and/or conduct business in Wayne County, Michigan.

46. Venue is further proper in this Court as the real property at issue in this case is located in Wayne County, Michigan.

47. Jurisdiction is proper in this Court because Plaintiffs seek equitable redress under Michigan law, and the amount in controversy exceeds $25,000.00.

## THE SAD AND UNFORTUNATE SELL-OUT OF THE RESIDENTS OF WYANDOTTE BY T-MOBILE, WYANDOTTE PUBLIC SCHOOLS OFFICIALS, AND CITY OF WYANDOTTE OFFICIALS

48. Plaintiffs incorporate by reference the above paragraphs as though the same have been fully set forth herein.

49. This sorry saga began in the Summer of 2017, when T-Mobile, through its site acquisition agent, Stephanie Pratt, of Catalyst Network Services, quietly proposed to the School District's business manager a lease deal that offered what seemed like a multi-year stream of essentially "free money" for the School District.

50. Ms. Pratt reached out to Ken Laub, the School District's business manager, to assess whether the School District would be interested in leasing space on the rooftop of the Washington Elementary School for the installation and operation of a substantial T-Mobile wireless communications facility. T-Mobile's sales pitch began with a telephone call from Ms. Pratt to Mr. Laub the last week of July 2017. Mr. Laub did not answer, and Ms. Pratt left a voicemail message which he did not return. She followed up on August 1, 2017, with an email to Mr. Laub, stating: "I found your email address on your Wyandotte Public School website.  I left a voicemail with you last week, but was concerned it may not have been received, so I am sending this email inquiry as well. I understand since school is out of session for the summer

17

that staff will be more difficult to contact. I represent T-Mobile and was looking at the Washington Elementary School property in Wyandotte for consideration of a wireless communications facility. I particularly was interested in the chimney structure as an excellent location for a wireless telecommunications facility. However, the main school building could also be considered a good location for a rooftop wireless telecommunications facility. T-Mobile is seriously interested in locating a wireless telecommunications facility at Washington Elementary School in Wyandotte. So, I would appreciate if you would contact me and I can give you further information regarding T-Mobile's interest. Thank you for your time and consideration."

51. The next morning, on August 2, 2017, Mr. Laub responded by email to Ms. Pratt, writing: "Hi Stephanie. I will get back to you later today. To help me with some discussion with my people, what would the wireless telecom facility look like/be comprised of."

52. Later that afternoon, on August 2, 2017, Ms. Pratt presented Mr. Laub with a proposal for T-Mobile to lease space on either the chimney or the rooftop of the Washington Elementary School for T-Mobile to install wireless equipment. *See* August 2, 2017 letter from Catalyst to Laub attached as **Exhibit A**.

53. Ms. Pratt proposed that the T-Mobile wireless equipment would consist of 6 panel antennas (with 2 panel antennas each mounted on 3 sides of the building), 9 remote radiohead units, 3 suppression units, 1 cable, along with supporting equipment cabinets to be mounted on the rooftop, mounted on a steel grating platform. Alternatively, she proposed that the 6 antennas could be mounted on the chimney, with the supporting equipment placed on the ground near the base of the chimney and secured with a chain link fence. T-Mobile planned to tap into the nearest electric power hookup and the nearest hookup for telephone service.

54. Ms. Pratt presented T-Mobile's standard lease term offer with an option period of one year plus an additional three one-year periods at a monthly rate of $100 per month prior to the wireless communications facility's construction. T-Mobile offered an initial five-year lease term at $1,000 per month, with automatic renewal at T-Mobile's option for five successive five-year terms. At the beginning of each five-year renewal period, T-Mobile proposed a small increase of 5% in the monthly rental amount. In addition, T-Mobile proposed to pay an additional $150 per month for utilities.

55. Very significantly, T-Mobile proposed that T-Mobile would be responsible for obtaining zoning approval and construction permits.

56. The School District's Business Manager and Superintendent of Schools quietly negotiated this "deal" with T-Mobile in a brief one-month period in August 2017.

57. On August 9, 2017, Ms. Pratt emailed Mr. Laub, stating that she was following up on the proposal she had sent him the prior week, and asking if the District was interested in "leasing space to T-Mobile at Washington Elementary."

58. Mr. Laub responded by email the next day, on August 10, 2017, writing: "We are interested in helping you out. Could you have either you or your construction engineer give my operations director a call. His name is Bernie Bowers 734.260.6741. He has some questions."

59. On Friday, August 11, 2017, Ms. Pratt emailed Mr. Laub, writing: "Good morning Mr. Laub: I spoke with Mr. Bowers yesterday to gauge his concerns. I understand he is concerned about the utility payment fee proposed and some building and structure concerns. I spoke with my manager at T-Mobile about his concerns. She said T-Mobile will submeter its utilities for separate billing at this location since Mr. Bower was concerned utility costs and consumption use. I hope this will alleviate your concerns with this issue. In addition, my manager is

working on getting a construction manager to speak with Mr. Bowers about his other technical concerns. So, he may receive a call soon from a construction manager. I hope this helps. Let me know if you have any further questions or concerns."

60. On August 24, 2017, Ms. Pratt and T-Mobile representatives met with Bernard Bowers, the School District's Director of Operations, for an onsite inspection at Washington Elementary School, where, according to an email Ms. Pratt sent to Mr. Laub later that day, she wrote: "We discussed the placement of the antennas, cabling, ground support equipment and utilities. I hope Mr. Bowers was satisfied with the visit and discussion that took place." Ms. Pratt's email continued: "Mr. Bowers said you were attending a school board meeting on Tuesday night to discuss T-Mobile's proposal. So, if you don't mind, I will follow up with you on Wednesday of next week to see how the meeting went."

61. Ms. Pratt's reference to the "school board meeting on Tuesday night" related to a Special Meeting of the School Board noticed for a "Working Session" "WALKING TOUR on some of our buildings' improvements," as set forth in the official agenda available on the District website.  No "Board Briefs" or other publicly-filed minutes of this Special Meeting apparently were prepared as they are not available on the District website. However, a Board of Education Work Session Summary describing the August 29, 2017 Special Meeting was prepared at some date, with an unknown distribution except for the known fact that it is not available on the District website. The document was produced to Plaintiffs' Counsel pursuant to a Freedom of Information Act request. The Board Work Session Summary states that the following Board members were present at the Special Meeting: Kinney, Kirby, Miello, and Swiecki; and Board members Bedikian, Browning, and Sutka were excused. Thus, a quorum of the Board was present. The meeting was held to tour bond work and other

construction/renovation work at several District school buildings. According to the Summary, at Washington Elementary School, the Board members, Superintendent Cost, her middle school age daughter, Christine Hensley, Recording Secretary, Bernie Bowers, Director of Operations, and Ken Laub, Business Manager toured the parent-funded playground renovation Phase 1 work which had been completed.  They also discussed "T-Mobile will install a cable tower and we will receive $1,000/month usage fee from them. Pea gravel will be laid around the tower."

62. The School Board seems to have approved the deal with T-Mobile in that Special Meeting because in the morning, on August 30, 2017, Mr. Laub sent an email to Ms. Pratt, stating: "Good morning Stephanie. We are authorized to go ahead with T-Mobiles [sic] proposal. Please draft the required agreements and forward them to me."

63. That afternoon, on August 30, 2017, Ms. Pratt responded to Mr. Laub's email, stating: "That is great news! Sure, I can draft the lease agreement and send it to you. I can have that to you tomorrow." Ms. Pratt continued: "I would just like to confirm that we are going with the smokestack structure, since there is also the option of going on the building rooftop.  However, when we met with Mr. Bowers last week, it seemed he preferred the smokestack structure since it was not in use anymore." Ms. Pratt informed Mr. Laub that T-Mobile needed to schedule another site visit at the school -- that's T-Mobile's procedure once a property is selected -- and T-Mobile's architectural and engineering firm, RF engineer, and construction manager would view the property.

64. Significantly, Ms. Pratt stated: "I would also like to know whether the school district goes through the City of Wyandotte for zoning and building permits?  I know some school districts don't fall under the jurisdiction of the municipality they are located in, since the school district

is generally considered its own jurisdiction under the State of Michigan. However, some do allow the municipalities to process permits for them. For instance, Detroit Public Schools prefers to use the City of Detroit for permits."

65.  In the morning of August 31, 2017, Mr. Laub confirmed to Ms. Pratt by email that he and Mr. Bowers preferred that the wireless communications facility be located on the building's "smokestack structure" because it is not in use anymore. Importantly, in that same email, Mr. Laub stated: "Lastly, we defer to the State of Michigan for permit approvals. Zoning should be moot, but I will do a little research on my end and let you know." Here, Mr. Laub offered Ms. Pratt his unsolicited and incorrect legal understanding that the School District would be exempt from local zoning laws with respect to permit requirements for locating wireless communications facilities on school buildings, and that instead, the School District defers to the State of Michigan for permit approvals.

66. Later that afternoon, on August 31, 2017, Ms. Pratt replied to Mr. Laub by email thanking him for confirming the smokestack as the site for the installation of the T-Mobile wireless communications facility and advising him that she will work with Mr. Bowers to schedule the follow-up site visit. She also thanked Mr. Laub "for confirming how you want to handle zoning and permitting," adding "[i]f you don't mind, I will check with the City of Wyandotte planning department to see if they have any concerns with this." Ms. Pratt attached the lease form, and asked Mr. Laub to send it to the District's legal counsel to review, along with a draft Memorandum of Lease which would be executed and recorded with Wayne County upon execution of the lease.

67. On September 1, 2017, Ms. Pratt sent another email to Mr. Laub, this time specifically addressing the utilities portion of the lease agreement. Instead of separately metering the

electric and telephone service to be used by T-Mobile, Ms. Pratt proposed that T-Mobile take advantage of the favorable rates that the City of Wyandotte's municipal utilities services charges the School District and that T-Mobile pay the District a flat monthly fee for utilities. She asked Mr. Laub to clarify how the District preferred to handle the utilities billing. She also asked Mr. Laub to confirm that the District uses the City of Wyandotte telephone service, and does not use Verizon or AT&T telephone services.

68. On September 6, 2017, Mr. Laub responded by email to Ms. Pratt, stating that the District had no preference on how payment for T-Mobile's utilities should be handled. He added that the District uses "Clear Rate" for its telephone service. Finally, he advised Ms. Pratt that he had sent the lease to the District's legal counsel for review. Later that day, Ms. Pratt emailed Mr. Laub, thanking him for the information, and requesting that Mr. Laub provide her with a completed W-9 form for the District.

69. On September 8, 2017, the District claims to have issued its Weekly Board of Education Memo in which Superintendent Cost purportedly wrote: "For those of you who were unable to attend our Building Tour last week, we mentioned that T Mobile [sic] approached us to put a cell tower on the chimney at Washington. Bernie is working on details, yet this could provide revenue of $1,000 per month for the district." A redacted version of the front page of this memo was produced to Plaintiffs' Counsel pursuant to his FOIA request by the District.

70. On September 14, 2017, Ms. Pratt sent Mr. Laub an email describing the positive meeting T-Mobile's construction designers and engineers had the prior day on their site visit with Mr. Bowers. Ms. Pratt stated that they have obtained the information required to prepare the engineering and construction documents to design the wireless communications facility on the smokestack. She explained that representatives from Landtech, T-Mobile's architectural

and engineering design firm, would prepare the construction drawings and structural analysis for the District to review, and they would reach out to Mr. Bowers over the next day or two to arrange to conduct a drone test to view the top of the smokestack structure. Ms. Pratt also asked Mr. Laub for an update on the status of the District's counsel's review of the draft lease and for an estimate on when she might expect to receive comments from the District's counsel.

71. Once the essential terms had been agreed to by the District, the Board, and T-Mobile by August 31, 2017, besides Dr. Cost's vague one-liner in the September 8, 2018 Weekly Board of Education Memo, neither the Superintendent nor the Business Manager notified affected parents, teachers, or staff of the Washington Elementary School that they had decided to allow T-Mobile Central to install and operate a wireless communications antenna that transmits wireless radiation on the school's rooftop just above the school's playground and adjacent to classrooms.

72. Instead, the Business Manager and Superintendent of Schools decided to fly "under the radar." For the next ten months, the draft lease was slowly worked on by the District's counsel and/or T-Mobile's counsel before being finalized in June 2018. Much of the delay appears to have resulted from the internal shift of responsibility for the project by T-Mobile or Catalyst Network Services LLC from Ms. Pratt to Jillyn Smith in November 2017 and from T-Mobile's belated preference to move the draft contract template from T-Mobile's form contract to one prepared by the District's counsel at the Thrun Law Firm during the Fall of 2017 and into the Spring of 2018.

73. Various contractual issues arose concerning the District's insistence that it be provided with advance notice before T-Mobile workers can access the building to perform repairs or work on the wireless facility, subrogation, insurance, and indemnification which gummed up the

24

process. And the parties kept going back and forth between a smokestack installment and a rooftop installment. But the substantive payment terms of the lease agreement did not change from the outset.

74. One significant issue that later arose was the Board's pushback to limit the lease term to a ten-year period so as not to tie up the property for the thirty years that T-Mobile desired. The District, however, caved in to T-Mobile's demand, and agreed to a lease which granted T-Mobile a series of five year terms that T-Mobile could essentially terminate with 90-days notice at the end of each term, but that the District had no right to cancel at all so long as T-Mobile abided by the terms of the lease.

75. By June 2018, the parties had worked out all the kinks in the lease. Once it was ready, Mr. Laub and Superintendent of Schools Cost simply sent the Board of Education a brief letter on June 19, 2018 advising the Board members that: (1) they had been approached by T-Mobile about a year earlier regarding locating a wireless communications antenna atop the Washington Elementary School roof; (2) they agreed with the idea and negotiated a lease with the help of the District's counsel; and (3) they recommended that the Board of Education approve the lease at the June 19, 2018 Board meeting. The letter states as follows:

> Almost a year ago, T-Mobile Cellular approached the district about the feasibility of T-Mobile locating a wireless communications antenna on the rooftop of Washington Elementary School. Following some conversation administratively, we decided to continue discussions with T-Mobile.

> Kari Shay, attorney with Thrun Law, represented the school district in negotiating and drafting, what she feels, is an acceptable agreement for both parties.

> The lease is initially for a term of five years with acceptable extension and non-renewal language for both parties. The rental fee paid by T-Mobile to Wyandotte Schools is one-thousand dollars per month plus an additional one hundred and fifty dollars per month for utilities.

Based upon the thorough review of the lease by Thrun, we are recommending the Board of Education approve the attached resolution authorizing the district to enter into a Lease Agreement with T-Mobile Cellular to install a cellular antenna on the rooftop of Washington Elementary School under the terms set forth.

*See* Letter to Dr. Cost and Board of Education attached as **Exhibit B**.

76. The Board of Education then added the lease agreement to its agenda for the June 19, 2018

Board meeting that evening.

77. The language set forth in the Board of Education Agenda for the June 19, 2018 Regular

Meeting is as follows:

T-Mobile Cellular would like to locate a wireless communications antenna on the rooftop of Washington Elementary School. After a year of negotiations, the Business Manager and I recommend approval of the enclosed lease agreement with T-Mobile. The documents have been prepared by our attorney, Thrun Law, and the lease will be for five years, with a rental fee paid by T-Mobile of $1,000/month plus an additional $150/month for utilities.

*See* June 19, 2018 Board of Education Agenda and Minutes attached as **Exhibit C**.

78. At the June 19, 2018 Board of Education Meeting, the School Board President called the

action item for the T-Mobile lease on the agenda. Superintendent of Schools Cost introduced

the item by stating, *in toto*: "T-Mobile Cellular would like to locate a wireless communications

antenna on the rooftop of Washington Elementary School. After a year of negotiations, Mr.

Laub and I recommend approval of the enclosed lease agreement with T-Mobile. The

documents have been prepared by attorney Kari Shay, and the lease will be for five years with

a rental fee by T-Mobile of $1,000 per month plus an additional $150 a month for utilities."

That is it – that is the full extent of the Superintendent's discussion of this proposed project.

79. Following Dr. Cost's extremely short statement, Board member Browning immediately

jumped in and stated: "I move the Board Secretary sign the Resolution authorizing the District

to enter into a lease agreement with T-Mobile Cellular to install a cellular antenna on the rooftop of Washington Elementary School under the terms set forth."

80. Board member Kinney instantly followed by saying "support," and School Board President Swiecki stated: "The move support. Is there any discussion?" After waiting for about one second, he then said: "Seeing none, can we attach the roll?" Board Secretary Bedekian responded: "The roll is attached." *See* **Exhibit C**.

81. The total elapsed time from when the Board President called the action item for the T-Mobile cellular antenna lease agreement until the lease agreement was approved by the School Board by unanimous vote and the roll was attached amounted to an astonishingly brief 48 seconds. The entire exchange is viewable on the School District's video archives available at vimeo.com/276093483 at 1:03:28 to 1:04:16.

82. With respect to the use of Washington Elementary School, the T-Mobile Site Lease states as follows:

> [District] is the owner of the real property located at Washington Elementary School, 1440 Superior Blvd., Wyandotte, MI 48192, as further described on **Exhibit A** (the "**Property**"). The portions of the Property which [T-Mobile] may require for the use and operation of its facilities as generally described on **Exhibit B** (the "**Premises**")…

> See Site Lease Agreement and Memoranda attached as **Exhibit D**.

83. Pursuant to Exhibit B of the T-Mobile Site Lease Agreement:

> Subject to the terms and conditions of this Lease, the location of the Premises is generally described and depicted as shown below or in the following attachment(s).

> However, it is expressly agreed and understood by and between the Landlord and Tenant that the exact and precise location of the Tenant's Antenna Facilities are subject to review and approval by the planning and/or zoning Boards having jurisdiction over the Property.

> Notwithstanding anything to the contrary, the specific number and type of equipment described in the Exhibit is for illustrative purposes only and in no way

limits Tenant's ability to alter, replace, add to, expand, enhance, modify, supplement, replace, refurbish, relocate or upgrade any such equipment within the Premises.

Equipment Configuration:

Six (6) panel antennas – up to 8' in height
Twelve (12) – up to 2 ¼" dia.
One (1) hybrid cable
Nine (9) RRU's
Three (3) OVP's
Ancillary equipment

See Attached 2 page Lease Exhibit created by Landtech Professional Surveying & Engineering, dated 11/2/17.

84. No Lease Exhibit was attached to Exhibit B of the Site Lease Agreement produced by the

District in response to a Freedom of Information Act request submitted by counsel.

85. Pursuant to the terms of the Site Lease Agreement, the term of the lease between the District

and T-Mobile is as follows:

a) The Initial Term of the Lease shall be 5 (five) years commencing on the date of Tenant's exercise of the Option (the "Commencement Date"), and ending on the day immediately preceding the fifth (5th) anniversary of the Commencement Date (the "Initial Term"). The Initial Term, together with any Renewal Terms and Extended Periods are referred collectively as the "Term."

b) The Initial Term shall automatically renew for five (5) successive renewal terms of five (5) years each (each a "Renewal Term"), provided that Tenant is not in default under the terms of this Lease. Tenant may elect not to renew by providing ninety (90) days' notice prior to the expiration of the then current Term.

c) Upon the expiration of the final Renewal Term, Tenant shall have the right to continue to occupy the Premises and the Term shall automatically extend for up to nine (9) successive one (1) year periods (each, an "Extended Period"). Landlord may terminate the renewal of any Extended Period by delivery of notice at least six (6) months prior to the end of the then current Extended Period. Tenant may terminate any Extended Period at any time by delivery of notice to Landlord.

86. The District only has the right to terminate the Lease after approximately thirty (30) years,

assuming T-Mobile's continued compliance with its terms.

87. Pursuant to Section 24(j) of the District's Site Lease Agreement with T-Mobile, T-Mobile's operations shall at all times be in compliance with all laws, rules, regulations, including but not limited to the Federal Communications Commission during the term of the Lease.

88. Unfortunately, the Board members never bothered to ask a single question about the T-Mobile cellular antenna project and the lease they were authorizing the District to enter with T-Mobile Central. It is a fair bet that none of the Board members actually read the final lease agreement before voting to approve it. Indeed, Superintendent Cost affirmatively misled the Board members about the term of the lease, asserting falsely at the June 19, 2018 Board meeting that the term is five years. In reality, the term is five years, with automatic renewals at T-Mobile's option alone for the first *thirty years* (provided that T-Mobile complies with the lease terms). Wyandotte Public Schools, therefore, would be locked into the lease for a minimum of thirty years, if T-Mobile had been able to comply with the lease terms. The thirty-year term available to T-Mobile, without the District's right to terminate, is plainly discernible in the lease agreement, yet no Board member challenged Superintendent Cost's false statement about the lease term during the 48-seconds the Board devoted to the entire T-Mobile matter. The Board's handling of the T-Mobile agenda item is a textbook example of a Board's abject failure to fulfill its fiduciary obligations to the District.

89. Following the June 19, 2018 Board meeting, the District issued its "Board Briefs," which the "publication" describes as "a brief summary of highlights of Wyandotte Board of Education meetings." In its Board Briefs covering the June 19, 2018 Board meeting, the District only states cryptically and unhelpfully: "Lease Agreement with T-Mobile Cellular to install an antenna on Washington School."

90. After Wyandotte Public Schools and T-Mobile Central signed the lease, virtually no one in the community was made aware of its existence -- or of the looming prospect of the installation and operation of a wireless communications antenna on the rooftop of the Washington Elementary School. Indeed, the matter of the wireless communications antenna hibernated for the next several years, especially with the onset of the Covid-19 pandemic.

91. The wireless facility emerged from hibernation on May 10, 2022, when Eric Finger, on behalf of T-Mobile, filed an application with the City of Wyandotte Department of Engineering & Building. *See* Application for Alterations attached as **Exhibit E**.

92. The application stated that T-Mobile plans to install an antenna/radio on the smokestack of the building located at 1440 Superior Blvd. (Washington Elementary School), and install ground equipment on a new 8' x 8' platform. T-Mobile falsely stated in that application that the estimated cost of the equipment was $10,000.00. Mr. Finger paid a "base fee" of $50 and permit fee of $160, as initialed "GM" by City Engineer Gregory Mayhew on the bottom of the first page of the application.

93. On the second page of the application, the form states: "In accordance with Section 2600 of the Zoning Ordinances, application is hereby made for a Certificate of Occupancy for a "[blank."]. Mr. Finger filled in the blank by requesting a Certificate of Occupancy for a "New T-MOBILE CELL SITE." (Despite the fact that the City of Wyandotte's form Application for Alteration was updated on January 21, 2021, the request for the Certificate of Occupancy on the second page still references Section 2600 of the Zoning Ordinances, which was, however, updated 14 years earlier, on April 2, 2007, to Section 190.370.) As for the plot plan, Mr. Finger directed the City Engineer to the Plans submitted by Landtech, dated May 10, 2022 and as shown on Index Sheet T-1.

94. On June 9, 2022, City Engineer Gregory Mayhew examined the T-Mobile application. He specifically noted that the structure was to be built in the "RA" Zoning District. However, under the City of Wyandotte's Zoning Ordinance, the only zoning districts in which towers and antennas for wireless communications facilities are permitted -- and then only if the Planning Commission grants a special use permit following a public hearing -- are the Industrial Districts I-1, I-2, and I-3.  *See* Section 190.201(B), Section 190.215, and Section 190.307(II).

95. Notwithstanding the unambiguous provisions of the City of Wyandotte's zoning ordinance, City Engineer Mayhew granted T-Mobile's application for a Certificate of Occupancy for the "New T-Mobile Cell Site" at the Washington Elementary School on June 9, 2022. *See* Approved Application for Alteration attached as **Exhibit F**.  In the "For Office Use Only" section of page two of the application, Mr. Mayhew signed the approval, and stated as follows:

> APPROVED INSTALLATION OF WIRELESS COMMUNICATION FACILITY PROVIDED PLANS COMPLY WITH ALL BUILDING PERMIT REQUIREMENTS AND THE REQUIREMENTS OF MCL 125.3514. GENERATOR SHALL NOT EXCEED 55 dbu AS MEASURED AT PROPERTY LINE.

96. Mayhew's basis for granting approval of the application and issuing the Certificate of Occupancy was his illegal, *ultra vires*, and legally incorrect determination that the proposed T-Mobile wireless communications facility meets the requirements of the Michigan Zoning Enabling Act, Act 110 of 2006, MCL 125.3514. Plainly, it does not. Mayhew's grievous error -- upon which T-Mobile Central knowingly capitalized upon and exploited -- has unleashed a "parade of horribles" which has left Wyandotte -- and particularly, the Washington Elementary School community -- reeling.

97. MCL 125.3514 was enacted in 2012 to make Michigan State law regarding wireless communications facilities consistent with the federal Spectrum Act. Pursuant to Section 6409(a) of the Spectrum Act, 47 U.S.C. §1455(a), a state or local government may not deny and shall approve any request for collocation, removal or replacement of equipment *on an existing wireless tower* provided that this does not constitute a substantial change in the physical dimensions of the tower. MCL 125.3514 thus provides in Section 514(1): "Wireless communications equipment is a permitted use of property and is not subject to special land use approval or any other approval under this act *if all of the following requirements are met: (a) The wireless communications equipment will be collocated on an existing wireless communications support structure or in an existing equipment compound."* (Emphasis added). Section 514(1) continues on with subparts (b) through (d), all of which are required to be met as well in order for the exemption from local zoning review to become applicable. But those subparts are irrelevant here because T-Mobile's proposed wireless communications equipment fails the threshold test of subpart (a) -- the equipment won't be collocated on an existing wireless communications support structure or in an existing equipment compound.

98. T-Mobile's plan called for installing the wireless communications facility atop the smokestack of the Washington Elementary School, and that smokestack did not host an existing wireless communications facility at the time Mayhew granted his approval nor was the equipment to be placed in an existing equipment compound. Indeed, the applicant filled in the blank requesting the Certificate of Occupancy for a "NEW T-MOBILE CELL SITE," with the applicant even capitalizing all the letters for emphasis. The submitted construction and engineering plans showed that the proposed wireless communications facility would be an entirely new facility on a smokestack that had no existing wireless communications

equipment already installed. The utter inapplicability of MCL 125.3514 to T-Mobile's proposed facility is incontrovertible, and should have been obvious to City Engineer Mayhew, who among his chief responsibilities, had the duty to issue and enforce permits that comply with the City's ordinances.

99. Mayhew's approval of the Certificate of Occupancy and the Permit, #J22-1480, which he approved on June 9, 2022, was an *ultra vires* and illegal act. Whether Mayhew approved the permit through recklessness, negligence, or malfeasance does not matter. This *ultra vires* and illegal act means that the Certificate of Occupancy and Permit that Mayhew approved are void under the law of the State of Michigan, and they were void *ab initio*. Mayhew's error in approving the Certificate of Occupancy and the Permit did not vest T-Mobile with the right to build its wireless communications facility atop Washington Elementary School. *See Streeter v. Marcellus*, 1990 U.S. Dist. LEXIS 19581 (W.D. Mich. 1990); *Building Commission v. Kunin*, 181 Mich. 604, 612-613 (1914); *Fass v. City of Highland Park*, 326 Mich. 19 (1949).

100. §190.307 of the Wyandotte, MI City Code sets forth special land uses of real property within the City.

101. §190.307(II) of the Wyandotte, MI City Code specifically addresses towers and antennas for wireless communication facilities:

> (1) Towers and antennas for wireless communication facilities shall be permitted in ***I-1, I-2 and I-3 Districts and on municipally owned or controlled property*** subject to the following.
>
> > (a) The height of the tower and antennas shall not exceed 200 feet, measured from the grade at the base of the tower to the top of the highest antennas.
> >
> > (b) The base of the tower shall be located centrally on a continuous parcel so that there shall be a distance of not less than one and one-half the height of the tower to all points on each property line.

(c) If located on the same zoning lot with another permitted use, such tower and any other accessory structures shall not be located in a front yard or side yard.

(d) A tower shall not be located within one mile of another freestanding tower. Towers shall be designated and constructed to accommodate multiple antennas on the same tower. Certified plans shall indicate the location of future antennas. Owner of towers shall not unreasonably deny other companies to locate antennas on the owners tower.

(e) The site of the tower shall be properly fenced or secured to prevent access to the tower by unauthorized persons.

(f) A certified, sealed statement by a licensed engineer or architect verifying that the tower, antennas or pole including all attachments will withstand wind speeds of up to 100 mph with no ice and 74 mph with up to one-half-inch of radial ice shall be furnished with the application.

(g) A licensed engineer shall certify that the wireless communication systems signal(s) will not interfere with the ability of surrounding uses to receive signals from different radio, television, telephone or other electronic equipment. Compliance with the Federal Aviation Agency and Federal Communications Commissions standards shall be required.

(h) Towers shall be of a color which blends into the surrounding area. Advertising or signage shall not be permitted on any tower, antennas or related structures.

(i) Antennas and supporting structures shall be permitted to be placed on the roofs of buildings subject to the following conditions.

   1. The principal use and any building or structure located on the property shall conform to all existing ordinance requirements.

   2. Existing structures 75 feet or greater in height above ground may be used to support antennas not exceeding 35 feet above the structure.

   3. Existing structures less than 75 feet in height above the ground may be used to support antennas provided the antenna is not higher than the structure and the antenna(s) are screened from view by materials which will maintain the normal appearance of the structure.

(j) If the use of any tower and antennas is discontinued for a period of 12 consecutive months the use shall be considered abandoned, and the owner of such tower shall remove same within 90 days from receipt of notice from the city. The city may remove the tower or antennas at the owner's expense. If there

are two or more users of a single tower, then these provisions shall not become effective until all users cease using the tower.

102.   §190.306(B) of the Wyandotte, MI City Code requires an application for special land use to be filed with the Engineering Department, accompanied by any plans or data prescribed by the Department, including adequate evidence showing the special land use will conform to the standards set forth in the section.

103.   §190.306(B) of the Wyandotte, MI City Code requires that upon receipt of an application for a special land use, a public hearing shall be held by the Planning Commission. Subsection (B) also requires that once notice that a request for special land use approval has been received, it shall be published in a newspaper of general circulation in the city and shall be sent by mail or personal delivery to the owners of property for which approval is being considered, to all persons to whom real property is assessed within 300 feet of the boundary of the property in question, and to the occupants of all structures within 300 feet…

104.   Due to Mayhew's illegal, *ultra vires*, and legally erroneous determination that T-Mobile's wireless communications tower on Washington Elementary School complied with MCL 125.3514, T-Mobile did not submit a special use application to the Engineering Department, no public hearing was held, and residents and/or occupants of buildings within 300 feet of the boundary of the Washington Elementary School property were not notified of the cell tower installation.

105.   With the Covid-19 pandemic having eased and supply chain issues relaxed, T-Mobile Central moved promptly to begin its lease payments under the lease and to begin construction of the wireless facility at Washington Elementary School.  On June 28, 2022, T-Mobile, Lease Management Team, sent a letter to the Wyandotte Public School District stating that the letter constituted notice that T-Mobile will commence the Site Lease Agreement on July 10, 2022.

106.    Sometime in the late Summer or early Fall of 2022, just as the 2022-2023 School Year was beginning, T-Mobile began construction activities at Washington Elementary School. On September 12, 2022, Kristin McMaster, the Principal at Washington Elementary School, sent an email to teachers and staff at the school to advise them of T-Mobile's construction project. She stated: "T-Mobile will be installing a cell tower on a portion of our building. There is a temporary fence being put up on the blacktop so they are able to still play outside while they are working. Currently, they are on the blacktop working and have a vehicle there so please avoid that area. Students are all going out on the woodchip playground today for lunch recess. You can pick them up at the doors at the end of the hall."

107.    As construction of the T-Mobile wireless communications facility continued at Washington Elementary School during September 2022, parents and students at the school became increasingly concerned, both about the construction activities and about the health and safety risks posed by having a powerful wireless radiation emitting cellular antenna facility on top of the chimney at the school, exposing students, teachers, staff, and visitors to wireless radiation at close proximity all day, every day they were present at the school.

108.    In an effort to allay these concerns, Superintendent Cost prepared a letter to Washington families and staff that she had sent on September 23, 2022. In the letter Cost states: "Dear Washington families and staff, Work was recently resumed on a T-Mobile cell tower on Washington Elementary School. This letter is intended to give you more background information with regard to when and how the decision was made to move forward with the project. In 2018, T-Mobile approached the District about the feasibility of locating a wireless communications antenna on the rooftop of Washington. Discussions began between the District, T-Mobile, and our attorney. Based on a thorough review of government approvals,

36

an analysis of the property and compliance with all federal, state and local environmental laws (including hazardous, toxic or dangerous substances) an agreement was drafted. The Board approved a lease agreement in 2018. The benefit to the District is a monthly rental fee that is deposited into our general fund. The work began, then the pandemic hit and then the labor/parts shortage. Construction on the tower is now being completed and should be finished by the middle of October. There have been a few questions raised regarding the safety of having such a tower within the Washington neighborhood. We are moving forward with an abundance of caution and ongoing tests will be made regularly to measure any possible exposure of hazardous substances. Please let me know if you have any additional questions or concerns."

109.  Dr. Cost's letter was filled with lies and misrepresentations as to the timing of T-Mobile's approach, the negotiations, the District's review process, the construction process, and the District's efforts to safeguard the health of students, faculty, staff, and visitors. Needless to say, the parents and students were not mollified by her words.

110.  Parents continued to complain, and Dr. Cost's lies grew. On September 23, 2022, Kristen Liberacki emailed Dr. Cost, asking her whether the District had a vote on approving this project before which parents and others in the neighborhood had been allowed to weigh in. Or else, she asked, was the decision made strictly by the School Board, the attorney, and T-Mobile? The parent also queried whether the District would cover future medical expenses of the students should it be determined in the future that long-term exposure to the cell tower and low level radio frequency waves causes health issues among the students and whether the District has a plan to monitor students' health after they leave the school. On September 26, 2023, Dr. Cost responded by email, stating: "There was a vote by the School Board, as this is

being constructed on District property, in July, 2019. This would have been the time for parents and neighbors to weigh in on the matter." This was a bald lie because, as alleged above, the School Board vote approving the lease took place on June 19, 2018.

111.   Dr. Cost continued: "The Board took into consideration all the attention cell phones have received, especially for harmful effects on children. Be assured this tower is being constructed in compliance with all federal, state and local guidelines. These have been in place since the approval was given by the Board. The cell phone company will continue to monitor the tower to ensure it will continue to be in compliance but there is no shield planned at this time."  Dr. Cost lied here as well. In the "quick as a wink" 48 second span that the Board considered and approved the T-Mobile wireless communications facility and lease at its June 19, 2018 Board meeting, as alleged above, the Board held no discussion at all. Since the Board can only meet as a Board in open session under the Open Meetings Law, it never discussed anything about this facility or lease as a Board. Dr. Cost concluded her email by stating: "We do not plan on monitoring students, although we will certainly keep track of them through high school. The current regulations are in place in order to protect students now and in the future. I realize those answers may not put your mind at ease, but a vast number of towers have been constructed on school property without incident. I have no reason to believe Washington will be any different."

112.   But Washington has proved to be different because in this community, "We are Wyandotte." With every day that T-Mobile has moved towards completion of its monstrous array of multiple wireless communications antennas and associated equipment -- the parents and students of Washington Elementary School have howled louder and stronger in protest against the intrusive, dangerous unwanted wireless facility. As construction of the wireless

facility proceeded during the Fall of 2022, parents and students at Washington Elementary School became increasingly concerned about its presence. During this period, many parents investigated the health effects of wireless radiation, and discovered, to their horror, an enormous body of well-researched, peer-reviewed, published medical and scientific literature demonstrating that exposure to wireless radiation -- at the level transmitted by cell towers and wireless communications facilities -- has been linked to many terrible cancers, neurological diseases and conditions, electromagnetic hypersensitivity, anxiety, dizziness, tinnitus, memory disorder, fogginess, and a host of other serious medical conditions. The parents addressed their worries to the School Board and the District Administration, and demanded answers. Since the beginning of 2023, parents and other residents have jammed the School Board and City Council meetings, pleading that the project be stopped in its tracks and that the wireless communications facilities be removed from Washington Elementary School.

113. Remarkably, in the face of this unbridled opposition, City Engineer Mayhew double-downed on his legally unjustified basis for approving the facility. In a February 16, 2023 letter released to the public, *see* Letter attached as **Exhibit G**, Mayhew stated:

Basis of Permit Approval:

The application was reviewed for compliance with the 2015 Michigan Building Code, and the Michigan Zoning Enabling Act, Act 110 of 2006, MCL 125.3514 Wireless communications equipment as permitted use of property.

The wireless communication equipment was found to meet the requirements of MCL 125.3514, and therefore is a permitted use of property and not subject to special land use approval.

114. The Superintendent and School Board arranged for an "information session" to be held at the March 2, 2023 School Board meeting to ease community concerns about the safety of the wireless facility. At the March 2, 2023 meeting, note cards were passed out to parents in

attendance to ask questions, which were to be answered at a later date by the District. The District's answers to said questions came via a separate letter after the meeting. *See* Memorandum from Dr. Cost attached as **Exhibit H**.

115.   At that March 2, 2023 meeting, crowded with parents, kids, and the media, the Superintendent explained how nearly six years earlier, the District's Business Manager had been approached by T-Mobile about allowing T-Mobile to install the wireless communications facility on top of the smokestack at Washington Elementary School because it was a "perfect location" for such a facility. She said that the Administration and School Board agreed to lease T-Mobile the site. As to parents' health fears, Dr. Cost assured the crowd that their worries are unfounded; the wireless radiation emitted by the facility is well within the FCC's safety guidelines and doesn't pose a health hazard. Parents were not mollified. They demanded to be allowed to speak, to ask questions, and to be given answers.

116.   Despite the presence of the media from all the major TV networks and press, the Superintendent refused to allow parents to speak further. The March 2, 2023 meeting quickly devolved into a shouting match between parents and Dr. Cost. Dr. Cost abruptly ended the meeting. Dr. Cost ordered the public and the media to leave the premises. She then called the Wyandotte City Police Department, and had the police officers clear the room of parents, school kids, and the media, thus ending the meeting in chaos.

117.   Dr. Cost's arrogant and condescending attitude did not serve her well. The news media's coverage of Dr. Cost's dismissive treatment of the people she was hired to serve with the highest degree of fiduciary responsibility was savage.

118.   The next regular School Board meeting took place on March 14, 2023. Dr. Cost and the School Board were so out of touch with the community and its concerns that they didn't even

bother to put the subject of the T-Mobile wireless communications facility on the agenda. Nevertheless, the meeting room was once again packed with parents, young students, residents, and the media. And the parents used the public comment period to slam Dr. Cost and the School Board for failing to protect their kids, the teachers, and staff from dangerous wireless radiation, and for proceeding with the T-Mobile lease. For over an hour, members of the public railed about the dangers of exposing young students to untested 5G wireless radiation. They lambasted the District for failing to notify residents about this installation for which the District is to receive a measly $1,000 per month in rental income. "I teach at Washington and that tower is directly outside of my classroom and I look at it every single day," said Denise Knapp during public comment. "I am in fear for my grandchild, who is in the building. I am in fear of my neighbor's children, who are in the building. I am in fear for my cousin's children, who are in the building. I am in fear for myself." Unmoved, Dr. Cost and the Board members refused to discuss the non-agenda item further, leaving residents frustrated but motivated to prevent this atrocity from happening.

119.   In the aftermath of this second failed School Board meeting, Dr. Cost and the School Board sought to salvage themselves and right their sinking ship by hosting yet another "informational" session on March 21, 2023, this time with the School Board, representatives of T-Mobile, and a representative from T-Mobile's purportedly independent safety consultant. The day before that meeting, Dr. Cost sent a letter to all families in the Wyandotte Public Schools.  *See* Dr. Cost Letter to WPS Families, dated March 20, 2023, attached as **Exhibit I.** In her Letter, filled with lies, misleading assertions, and self-serving spin Dr. Cost states:

> Good afternoon, WPS families, I usually don't write long letters to you, but this time, I want you to have all of this important information.

You are likely aware that Wyandotte has been in the news lately regarding the cell tower at Washington Elementary. For those of you who are not, the Board of Education was approached by T-Mobile five years ago. After a legal review, the Board approved the contract per the Open Meetings Act. Construction was delayed until this September when I sent a letter to the Washington families. Not until just recently did the District receive pushback from the community.

There is a legal agreement between the District and T-Mobile, and the City has no authority over this. In order to make any changes or demands the contract would have to be broken, which would lead to legal implications. Although the Mayor is eager to help, the City is not listed on the agreement.

An informational meeting was attempted on March 2, 2023, to discuss these details. The Board held a regularly scheduled meeting on March 14, 2023. They heard over 30 people present at public comment. The Board and I listened, and we want everyone to know that they were heard. This situation is difficult for all of us.

Since last week, the District has looked into what it would cost if we broke the contract with T-Mobile, and it is estimated to be in the millions of dollars. The District would be sued by T-Mobile, and our insurance will not cover this. Based on the signed contract, our legal counsel has said we would be responsible for paying T-Mobile for damages, attorney fees, and court costs, which could be in the millions of dollars. These fees would come out of the general fund. This is why this impacts every family and every staff member, as there would be less available to the remaining classrooms and staff members.

Last week, I had numerous conversations with the Mayor and City Leadership to develop creative solutions. One idea was to relocate the tower, but as of late Friday, T-Mobile expressed no interest in pursuing this as it would cost over $1M in supplies, permits, construction, and employee costs. As a result of the contract in place, the District cannot force T-Mobile to relocate the tower. The Board and I will continue to look for feasible alternatives.

I have been working with Mr. Bowers to make changes to the generator fencing to [sic] balls and other recess equipment can't fall into the area. We have also been looking to add back to the green space that was lost to children. This is a result of specific concerns that were brought to us.

Is the cell tower at Washington safe? An outside organization, Site Safe, provided information with respect to this specific project (see the attached pages). A model of Washington has been constructed, and RF measurements were calculated. These were all well, well below the legal limits, and would not cause harm to children. T-Mobile has assured me that we will be notified before the tower is turned on. When it is turned on safety studies will be done with

measurements inside and outside of Washington, which will then be shared with the Washington families.

Our next steps include the Board meeting with a T-Mobile representative on Tuesday, March 21, 2023, at 6:30 p.m. in an open meeting at the Board of Education building to ask questions and explore any other options.  There is no set date for turning the tower on, as the final inspections still need to be conducted.

Those Washington families that would like to initiate a transfer to another school may do so beginning April 3, 2023.  This can be done by filling out a form on the website, which will be under School of Choice.  For those staff who would like to initiate a change in placement, that process will also begin this spring. See your supervisor for an exact timeline.

As new information becomes available, I will share it with all of you.  Working together, we will find the best possible answer.

Sincerely, Catherine M. Cost, Ed.D. Superintendent.

120.   Dr. Cost's letter to the Washington Public School community is a masterful piece of sophistry. She blames the victims, falsely stating "[n]ot until just recently did the District receive pushback from the community." She fails to disclose how she and the School Board never discussed the prospect of installing a T-Mobile wireless communications facility with the school community -- the teachers, staff, and students or their parents -- or the residents of. the neighborhoods immediately surrounding the school, at the time the District was approached in August 2017. She does not explain how she buried the agenda item way back on June 19, 2018, when the School Board approved the lease in the flash of an eye -- taking all of 48 seconds to call the item, move it for approval, have zero discussion, and then unanimously vote in favor of an onerous, utterly one-sided lease, offering the District a trivial amount of money, yet tying up the District property for an astounding thirty years.

121.   Dr. Cost omits from her letter that she never mentioned the wireless facility atop the

smokestack at Washington Elementary School again until early September 2022, when T-

Mobile began its construction. How convenient and self-serving of her to blame the victims!

122.   Dr. Cost then recklessly imperils the District's legal position by either intentionally but

stupidly or just plain stupidly asserting, without basis, "[t]here is a legal agreement between

the District and T-Mobile, and the City has no authority over this. In order to make any

changes or demands, the contract would have to be broken, which would lead to legal

implications. Although the Mayor is eager to help, the City is not listed on the agreement."

123.   In reality -- and had Dr. Cost and Wyandotte Public Schools sought and obtained competent

legal advice, they would have learned that the City does have "authority over this." The City

has zoning regulatory authority over the siting of T-Mobile's wireless communications

facility. Moreover, they would have understood that under the City's valid zoning ordinances,

locating a wireless communications facility in a residentially-zoned district such as the one in

which the Washington Elementary School sits is strictly forbidden. They would have also

learned that no exemption from the City of Wyandotte's zoning ordinance applies under MCL

125.3514 because T-Mobile's facility is not a collocation on an existing wireless support

infrastructure.

124.   Therefore, they would have understood that the City permit and Certificate of Occupancy

that T-Mobile procured from City Engineer Mayhew to construct and operate the facility are

illegal, *ultra vires*, and void *ab initio*. Dr. Cost and the School Board would have forbidden

T-Mobile from starting construction of this nuisance *per se* on Wyandotte Public Schools

property. At the very least, they would have ordered T-Mobile to relocate the wireless facility

off of the school property, notwithstanding T-Mobile's refusal to do so, and despite T-Mobile's

false contention that "it would cost over $1M in supplies, permits, construction, and employee costs" to move the facility, even if T-Mobile were willing to relocate it. Dr. Cost has lied to residents, teachers, staff, and the media, falsely claiming that "the District has looked into what it would cost if we broke the contract with T-Mobile, and it is estimated to be in the millions of dollars." Dr. Cost has caused mental anguish to parents and School District taxpayers, wrongly stating that the "millions of dollars" of fees the District would owe to T-Mobile "would come out of the general fund. That is why this impacts every family and every staff member, as there would be less available to the remaining classrooms and staff members." Dr. Cost and the School Board should have hired competent counsel to repudiate the contract or to sue T-Mobile for breach of contract. *For T-Mobile has never been able to perform its duties under the terms of the lease.* T-Mobile has had the duty under the lease to procure all necessary permits and to comply with all applicable laws and regulations. And yet, T-Mobile cannot do so and never could. T-Mobile is actually the party in breach here, and T-Mobile is liable to the District for the very substantial damages arising from its breach of contract.

125.   T-Mobile's conduct -- threatening to sue the District for millions of dollars-- and terrorizing the residents of the City of Wyandotte in the process -- is wanton, malicious, and monstrous -- when T-Mobile knowingly procured an illegal permit and Certificate of Occupancy to build its illegal wireless communications facility on top of the school. Rather than acquiesce to T-Mobile's vacuous threats, the District should hold T-Mobile legally accountable for its vile business practices which have caused so much unneeded, senseless distress to the wonderful residents of Wyandotte.

126.   The March 21, 2023 School Board meeting -- the "informational session" with the T-Mobile representations intended to assure the community that the wireless facility atop the smokestack is safe -- proved to be another Dr. Cost-orchestrated fiasco. Hundreds of parents and the media again jammed the meeting room at the Board of Education offices. During the meeting, Dr. Cost and Board President Kinney continued to insist that if the District were to break the contract with T-Mobile, the District would have to pay millions of dollars in damages to T-Mobile.  They further stated that T-Mobile was not amenable to moving the tower to another site. "We do have a contract that if we were to breach it, it would be millions," said President Kinney. "They would bankrupt our district."

127.   During public comment, parents spoke not only of their own stress and concerns, but of their children's worries and anxieties. Some parents talked about their children experiencing nightmares and having trouble sleeping because of their fears about the T-Mobile facility causing them to develop cancer and other diseases. Others discussed their kids' emotional distress about the tower as well as the possibility of having to leave their school and their school friends in order to transfer to a building without a cell tower. One parent who lives near the school said her child looks at the red lights atop the tower and calls it "the monster with the big red eyes." "This boy is in trauma therapy for other issues and now this is his main focus because he's terrified to be in school," said one woman. "Terrified. He does not want to go to that building." "You're just going to throw this on our school like we are test animals, and then you are going to see what happens to us," said one boy.

128.   T-Mobile's director of lease and site optimization, Michelle Sanders, claiming the wireless facility poses no health risks, stated: "It's not a cell tower. It is antennas attached to an existing structure." "We have literally hundreds of cell sites in the central region that are on schools

from nursery school through college." The sole School Board member to speak up against the wireless facility, Frank Tarnowski, asked T-Mobile to reconsider relocating the wireless away from the school property: "Has T-Mobile ever took [sic] into consideration that basically the whole city of Wyandotte is against you guys?" T-Mobile's Sanders quickly put the kibosh on that prospect: "We have all of our federal permits, all of our state permits, all of our local permits, and a valid contract that allows our cell site to operate and to go on air when it's time to go." That's a bald lie, of course, since the local permit issued by the City of Wyandotte is void *ab initio* because a wireless communications facility is not a permitted use at the site under the City's valid zoning ordinance, and T-Mobile's contract is invalid because T-Mobile is not legally able to procure all necessary permits and is not legally permitted to operate the facility at that site.

129. T-Mobile also had a purported RF expert present to the Board and crowd. The so-called expert is Anthony Handley, the director of engineering for Site Safe, a company which provides RF regulatory compliance services to the wireless industry. Site Safe conducts theoretical analyses and modeling of the RF emissions expected from wireless communications facilities and measures RF emissions from operational facilities. Site Safe is wholly-owned by QualTec, a publicly-traded corporation which is an infrastructure provider to the telecommunications and power industries. QualTec filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court on May 23, 2023.

130. Mr. Handley is not a scientific expert. He holds a B.S. degree in electrical engineering from Widener University. He provides RF modeling and RF testing services for wireless companies, and advises such companies how to comply with governmental regulations regarding wireless radiation emissions, including the use and messaging of safety warning

signs and safety fencing. Mr. Handley is not a physician. He is not an epidemiologist.  He has no formal medical training. He holds no advanced academic degrees. He is not a research scholar. Mr. Handley simply is a technician who can use equipment to measure RF emissions, and who purportedly can model the levels of wireless radiation certain wireless communications facilities will emit.

131.   Mr. Handley's lack of qualification to speak on the safety (or lack thereof) of to human health, especially to kids, of T-Mobile's wireless facility atop the smokestack at Washington Elementary School didn't stop T-Mobile from proffering him as a health safety expert. Nor did Dr. Cost or the Board members questions his *bona fides* as an expert. Mr. Handley told the Board and the assembled crowd his calculations show that the T-Mobile wireless communications facility is safe: "In that review, I found that the maximum exposure on the top of the rooftop is well below the standards for FCC for electromagnetic field safety." He continued: "Within the building will be even far less than that." "The power levels that are being used and that I used in my analysis were the maximum power available from the radios that are installed with the antennas." "The maximum power that T-Mobile will operating is also a fraction of what the FCC allows for power." Mr. Handley asserted that even with the 5G speed designations, the exposure levels on all of the school property, including ground level, the playground adjacent, inside the building and on the rooftop of the school will be far below the standards set by the FCC.

132.   Part of the problem with Mr. Handley's analysis is that it isn't based on real-world data since, of course, the wireless facility hasn't yet been turned on. So, all he has done is made theoretical calculations using the equipment specifications and the geospatial locations of the antennas and radio-equipment. But even assuming that his theoretical calculations turn out to

be accurate, the real problem is that thousands of peer-reviewed, published scientific and medical studies, along with renowned medical researchers, physicians, scientists, epidemiologists, and toxicologists, have concluded that wireless radiation exposure from wireless communications facilities at levels far below the levels considered "safe" by the FCC causes a litany of diseases and serious medical conditions, as alleged above. So, the T-Mobile wireless facility at the top of the Washington Elementary School is not "safe" for the young students playing on the playground or attending school throughout the school year. Nor is it safe for the teachers and staff who work in the building and its grounds. Residents who live in the neighborhoods immediately surrounding the school are also in danger from the wireless radiation exposure that they will be forced to endure against their will should the T-Mobile facility be activated.

133.   In any event, following the two presentations by the T-Mobile representatives and their discussions with the Board members, no parents or other members of the public were permitted by Dr. Cost to ask any questions of the T-Mobile representatives. Parents had been led to believe that this meeting was their opportunity to have their concerns heard and their questions answered by T-Mobile. Their expectations were crushed by Dr. Cost's refusal. Immediately after the T-Mobile representatives concluded their presentations, they simply left the meeting without taking any questions from the public. The public was outraged.  "My daughter's crying at school because she thinks if the cell tower turns on she's going to get cancer. Then she's crying at home because she doesn't want to leave Washington. Give us answers," one parent cried.

134.   Some parents followed the T-Mobile representatives down the hall.  "This is our chance to talk to you, stand before us and answer our questions," said one mother. "We're not going

to hurt you, trust me. We just want to talk to you guys because we've been waiting to." The news reporter from Fox 2 News tried, without success, to engage them as well: "When will you come back? The news media has questions too." Parent: "Yeah, the news has questions too."

135.  No tangible changes came about following the March 21, 2023 School Board meeting. Parents continued to pressure the School Board and the Superintendent to take action to have T-Mobile remove the wireless facility from the top of the smokestack. Other parents called for the School Board to fire Dr. Cost or for Dr. Cost to resign.

136.  On March 27, 2023, T-Mobile's Michelle Sanders, who had spoken at the March 21, 2023 School Board meeting, sent a letter to Dr. Cost and President Kinney, on behalf of T-Mobile, sardonically opening by saying: "T-Mobile values the open communication we've continued to have with the school board members and community of Wyandotte. It was a pleasure to attend the March 21st public meeting and share more on our plans." Ms. Sanders continued: "While we followed the school board's guidance to have our representatives leave the meeting after our presentation to allow the meeting to continue, we remain available to answer any additional questions concerning the site and look forward to continuing to work with the school board to navigate next steps." Ms. Sanders set forth T-Mobile's action plan to activate the facility "[i]n response to the school board's requests, and in an effort to get this site up and running to support connectivity in the community," while not disrupting the end of the school year: "T-Mobile will delay turning on the cell site until after the school year ends on June 9." Other steps T-Mobile is undertaking in light of community concerns include: T-Mobile will conduct pre- and post-on-air RF emissions testing with a third party professional, and School Board members are invited to join the on-site testing; T-Mobile will conduct annual RF

emissions testing confirming compliance with applicable FCC guidelines and will provide the results to the district; the company will evaluate removing the generator from the site, but will leave the concrete pad in place so that in the event of a power failure, a portable generator can be brought in to restore service to the community; and T-Mobile plans to partner with the school district staff to design additional protective fencing for the ground equipment and generator pad at the site. Ms. Sanders cynically closes her letter, stating: "We look forward to continuing to work with the you [sic], the school board, District and Wyandotte community to best meet your needs to deliver the reliable connectivity you depend on. Please do not hesitant [sic] to contact us with any additional questions. Sincerely, Michelle Sanders On behalf of T-Mobile." Ms. Sanders leaves no doubt that she is speaking "on behalf of T-Mobile." She also made clear that T-Mobile has no intention of working with the Wyandotte community to best meet its needs -- which the community has urged for months -- remove the wireless facility from the top of the smokestack.

137.   Under relentless pressure from the community to take constructive action about removing the wireless facility, the School Board scheduled a Special Meeting of the School Board for March 28, 2023 to meet in Executive Session to receive legal advice and then to return to open public session. The meeting was later cancelled on short notice and re-scheduled for the following week, April 5, 2023. The agenda provided for a closed session at the outset to receive a legal opinion, followed by an open session for discussion by the Committee of the Whole, followed by Public Comment.

138.   At the April 5, 2023 School Board meeting, the Board announced that Superintendent Cost and the District had entered into a severance agreement and that Dr. Cost had resigned, effective April 5, 2023. The terms of the severance agreement were not made public. In a

letter to the Washington Public Schools community, dated April 6, 2023, Dr. Cost stated: "I am writing to you as last night the Board agreed to a severance package which means that a new leader will assume the role of Superintendent, effective immediately."

139. On April 11, 2023, the School Board held a regular public meeting at which the Board appointed Dr. Carla Harting as interim Superintendent. Dr. Harting had been Superintendent of Wyandotte Public Schools for three years and was Dr. Cost's predecessor before retiring. After introducing Dr. Harting to the public, the Board went into closed session to meet with legal counsel. The Board did not take any action with respect to the T-Mobile wireless facility.

140. On April 20, 2023, Evelyn Sanguinetti, T-Mobile's Central Region Senior Siting and Advocacy Manager, sent a letter to School Board President Kinney advising President Kinney that Sanguinetti is replacing T-Mobile's Michelle Sanders as the point person regarding the T-Mobile wireless facility located on the smokestack at Washington Elementary School. Ms. Sanguinetti noted that Ms. Sanders recently had a conversation with the School District's attorney, Phillip Clark from Thrun Law Firm, and Ms. Sanguinetti wanted to follow up with additional information regarding 5G technology. Ms. Sanguinetti provided President Kinney with a very misleading, convoluted explanation of what 5G technology is, saying "it might be helpful to think of 5G as a software upgrade that will allow customers to experience our network in better and unprecedented ways." Far from it -- 5G is new technology designed to carry extremely large quantities of data for Internet uses such as live streaming, speedy downloading of movies, and *uses other than making phone calls with a cell phone.* 5G signals do not travel as far as 4G signals; they don't penetrate buildings or foliage as effectively. Therefore, 5G wireless facilities must be located much closer to one another than 4G cell

towers; the industry term of art for this is "densification."  Calling 5G simply a software upgrade is like calling the space shuttle an airplane.

141.   Ms. Sanguenetti carries on T-Mobile's *false narrative* that wireless radiation transmitted by T-Mobile's wireless communications facilities is safe for humans who are subject to continuous exposure. For instance, Ms. Sanguenetti writes: "T-Mobile broadcasts signals over frequencies regulated and licensed by the FCC and will operate the subject site in compliance with FCC rules and regulations regarding maximum permissible exposure ("MPE") limits and guidelines. The MPE limits established by the FCC are designed to protect public health with a very large margin of safety and have been endorsed by the EPA and FDA." Truth be told, the EPA explicitly warns on its official website: "EPA does not regulate the non-ionizing radiation from wireless technology, and does not maintain expertise in this area." *See* https://www.epa.gov/radtown/non-ionizing-radiation-wireless-technology.  Meanwhile, the D.C. Court of Appeals, in *Environmental Health Trust v. FCC*, supra, 9 F.4th at 905-906, excoriated the Federal Communications Commission's reliance on the FDA's conclusory statements that the FDA had reviewed recent scientific literature and determined that exposure to RF radiation at levels below the Commission's current limits does not cause harmful health effects. The Court held: "Such conclusory statements 'cannot substitute for a reasoned explanation,' for they provide "neither assurance that the [FDA] considered the relevant factors nor [do they reveal] a discernable path to which the court may defer.' They instead represent a failure by the FDA to address the implication of Petitioners' studies: The factual premise—the non-existence of non-thermal biological effects—underlying the current RF guidelines may no longer be accurate." (Citation omitted).

142.   On April 27, 2023, Interim Superintendent Harting sent a letter to Members of the School Community, providing an update "on what we as a district are pursuing in our ongoing discussions concerning the cell phone equipment located at Washington Elementary." Dr. Harting wrote that the District's attorney, Philip Clark, had requested that T-Mobile provide, by April 26, 2023, the following information the District had previously requested, but which T-Mobile had failed to provide: (1) confirmation, including documentation, of State and City permit approvals relative to construction codes and zoning requirements for this specific project; (2) an answer as to whether the State or the City of Wyandotte would conduct and approve the final inspections required prior to activation; (3) the cost to remove the cell equipment from the smokestack; at a March 28, 2023 school board workshop with representatives of T-Mobile, T-Mobile promised to provide that information within a week, but had not done so; and (4) an answer as to whether any of the multiple relocation sites identified for the tower is acceptable and whether T-Mobile has identified any alternative location(s).

143.   Dr. Harting stated that T-Mobile responded to the District's Attorney, writing: "Thank you for your email of April 24, 2023, requesting answers to several questions regarding T-Mobile's wireless facility. T-Mobile remains committed to maintaining an open dialogue and answering questions relating to the use and operation of our wireless facility. I believe we've demonstrated that we're responsive and forthcoming regarding our site and related 5G technology. As requested, attached are copies of the original and renewed building permits issued by the City of Wyandotte and T-Mobile will request a final inspection prior to the site being activated. While we appreciate the alternate locations provided by the District, upon evaluation and review, these locations are not viable due to construction and zoning

requirements, and network needs. T-Mobile looks forward to partnering with the District as set forth in our letter dated March 27th."

144.   Dr. Harting noted: "We did not receive a response to #3 and will be contacting T-Mobile again for the cost to remove the cell equipment from the smokestack. I am including the T-Mobile letter from March 27th and one we received from April 20th. Lastly, we are also reviewing our options with an attorney who specializes in telecommunications. If it is determined that this attorney can assist us, we will bring this to the School Board for the required approval. As stated in the past, we will continue these conversations and provide updates when possible in hopes to find a resolution that will work for everyone."

145.   Dr. Harting's April 27, 2023 letter to the community confirmed yet one more time that T-Mobile has no interest whatsoever in changing course to work with the community and to relocate the wireless facility that is causing so much misery and unrest. T-Mobile simply reiterates its utterly groundless position that it has valid City permits to build and operate the wireless facility and that it fully intends to activate the facility upon passing the final inspection sometime imminently after June 9, 2023.

146.   Recognizing the futility of having the School District remedy the disastrous situation with T-Mobile, Washington Elementary School parents turned to the City Council for a final plea for it to take responsibility to enforce its own zoning ordinance by revoking the illegal permit and Certificate of Occupancy which the former City Engineer had improperly issued to T-Mobile on June 9, 2022. On April 27, 2023, Plaintiffs' counsel, Joshua Castmore sent a letter to the Mayor and the Members of the City Council requesting that his letter be placed on the May 8, 2023 Council Agenda.  Mr. Castmore's letter asks that the following questions be taken up by the Council and voted upon at the May 8, 2023 meeting: (1) Whether the cell

tower installed on Washington Elementary School is in violation of the City's Code of Ordinances, specifically Sec. 190.307? **YES OR NO**; (2) Whether T-Mobile and/or Wyandotte Public Schools are entitled to an exemption from the City of Wyandotte's zoning laws pursuant to MCL 125.3514, 280.1263, 380.11a, or other statutory authority and/or case law? **YES OR NO**; and (3) Whether the permit issued to T-Mobile for installation of a cell tower on Washington Elementary School should be revoked, set aside, or otherwise extinguished? **YES OR NO**. Mr. Castmore's letter explains in detail why the City's zoning ordinance prohibits a wireless communications facility from being located atop Washington Elementary School. He further spells out why MCL 125.3514 does not provide an exemption from local zoning laws for this particular wireless facility. Mr. Castmore then elucidates the black letter Michigan case law that holds that a permit which has been issued improperly has no legal status, the permit applicant is charged with constructive notice of the proper scope and application of the ordinance, and the municipality is required to enforce its zoning ordinance and revoke the improperly issued permit.

147.   On May 5, 2023, Dr. Harting sent another update letter to the community. She stated: "We are continuing to follow up with T-Mobile on proposed relocation sites and safety issues. We had been in discussions with Michael Watza, an attorney with telecommunications expertise, as a consultant. We were unable to come to an agreement on how to use his services. There has been a concern expressed that the district might be 'ramping up to litigate with their own citizens.' We would never consider litigation with our community over this issue. We will continue to work towards the best solution possible for this issue."

148.   On May 8, 2023, the City Council met in open session. The Mayor and the City Council addressed Mr. Castmore's petition for the City to invalidate the permit issued to T-Mobile

allowing it to construct and operate the wireless communications facility atop the smokestack at Washington Elementary School. Mr. Castmore explained the City's duty to enforce its zoning laws which requires the City to revoke the T-Mobile permit. Following Mr. Castmore's presentation, the Mayor and the City Attorney both asserted that the City has no legal authority to revoke the permit. The City Council voted to file Mr. Castmore's petition, meaning the petition has been tabled.

149.   On May 9, 2023, Mr. Castmore and another Washington Elementary School parent, Alexandria Hayes Cotner, met with Dr. Harting.  Dr. Harting presented the District's final word: The District will not breach its contract with T-Mobile.

150.   Parents of Washington Elementary School students and residents of the City of Wyandotte have exhausted all efforts to convince the School District and/or the City government to stand up and protect them from the illegal and immoral acts committed by T-Mobile. Parents and residents have packed Board of Education meetings and City Council meetings ever since the March 3, 2023 meeting, requesting that the Board of Education void the contract with T-Mobile for its failure to comply with local zoning laws, and to demand that the City of Wyandotte enforce its own zoning laws.

151.   To date, neither the District or the City of Wyandotte has taken any action to void the Site Lease Agreement or to enforce the City of Wyandotte's special land use provisions. Wyandotte residents have been abandoned by their elected leaders, and are left to seek relief from the Court on their own.

152.   Pursuant to a recent letter from T-Mobile to the District, T-Mobile intends to activate the tower on Washington Elementary School on or after June 9, 2023. See correspondence from District to parents containing letters from T-Mobile attached as **Exhibit J**.

153.   This battle has attracted intense coverage from the Detroit media, as Wyandotte residents fight to protect their families from an illegal and dangerous wireless communications facility on top of their beloved neighborhood elementary school. The facility is explicitly prohibited by the City of Wyandotte's zoning ordinances from being sited in this RA single-family residence zoning district. Neither the federal Spectrum Act nor MCL 125.3514 provide any exemption from the City of Wyandotte's valid zoning ordinances that would allow this illegal facility to be placed on top of Washington Elementary School. Even though the City Engineer illegally issued the permit and Certificate of Occupancy pursuant to which T-Mobile asserts the right to construct the facility, the City Engineer's *ultra vires* and illegal act is void, and the law charges T-Mobile with knowledge of the invalidity of the permit and the Certificate of Occupancy.

154.   Notwithstanding that this soon-to-be activated wireless telecommunications facility is patently illegal, neither the City of Wyandotte nor the School District will take any action to force its removal. T-Mobile appears intent to begin irradiating the entire neighborhood on or shortly after June 9, 2023 absent this Court's emergency intervention. The harm to Plaintiffs, students, staff, teachers, and residents surrounding the school will be irreparable unless this Court intercedes at once.

### **COUNT I FOR DECLARATORY RELIEF (MCL 125.3407)**

155.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as though fully restated here.

156.   An actual and justiciable controversy exists between the parties.

157.   The location of the parties' dispute and the Property at the heart of the dispute are within this Court's jurisdiction.

158.   Declaratory relief in this case will avoid a multiplicity of actions at law.

159.   Plaintiffs require an adjudication of the issues in this case to determine the rights of the

parties, in addition to the monetary relief to which they are entitled.

160.   Pursuant to MCL 125.3407, and in relevant part: "Except as otherwise provided by law, a

use of land or a dwelling, building, or structure, including a tent or recreational vehicle, used,

erected, altered, razed, or converted in violation of a zoning ordinance or regulation adopted

under this act is a nuisance *per se*. The court shall order the nuisance abated, and the owner

or agent in charge of the dwelling, building, structure, tent, recreational vehicle, or land is

liable for maintaining a nuisance *per se*."

161.   Pursuant to §190.307(II) of the Wyandotte, MI City Code, towers and antennas for wireless

communications facilities are only permitted in I-1, I-2, and I-3 Districts and on municipally-

owned or controlled property.

162.   I-1, I-2, and I-3 properties are defined within Wyandotte, MI City Code as industrial

districts.

163.   Washington Elementary School is located in a RA zoning district, which is a single-family

home residential zoning district.

164.   Washington Elementary School is not located on municipally-owned or controlled

property. Rather, the elementary school is owned by Wyandotte Public Schools and sits on

land owned by Wyandotte Public Schools, not on land owned or controlled by the City of

Wyandotte.

165.   A nuisance *per se* is an act, occupation, or structure which is a nuisance at all times and

under all circumstances.

166.   T-Mobile's installation of a wireless communication facility on the smokestack of Washington Elementary School blatantly violates of the zoning ordinances of the City of Wyandotte and constitutes a nuisance *per se*.

167.   Defendants T-Mobile and Wyandotte Public Schools do not qualify for any exemption from the City of Wyandotte's zoning laws. In particular, MCL 125.3514, upon which defendant Gregory Mayhew, the former City Engineer, illegally based his issuance of the City building permit and Certificate of Occupancy to T-Mobile for T-Mobile's illegal wireless communications facility atop Washington Elementary School, does not apply because T-Mobile did not install its facility on an existing wireless communications support structure or in an existing equipment compound.

168.   By illegal constructing and maintaining a wireless communications facility on the smokestack of Washington Elementary School and associated equipment on the ground adjacent to the smokestack, in violation of the City of Wyandotte zoning ordinances, T-Mobile is liable for maintaining a nuisance *per se*.

169.   As the owner and lessor of the property on which T-Mobile has constructed and is maintaining a wireless communications facility on the smokestack of Washington Elementary School and associated equipment on the ground adjacent to the smokestack, in violation of the City of Wyandotte zoning ordinances, Washington Public Schools is liable for allowing the construction of and maintenance of a nuisance *per se*.

170.   The current School Board member defendants and the interim Superintendent of Schools have the duty to ensure that Wyandotte Public Schools operates in compliance with the law. However, as alleged above, Washington Public Schools is maintaining a nuisance *per se* because it has allowed T-Mobile to construct and maintain a wireless communications facility

60

on the smokestack of Washington Elementary School and associated equipment on the ground adjacent to the smokestack, in violation of the City of Wyandotte zoning ordinances. The current School Board member defendants and the interim Superintendent of Schools are, therefore, liable for allowing the construction of and maintenance of a nuisance *per se*.

171. Former Superintendent of Schools, Dr. Cost, Kenneth Laub, the District's Business Manager, and the former and current Trustees of the Board of Education who approved the lease agreement with T-Mobile for the construction and operation of the illegal wireless communications facility atop the smokestack on Washington Elementary School are liable for authorizing and allowing the construction of a nuisance *per se*.

172. Plaintiffs are entitled to a writ of mandamus compelling the City of Wyandotte, Wyandotte City Council, Wyandotte City Engineer, and/or District to enforce the City of Wyandotte's zoning laws.

173. Defendant City of Wyandotte's grant of a permit and Certificate of Occupancy for the installation of a wireless communications facility and associated equipment on Washington Elementary School (by way of and through City Engineer Mayhew) was illegal, *ultra vires*, and in error, and should be immediately revoked.

174. Defendants must be compelled to remove the wireless communications facility currently installed on the smokestack of Washington Elementary School and all associated equipment.

175. Absent the intervention of this Court, T-Mobile's wireless communications facility on Washington Elementary School will become operational on or after June 9, 2023, and could remain operational for thirty or more years.

176. Plaintiffs each are "aggrieved parties" because their legal, personal, pecuniary, and property rights have been adversely affected by defendants' actions and/or failures to act which

have allowed T-Mobile and Wyandotte Public Schools to construct and maintain an illegal nuisance *per se* on the Washington Elementary School building and grounds. T-Mobile's illegal wireless communications facility and associated equipment are located in extremely close proximity to plaintiffs' residences where they and their families reside. Moreover, plaintiffs each have one or more young children who currently attend Washington Elementary School and the health and safety of their children is threatened by the presence and imminent operation of the illegal wireless facility on that site. Plaintiffs have suffered special damages arising from the nuisance *per se* that place a greater burden on their interests than the effects on others in the local community. These special damages arise from the following factors, *inter alia*: (1) each plaintiff and her family lives in a house located within several hundred feet of the offensive illegal T-Mobile wireless communications facility; (2) the illegal T-Mobile wireless communications facility will be blasting powerful wireless radiation on each plaintiff's house continuously, twenty-four hours per day, seven days per week, thereby exposing plaintiff and her family members, including highly vulnerable young children, to dangerous levels of wireless radiation; (3) each plaintiff strongly opposes her and her family members being exposed to these continuous, dangerous levels of wireless radiation against their will, especially because T-Mobile has illegally constructed its wireless communications facility in a single family home residential zoning district where wireless communications facilities are forbidden under the City's valid zoning code; (4) each plaintiff is forced to look at T-Mobile's visual monstrosity -- an industrial array of wireless antennas atop the elementary school building chimney directly across from each plaintiff's home; each plaintiff's quiet enjoyment of their property is greatly diminished by the visual degradation imposed by T-Mobile's illegal wireless facility and the value of each plaintiff's property is significantly impaired thereby.

**COUNT II – PRIVATE NUISANCE – MCL 600.2940:**
**MONEY DAMAGES AND ABATEMENT**
**(WYANDOTTE PUBLIC SCHOOL DISTRICT DEFENDANTS AND T-MOBILE)**

177.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as though fully restated here.

178.    As stated in Count I above, Defendants' illegal and *ultra vires* grant of a permit to install, agreement to lease, Certificate of Occupancy, and the installation and maintenance of the wireless communications facility and associated equipment on the Washington Elementary School and grounds constitutes a nuisance *per se*.

179.    Wyandotte Public School District Defendants have authorized, approved, and allowed T-Mobile to construct an illegal wireless communications facility on School District property, and T-Mobile now has placed a monstrous, hideous, wireless communications facility, comprised of multiple, powerful, wireless radiation transmitting and receiving antennas, brackets, and open face pipe and corner wall mounts at the top of the smokestack tower on the Washington Elementary School.   The equipment includes, among other things, three gigantic Commscope FFVV-65C-R3-V1 transmitting antennas, spanning nine feet in height (95.9"l x 25.2"w x 9.3"d) and more than two feet in width, that hang from the top sidewalls of the smokestack tower, along with three Nokia AEHC Massive MIMO transmitting antennas, each more than three feet high by two feet wide (38.2"l x 21.5"w x 5.9"d). Additionally, the smokestack tower is adorned with three Nokia AHLOA radioheads and three Nokia AHFIG radioheads. These aesthetically atrocious wireless appurtenances are visible from each of plaintiffs' properties, each of which is only a few hundred away.

180.   More frighteningly, T-Mobile intends to activate and begin transmitting dangerous levels of wireless radiation from this wireless communications facility on or about June 9, 2023, unless enjoined by this Court and/or ordered to do so by the City pursuant to this lawsuit.

181.   T-Mobile intends to operate this wireless communications facility continuously, twenty-four hours per day, seven days per week, for the duration of the lease term, which T-Mobile has the option to extend at its will for thirty years.

182.   The endless stream of wireless radiation that the T-Mobile wireless communications facility will transmit from the smokestack on top of Washington Elementary School will almost immediately bathe plaintiffs' proximate homes and properties with dangerous wireless radiation, and place plaintiffs, and especially their young children, at serious health risk, including the risks of developing and dying prematurely from brain cancer, lung and thyroid cancers, rare cancers of the heart, blood cancers, liver disease, heart disease, diabetes, various serious neurological diseases, including Parkinson's disease, as well as developing or exacerbating medical diseases and conditions such as insomnia, anxiety, dizziness, tinnitus, memory disorders, electromagnetic hypersensitivity, and numerous others associated with wireless radiation exposure.

183.   Although T-Mobile claims that its illegally-sited wireless communications facility will operate within FCC wireless emissions guidelines, those guidelines have not been updated since 1996, when the wireless industry was nascent, and the current, powerful wireless radiation transmitting technology in place was not even imagined. The Court of Appeals for the D.C. Circuit has ruled in *Environmental Health Trust v. Federal Communications Commission*, 9 F.4th 893 (D.C. Cir. 2021), that FCC's decision not to update its 1996 "safety" guidelines for wireless emissions with respect to children, the environment, and non-cancer

diseases and medical conditions is arbitrary and capricious and lacking in reasoned decision-making. The D.C. Court of Appeals has mandated that the FCC reconsider its decision not to update its wireless radiation emissions guidelines in light of the Court's ruling. The D.C. Court of Appeals ruling is based upon thousands of peer-reviewed published scientific studies documenting the serious negative health effects arising from exposure to wireless radiation of the type emitted by cell towers and wireless communications facilities.

184.    A very recent peer-reviewed scientific study published in *Current Problems in Pediatric and Adolescent Health Care*, Vol. 53, Issue 2, February 2023, titled, "Wireless Technologies, Non-ionizing Electromagnetic Fields, and Children: Identifying and Reducing Health Risks," by Devra Davis, et al., provides an up-to-date survey of the latest science demonstrating the severe health consequences to humans, and especially to children, from exposure to wireless radiation from wireless communications facilities and cell phones.

185.    These dangers are not theoretical or speculative. In April 2022, the Board of Health of the City of Pittsfield, Massachusetts, issued a Cease and Desist Order directing Verizon Wireless to abate a nuisance caused by its operation of a cell tower immediately adjacent to a residential neighborhood, where many neighborhood residents documented serious physical injuries and medical conditions that arose shortly after the cell tower started to transmit. The Board of Health had conducted an in-depth investigation over more than one year, reviewing over one thousand scientific studies, holding numerous public hearings, hearing from medical experts and scientists, affected residents, other members of the public, and examining medical records of some of the affected residents, before reaching its determination that the Verizon Wireless cell tower's wireless radiation transmissions were injuring the nearby residents and that the

operation of the facility was a nuisance that needed to be abated. *See* https://ehtrust.org/cease-and-desist-order-against-verizon-cell-tower-by-board-of-health-pittsfield-ma/.

186. Under Michigan law, a private nuisance is a non-trespassory invasion of another's interest in the private use and enjoyment of land. The essence of private nuisance is the protection of a property owner's or occupier's reasonable comfort in occupation of the land in question. Private nuisance involves "not only a defect, but threatening or impending danger ... to the property rights or health of persons sustaining particular relations to the same." *Adkins v. Thomas Solvent Co.*, 440 Mich. 293, 303 (1992), quoting *Kilts v. Kent Co. Supervisors*, 162 Mich. 646, 651 (1910). *Morse v Colitti*, 317 Mich App 526, 554; 896 NW2d 15 (2016) (A "nuisance" is defined as "an interference with the plaintiff's use and enjoyment of his land.").

187. The elements of a private nuisance are satisfied if (a) the other has property rights and privileges in respect to the use or enjoyment interfered with, (b) the invasion results in significant harm, (c) the actor's conduct is the legal cause of the invasion, and (d) the invasion is either (i) intentional and unreasonable, or (ii) unintentional and otherwise actionable under the rules governing liability for negligent, reckless, or ultrahazardous conduct. To prove a nuisance, significant harm to the plaintiff resulting from the defendant's unreasonable interference with the use or enjoyment of property must be proven. *Pine Bluffs Ass'n v DeWitt Landing Ass'n*, 287 Mich App 690, 729 n. 23, quoting *Capitol Props Group, LLC v 1247 Ctr Street, LLC*, 283 Mich App 422, 431-432.

188. Pursuant to MCL 600.2940. Nuisance; abatement; circuit court; injunction; private nuisance; damages; warrant to abate and remove nuisance; expense; actions: (1) all claims based on or to abate nuisance may be brought in the circuit court. The circuit court may grant injunctions to stay and prevent nuisance. (2) When the plaintiff prevails on a claim based on

a private nuisance, he may have judgment for damages and may have judgment that the nuisance be abated and removed unless the judge finds that the abatement of the nuisance is unnecessary.

189.   Each of the plaintiffs owns and/or occupies a home and property located within several hundred feet of the T-Mobile wireless communications facility installed atop the Washington Elementary School smokestack. If and when T-Mobile turns on and operates this wireless communications facility, as T-Mobile intends to do commencing on or about June 9, 2023, each plaintiff and her family members residing on said property, including her young children, will be continuously exposed to dangerous wireless radiation which T-Mobile will be intentionally transmitting from the facility. Defendants' actions are the legal cause of the invasion of each plaintiffs' properties.

190.   Defendants' invasion of plaintiffs' property rights is intentional and unreasonable. The whole purpose of T-Mobile's installation and operation of its wireless communications facility on top of the Washington Elementary School smokestack is to transmit its wireless signals -- in the form of wireless radiation -- throughout the entire neighborhood. The Wyandotte Public Schools defendants are willing participants to this invasion since they signed the lease knowing full well that T-Mobile's wireless signal would saturate the surrounding neighborhood with wireless radiation. All the defendants are charged with the knowledge that wireless communications facilities are forbidden uses in this residential zoning district and are nuisances *per se*. Hence, defendants' actions and/or inactions are both intentional and unreasonable. And even if the defendants' actions were unintentional, they are actionable because actionable under the rules governing liability for negligent, reckless, or ultrahazardous conduct.

191. Each plaintiff strongly objects to being subjected to T-Mobile's noxious wireless radiation which will suffuse their properties and their personal bodies and their family members' bodies without their consent. Each plaintiff has a reasonable, well-found, scientifically-based fear that she and/or her family members, especially her young children, will develop serious debilitating diseases, illnesses, and/or medical conditions from continuous unwanted exposure to T-Mobile's wireless radiation transmitted from its wireless communications facility on top of the smokestack that passes onto and permeates plaintiffs' properties and plaintiffs' and their family members' physical bodies. This rational fear that plaintiffs now have constitutes a serious interference with their use and enjoyment of their properties for which they are each entitled to monetary damages.

192. The National Association of Realtors ("NAR") has recently posted an article on its website, citing several studies and journals related to the impact that cell phone towers have on property values.[1]

193. Quoting from several sources, the NAR published the following data as it relates to the diminution in property value as a result of cell towers:

   a) "We find that homes close to towers sell for a discount of up to 7.6% and that any noticeable effect disappears at 1500 feet." The Disamenity Value of Cellular Phone Towers on Home Prices in Savannah, Georgia (*The Empirical Economics Letters*, Aug. 2019).

   b) "On average, the potential external cost of a wireless tower is approximately $4,132 per residential property, which corresponds to a negative price effect of 2.65%. The negative price impact of 9.78% is much more severe for properties within visible

---

[1] https://www.nar.realtor/cell-phone-towers.

68

range of a tower compared to those not within visible range of a tower. This negative impact vanishes at radii distances exceed 0.72 km." Wireless Towers and Home Values: An Alternative Valuation Approach Using a Spatial Econometric Analysis (*Journal of Real Estate Finance & Economics*, May 1, 2018).

c) If purchasing or renting a property near a CPBS (cellular phone base stations), over a third (38%) of the control group respondents said a CPBS would reduce the price of their property by more than 20%. The Impact of Cell Phone Towers on House Prices in Residential Neighborhoods (*The Appraisal Journal*, Summer 2005).

194. Plaintiffs, and those similarly situated, all live in varying but very close proximity to the wireless communications facility on the top of the smokestack on Washington Elementary School.

195. Plaintiffs' homes all fall within the range of real property in which an elementary school aged child would have Washington Elementary School as his or her assigned school.

196. Licensed real estate appraiser Jason Malone agrees with the assessment of NAR.

197. The City of Wyandotte and Wyandotte City Council have designated industrial zones as well as city-owned property, subject to restrictions, as satisfactory locations for cell towers within the City of Wyandotte.

198. Washington Elementary School sits in the middle of a residential district in which Plaintiffs live.

199. As a result of an illegally and improperly granted permit by the City of Wyandotte Engineer, the City Engineer's refusal to revoke said permit, and the Wyandotte Public School District's decision to enter into a lease with T-Mobile for placement of a cell tower on top of

Washington Elementary School, Plaintiffs and those similarly situated will suffer between a 2.65% and 20% reduction in their home values.

200.   Plaintiffs request a third-party appraisal and/or analysis to determine their individual losses as a result of Defendants' actions.  Plaintiffs are each entitled to recover monetary damages on their private nuisance cause of action for the damages they have suffered by reason of loss of enjoyment of their properties and for the diminution of the value of their properties caused by Defendants' actions.

WHEREFORE, Plaintiffs respectfully request the following relief:

1.   The Court to find and declare Defendants' placement of the wireless communications facility on Washington Elementary School as a nuisance *per se*;

2.   The Court to find and declare that Plaintiffs and the Class are entitled to money damages related to the loss of enjoyment of their properties and the diminution of property value in association with the nuisance *per se*;

3.   The Court to find and declare Defendants' placement of a wireless communications facility on the smokestack on Washington Elementary School as a private nuisance, and ordering Defendants to immediately abate the nuisance;

4.   The Court to find that Plaintiffs are entitled to actual money damages in excess of $25,000.00, and in an amount to later be determined by a jury;

5.   The Plaintiffs to recover their costs of this suit, including reasonable attorney's fees, as provided by law; and

6.   The Court to grant the Plaintiffs such relief as the nature of the case may be deemed just and proper by this Court.

Respectfully submitted,

**CASTMORE LAW, PLLC**

Dated: May 31, 2023

By: /s/ *Joshua Castmore*
Joshua Castmore (P76326)
2475 8th St.
Wyandotte, MI 48192

**LAW OFFICE OF ROBERT J. BERG PLLC**

Dated: May 31, 2023

By: /s/ *Robert J. Berg*
Robert J. Berg
(Admitted only in New York and New Jersey;
motion for admission *pro hac vice* to be filed
promptly)
17 Black Birch Lane
Scarsdale, New York 10583

Attorneys for Plaintiffs

# EXHIBIT A

ll.232.6414.031



NETWORK SERVICES

August 2, 2017

Mr. Ken Laub
Business Manager
Wyandotte Public Schools
Board of Education
639 Oak Street
Wyandotte, MI 48192

**RE:** T-Mobile Proposal for Washington Elementary School Building Rooftop or Chimney Wireless
Telecommunications Facility

Dear Mr. Laub:

In follow up your email request today, I am sending you this information regarding the Washington
Elementary School Building property. I represent T-Mobile and the Washington Elementary School
building appears to meet T-Mobile's criteria for a wireless telecommunications facility. The amount of
space that T-Mobile's equipment requires is negligible and will not disrupt existing uses within and
outside of the school building.

For the Washington Elementary School building I was looking at the chimney located in the rear of the
property or on the school building rooftop. The wireless equipment would consist of six (6) panel
antennas (with two (2) panel antennas each mounted on three (3) sides of the building), nine (9) remote
radiohead units, three (3) surge suppression units and one (1) cable. Supporting equipment cabinets are
required and can be placed on the rooftop as well, mounted on a steel grating platform. T-Mobile requires
a lease area of 12' x 20' (240 s.f.) to house its equipment cabinets. An alternative design could be the use
of the chimney and mount the six (6) antennas on the chimney and place the supporting equipment on the
ground near the base of the chimney. Again, the supporting equipment would require 240 s.f. of space
and would be enclosed and secured with a chain-link fence. T-Mobile would tap into the nearest electric
power hook-up as well as the nearest telco hook-up for telephone service.

So, I would like to present to you the standard terms of the lease offer with an option period of one (1)
year plus three (3) one (1) year period(s) at a proposed monthly rent amount of $100 prior to the wireless
telecommunications facility being constructed. Once the wireless telecommunications facility is
completed, the lease term would commence. An initial term of five (5) years is offered at a proposed
monthly rent amount of $1,000, then the terms of the lease allow for an automatic renewal of the initial
five (5) year term with five (5) successive renewal terms at five (5) years per term. At the beginning of
each renewal term (every five years), an increase in the monthly rent amount would occur. That amount is



Catalyst
NETWORK SERVICES

five percent (5%) monthly rent increase from the previous five (5) year term. In addition, T-Mobile would pay utilities fees of $150 per month for electric and phone line usage.

All lease terms are subject to negotiation and are subject to T-Mobile's approval and mutual agreement between all involved parties. T-Mobile would be responsible for obtaining zoning approval and construction permits, as well as conducting an engineering structural analysis report.

Therefore, I would like to request whether Wyandotte Public Schools would be interested in leasing space to T-Mobile? Please review and contact me to discuss any further questions or concerns you may have. Thank you for your consideration.

Sincerely,

*Stephanie Pratt*

Stephanie Pratt, Agent for T-Mobile
**Catalyst Network Services, LLC**
517.214.7454
Email: pratts200@gmail.com

# EXHIBIT B

# The School District of the City of Wyandotte



*Administrative Business Services*

*639 Oak Street. Wyandotte, Michigan 48192*

(734) 759-6026 • Fax (734) 759-6009 • www.wyandotte.org

Kenneth C. Laub
Business Manager

*"Achieving Excellence"*

Dr. Catherine Cost
Superintendent of Schools

---

DATE:       June 19, 2018

TO:         Dr. Cost and Board of Education Members

FROM:       Kenneth C. Laub, Business Manager

SUBJECT:    T-Mobile – Site Lease Agreement Approval

---

Almost a year ago, T-Mobile Cellular approached the district about the feasibility of T-Mobile locating a wireless communications antenna on the rooftop of Washington Elementary School. Following some conversation administratively, we decided to continue discussions with T-Mobile.

Kari Shay, attorney with Thrun Law, represented the school district in negotiating and drafting, what she feels, is an acceptable agreement for both parties.

The lease is initially for a term of five years with acceptable extension and non-renewal language for both parties. The rental fee paid by T-Mobile to Wyandotte Schools is one-thousand dollars per month plus an additional one hundred and fifty dollars per month for utilities.

Based upon the thorough review of the lease by Thrun, we are recommending the Board of Education approve the attached resolution authorizing the district to enter into a Lease Agreement with T-Mobile Cellular to install a cellular antenna on the rooftop of Washington Elementary School under the terms set forth.

# EXHIBIT C

# BOARD BRIEFS

A Brief summary of highlights of Wyandotte Board of Education Meetings
**Board of Education 2017-2018:** President—Michael Swiecki; Vice President—Cynthia Kinney;
Treasurer—Stephanie Miello; Secretary—Kathryn Bedikian. Trustees—Dana Browning, Robert Kirby, Patrick Sutka

## June 19, 2018
## Regular School Board Meeting

### Attendance
**Present:** Browning, Kinney, Miello, Swiecki
**Excused:** Bedikian, Kirby, Sutka

### Recognition
**5th & 8th Grade Scholarships:**
- Wilson Students: Michael Calhoun & Francesca Giammalva, presented by Principal Carol Makuch.
- Garfield Students: Kallie Blackwell, Katherine Fugon-Saravia, Jacob Jones, Andrew Dmitruchina, Marcus Dooley and Tegyn Gourlay (Larissa Carlson was absent), presented by Principal Krizia Totty and Teachers Tom DeFeyter, Amanda Phillips, & Shelley Turkowski.
- Jefferson Students: Lily Martinez & Gabriel Schilk, presented by Principal Crystal Eskin and Teacher Julie Lapinski.
- Monroe Students: Jake Stroia & Krystinya Bayn, presented by Principal Vicki Wilson & Teacher Tiffany Dean.
- Washington Students: Justin Stewart, Alexandra Puckett, and Addison Cleveland (Ava Szuch was absent), presented by Principal Kristin McMaster & Teacher Denise Knapp.

**Board President Michael Swiecki** – Recognized for his 2017/2018 Presidency on the School Board.

### Hearing of the Public
- ✓ 2017-18 & 2018-19 Budgets Hearing. Mr. Laub gave an overview. No comments from the public.
- ✓ Regular Hearing of the Public - None.

### Action Agenda
- ○ Approval of 2017-18 & 2018-19 Budgets.
- ○ Approval of 18 mills non-homestead property & 6 mills on all property for the 2018-19 SY.
- ○ Approval of borrowing through the State Aid Note Program.
- ○ Lease Agreement with T-Mobile Cellular to install an antenna on Washington School.
- ○ Approval to add 15 additional days to District Technology Director Jeff Trudell's Admin. Contract.
- ○ Approval of 1500 HP Student Chromebooks from Sehi Computers, 1500 GoGuardian Admin/Teacher Chromebook Licenses from Tierney Brothers, totaling $412,785 (WC Enhancement Millage).
- ○ Approval of 110 HP Teacher Laptops (At Risk 31a), 14 HP Admin./Counselor Laptops (Fund Balance), 20 HP Admin. Asst./Office Desktop Computers (Fund Balance), all from InaComp, totaling $173,039.50.
- ○ Approval of Instructional Coaches through The Institute for Excellence in Education, in the amount of $126,000.
- ○ Approval of 2018-19 SY Calendar.
- ○ Organizational SB Mtg. – Tues. 7/24 pm @ City Hall

### Consent Agenda
- ❖ Bills/Vouchers approved - $4,315,628.85.
- ❖ 40/60 Job Share – Jefferson Teachers Filomena Schivelbein & Rachel Rowell.
- ❖ 50/50 Job Share – Monroe Teachers Krissy Kobiljak & Nicole Riopelle.
- ❖ Resignation of RHS Math Teacher Katie Barbour.

### Announcements
- ➢ Happy Retirement to Business Manager Ken Laub.

| VISION STATEMENT<br>Developing Character,<br>Strengthening Community,<br>Achieving Success |  | **Wyandotte Board of Education**<br>Regular Meeting<br>Tuesday, June 19, 2018 – 7 pm<br>Wyandotte City Hall, 3200 Biddle Avenue | MISSION STATEMENT<br>Educate, Inspire, Empower |
|---|---|---|---|

Motions tonight will be made by Member Browning, and supported by Member Kinney

## A. MEETING

1. **Call to Order.** The Regular meeting of the Board of Education scheduled for Tuesday, June 19, 2018, will be held at 7 p.m. in the Council Chambers of Wyandotte City Hall, 3200 Biddle Avenue.

2. **Roll Call.** The recording secretary will call the roll of the Board of Education. If members are unable to attend, please advise Dr. Cost.

3. **Recitation of the Pledge.** President Swiecki will lead or ask a Board Member or staff member to lead the Board and audience in the recitation of the Pledge of Allegiance.

4. **Recitation of the Vision Statement and Mission Statement.** Trustee Dana Browning will read the Vision Statement, and Vice President Cindy Kinney will read the Mission Statement.

5. **Reading of the Minutes.** Proposed Minutes for the Regular School Board Meeting held on June 5, 2018, and the Work Session Summary held on June 12, 2018, are included in your packet. Secretary Bedikian reviewed the Minutes and Summary, found them to be in order, and acceptable as presented.

> **"I move the Minutes of the Regular School Board Meeting held on June 5, 2018, and Work Session Summary held on June 12, 2018, be approved and accepted as presented (or amended)."**
>
> Roll call vote:    YEAS:
>    NAYS:    KB, DB, CK, RK, SM, PS, MS    P  F

6. **Recognition.**
   **a. 5th and 8th Grade Scholarships:**

| Name | Recipient(s) | Scholarship | Presented by |
|---|---|---|---|
| Wilson | Michael Calhoun & Francesca Giammalva | - Al DeFran $250 each | Principal Carol Makuch |
| Garfield | Larissa Carlson, Katherine Fugon-Saravia, Jacob Jones<br>Kallie Blackwell<br>Andrew Dmitruchina, Marcus Dooley, Tegyn Gourlay | - Academic $300 each<br>- Safety $300<br>- Mrs. Wright's Principal's Choice $200/ea. | Teacher Tom DeFeyter<br>Teacher Amanda Phillips<br>Teacher Shelley Turkowski |
| Jefferson | Lily Martinez & Gabriel Schilk | - Schonfeld Respect Award $250/each | Teacher Julie Lapinski<br>Principal Crystal Eskin |
| Monroe | Jake Stroia & Krystinya Bayn | - MVPS $500 each<br>(Monroe Valuable Parents & Staff) | Principal Vicki Wilson |
| Washington | Addison Cleveland & Ava Szuch<br>Justin Stewart & Alexandra Puckett | - Outstanding Citizenship $250 each<br>- The Janel McHugh Memorial<br>  Washington General's Spirit<br>  Scholarship $500 each | Teacher Denise Knapp<br>Teacher Gerry Fivecoat |

   **b. Board President Michael Swiecki.** President Swiecki will be thanked for his presidency during the 2017/2018 School Year.

## B. SPECIAL ORDERS & REPORTS

1. **None.**

## C. HEARING OF THE PUBLIC

1.  **2017-18 & 2018-19 Budgets Hearing.** The Business Manager will present a summary of the 2017-18 Final Budget Revisions and the proposed 2018-19 Budget.  All persons who desire to be heard shall be given the opportunity to speak on these two Budgets.

2.  **Petition of Visitors.**  At this time members of the community are provided an opportunity to address the Board of Education.

## D. ACTION AGENDA

1.  **2017-18 FY Final Revised Budgets & 2018-19 FY Proposed Budgets.** The 2017-18 FY Final Revised Budgets and the 2018-19 FY Proposed Budgets as recommended by Business Manager, Ken Laub, were discussed at a Work Session held on June 12, 2018, and during the Public Hearing portion of this Meeting.  The Business Manager and I recommend adoption of the 2017-18 Final Budget Revisions as proposed; and adoption of the 2018-19 Budgets as proposed.

> "I move approval of the Resolution for Adoption of the 2017-18 Final Budget Revisions as proposed; and adoption of the 2018-19 Budget as proposed."
>
> Roll call vote:  YEAS:
>                  NAYS:    KB, DB, CK, RK, SM, PS, MS       P   F

2.  **Tax Levy Certification.** Business Manager Laub has prepared a Resolution to establish our Tax Levy for operating purposes for 2018-19 for 18.00 mills on non-homestead property; and to authorize the debt levy of 6.00 mills on all property.  The taxes are to be levied 50% on the summer and 50% on the winter tax collections.

> "I move adoption of the Resolution for the 2018-19 Tax Levy, authorizing a tax of 18.00 mills on the non-homestead property, and a tax of 6.00 mills on all property for debt obligations for the 2018-19 School Year."
>
> Roll call vote:  YEAS:
>                  NAYS:    KB, DB, CK, RK, SM, PS, MS       P   F

3.  **Resolution to Borrow Against State Aid.** Each year it is necessary for Wyandotte Public Schools to borrow funds in order to meet its cash flow needs during the months of August through December.  It is anticipated that our borrowing requirement this year will be approximately $4 to 5 million.  This was discussed at the Work Session on June 12, 2018.  Business Manager Laub and I are recommending the Board approve the Resolution to participate in the Michigan Municipal Bonding Authority State Aid Note Program, authorizing the issuance of State Aid Anticipation Notes.

> "I move approval of the enclosed Resolution to participate in the Michigan Municipal Bonding Authority State Aid Note Program authorizing the Issuance of State Aid Anticipation Notes, for the 2018-19 school year."
>
> Roll call vote:  YEAS:
>                  NAYS:    KB, DB, CK, RK, SM, PS, MS       P   F

2

4. 💰 **T-Mobile Site Lease Agreement**. T-Mobile Cellular would like to locate a wireless communications antenna on the rooftop of Washington Elementary School. After a year of negotiations, the Business Manager and I recommend approval of the enclosed lease agreement with T-Mobile. The documents have been prepared by our attorney, Thrun Law, and the lease will be for five years, with a rental fee paid by T-Mobile of $1,000/month plus an additional $150/month for utilities.

> "I move the Board Secretary sign the Resolution authorizing the District to enter into a Lease Agreement with T-Mobile Cellular to install a cellular antenna on the rooftop of Washington Elementary School, under the terms set forth."

| | YEAS: | | P F |
|---|---|---|---|
| Roll call vote: | NAYS: | KB, DB, CK, RK, SM, PS, MS | |

5. 🎓 **Administrative Contract Adjustment**. As discussed at the Work Session on June 12, 2018, I recommend that 15 additional days be added to District Technology Director Jeff Trudell's Administrative Contract due to the increased demands of the Department. The new rate of Annual pay will be $102,395 for the 2018-19 School Year.

> "I move approval to add 15 additional days to District Technology Director Jeff Trudell's Administrative Contract, and his rate of pay be $102,395, effective for the 2018-19 School Year."

| | YEAS: | | P F |
|---|---|---|---|
| Roll call vote: | NAYS: | KB, DB, CK, RK, SM, PS, MS | |

6. 🎓 **Chromebooks/Licenses**. We are in need of Technology Devices for 5th, 6th, 9th and 10th Grade Classes, and Licenses using the Michigan Statewide Purchasing Online Tool through REMCBIDS, from the Wayne County Enhancement Millage Funds. Jeff Trudell, Technology Director, and I recommend purchase of the following items at a total cost of $412,785:
   a. 1500 HP G6 Student Chromebooks with touchscreens at $247.80 each for a total of $371,700, from Sehi Computer Products Inc.
   b. 1500 GoGuardian Admin/Teacher Chromebook Management 4 year licenses at $6.85 per year per Chromebook for a total of $41,085, from Tierney Brothers.

> "I move approval of 1500 HP Student Chromebooks for a total of $371,700 from Sehi Computers; and 1500 GoGuardian Admin/Teacher Chromebook Management 4 year licenses for a total of $41,085 from Tierney Brothers; with funds coming from the Wayne County Enhancement Millage."

| | YEAS: | | P F |
|---|---|---|---|
| Roll call vote: | NAYS: | KB, DB, CK, RK, SM, PS, MS | |

7. **Laptops/Desktops.** We are in need of Technology Devices for staff, using the Michigan Statewide Purchasing Online Tool through REMCBIDS, from the Fund Balance Spend Down money and At Risk 31a funds. Jeff Trudell, Technology Director, and I recommend purchase of the following items at a total cost of $173,039.50:
   a. 110 HP ProBook 650 Teacher Laptops $1,081.61 each for a total of $118,977.10, from InaComp TSG, from At Risk 31a Funds.
   b. 14 HP Elitebook 360 Administrator/Counselor Laptops at $2,200 each for a total of $30,800, from InaComp TSG, from the Fund Balance Spend Down monies.
   c. 20 HP Elitebook 800 Administrative Assistant/Office Desktop Computers at $1,163.12 each for a total of $23,262.40, from InaComp TSG, from the Fund Balance Spend Down monies.

| "I move approval of 110 HP Teacher Laptops for a total of $118,977.10 from At Risk 31a Funds; 14 HP Administrator/Counselor Laptops for a total of $30,800 from Fund Balance Spend Down monies; and 20 HP Administrative Assistant/Office Desktop Computers for a total of $23,262.40 from Fund Balance Spend Down monies; all from InaComp TSG." |
|---|

| | YEAS: | | P F |
|---|---|---|---|
| Roll call vote: | NAYS: | KB, DB, CK, RK, SM, PS, MS | |

8. **Instructional Coaches.** At the Work Session on June 12, 2018, we discussed the need for Instructional Coaches for our team at Roosevelt High School. The Instruction & Assessment Coordinator, Jessica Shipman, and I recommend approval of The Institute for Excellence in Education to provide Instructional Coaches for the 2018-19 SY, in the amount of $126,000.

| "I move to approve the contract with The Institute for Excellence in Education to provide Instructional Coaches, in the amount of $126,000, from the Fund Balance Spend Down monies." |
|---|

| | YEAS: | | P F |
|---|---|---|---|
| Roll call vote: | NAYS: | KB, DB, CK, RK, SM, PS, MS | |

9. **School Year/School Calendar/School Day.** Board Policy requires approval of a School Calendar which is consistent with policies on Student Learning and Achievement. I recommend the proposed 2018-2019 School Year Calendar listing instructional days, professional development days, holidays, daily times, etc., and in compliance with State clock hour requirements, be approved.

| "I move approval of the 2018-19 School Year Calendar as presented." |
|---|

| | YEAS: | | P F |
|---|---|---|---|
| Roll call vote: | NAYS: | KB, DB, CK, RK, SM, PS, MS | |

10. **Organizational Meeting Date.** The Administration proposes that the Board's Organizational Meeting be scheduled for Tuesday, July 24, 2018, at 7:00 pm, in the Council Chambers of Wyandotte City Hall.

| "I move scheduling of the Organizational Board of Education Meeting for Tuesday, July 24, 2018, at 7:00 pm, in the Council Chambers of Wyandotte City Hall." |
|---|

| | YEAS: | | P F |
|---|---|---|---|
| Roll call vote: | NAYS: | KB, DB, CK, RK, SM, PS, MS | |

| **E. COMMITTEE OF THE WHOLE/DISCUSSION AGENDA** |
|---|

1. **Work Session Update.** A Work Session was held on Tuesday, June 12, 2018, at the Board of Education. The following topics were discussed: 2017-18 & 2018-19 Budgets Review, Fund Balance Spend Down List, and Technology Department Restructuring.

2. **Other.**

---

**F. CONSENT AGENDA**

---

Because items on the Consent Agenda are routine, and there is little need for discussion, one motion can complete this part of the Agenda. If anyone is interested in copies of reports/recommendations/information, please contact the Supt.'s Office at 759-6002.

---

"I move approval of Bills and Vouchers in the amount of $4,315,628.85; approval of 40/60 percent Job Sharing/Leaves of Absence for Jefferson Teachers Filomena Schivelbein and Rachel Rowell for the 2018/2019 School Year; approval of 50/50 percent Job Sharing/Leaves of Absence for Monroe Teachers Krissy Kobiljak and Nicole Riopelle for the 2018/2019 School Year; and acceptance of the resignation of Roosevelt High School Mathematics Teacher Katie Barbour effective 6/30/2018."

|  | YEAS: |  | P F |
|---|---|---|---|
| Roll call vote: | NAYS: | KB, DB, CK, RK, SM, PS, MS | |

1. **Bills and Vouchers.** Included in your packet are check register sheets dated June 1, 2018, as follows:

| | | |
|---|---|---:|
| Bills & Vouchers | $ | 349,473.73 |
| Payroll | $ | 911,375.51 |
| Payroll Withholding | $ | 374,404.69 |
| Wire Transfer: BC/BS | $ | 596,803.67 |
| Workmen's Comp. | $ | 22,731.66 |
| MedTipster | $ | 23,739.55 |
| Gordon Food Service | $ | 74,053.14 |
| Postage | $ | 2,000.00 |
| PESG | $ | 202,263.19 |
| Retirement-May, 2018 | $ | 927,931.18 |
| UAAL Stabilization | $ | 730,524.45 |
| Repayment of StateAid | $ | 100,328.08 |
| **Total** | | **$4,315,628.85** |

2. **Job Sharing/Leaves of Absence.** Two Jefferson Elementary Teachers, Filomena Schivelbein and Rachel Rowell, are requesting part-time (40/60) Job Sharing/Leaves of Absence for the 2018/2019 school year.

3. **Job Sharing/Leaves of Absence.** Two Monroe Elementary Teachers, Krissy Kobiljak and Nicole Riopelle, are requesting part-time (50/50) Job Sharing/Leaves of Absence for the 2018/2019 school year.

4. **Resignation.** Katie Barbour, Roosevelt High School Mathematics Teacher wishes to resign effective June 30, 2018.

---

**G. ANNOUNCEMENTS**

---

*From the Superintendent:*

*From Board Members:*

---

**H. ADJOURN**

---

5

# WYANDOTTE SCHOOL DISTRICT
## *Board of Education Regular Meeting*
June 19, 2018

### A. MEETING

1.    <u>Call to Order</u>.
    A Regular Meeting of the Board of Education was held in the Council Chambers of the Wyandotte City Hall, on Tuesday, June 19, 2018.  President Swiecki called the meeting to order at 7:00 p.m.

2.    <u>Roll Call</u>.
    Present:  Members Browning, Kinney, Miello, Swiecki
    Excused:  Members Bedikian, Kirby, Sutka
    Also present:  Dr. Catherine Cost, Superintendent; Rebecca Eyster, Human Resources Director; Kenneth Laub, Business Manager; and Christine Hensley, Recording Secretary.

3.    <u>Recitation of the Pledge</u>.  President Swiecki asked all of the Elementary School Students to lead the Board and audience in the recitation of the Pledge of Allegiance.

4.    <u>Recitation of the Vision and Mission Statements</u>.  Trustee Dana Browning read the School Board's Vision Statement, and Vice President Cindy Kinney read the Mission Statement.

5.    <u>Reading of the Minutes</u>.
    Motion by Member Browning, supported by Member Kinney, move the Minutes of the Regular School Board Meeting held on June 5, 2018; and Work Session Summary held on June 12, 2018, be approved and accepted as presented.
    Roll Attached.  Motion Carried.

6.    <u>Recognition</u>.
    a.  <u>5th & 8th grade Scholarships</u>.  Staff members and/or parent representatives recognized and awarded scholarship certificates to the following outstanding 5th grade students from each of the four elementary schools; and the Al DeFran Awards to the following outstanding 8th grade students:
    - ➢ Wilson Principal Carol Makuch presented students Michael Calhoun and Francesca Giammalva with $250 each Al DeFran Scholarships.
    - ➢ Teachers Tom DeFeyter, Amanda Phillips, and Shelley Turkowski, presented student Kallie Blackwell with a $300 Safety Scholarship; and students Larissa Carlson (absent), Katherine Fugon-Saravia, and Jacob Jones with $300 Academic Scholarships; and students Andrew Dmitruchina, Marcus Dooley and Tegyn Gourlay with $200 each Mrs. Wright's Choice Scholarships.  Garfield Principal Krizia Totty was also present.
    - ➢ Jefferson Principal Crystal Eskin introduced Teacher Julie Lapinski, who presented students Lily Martinez and Gabriel Schilk with $250 each George Schonfeld Respect Scholarships.
    - ➢ Monroe Principal Vicki Wilson introduced Teacher Tiffany Dean who presented students Jake Stroia and Krystinya Bayn with $500 each MVPS Scholarships.
    - ➢ Washington Principal Kristin McMaster introduced Teacher Denise Knapp, who presented students Justin Stewart and Alexandra Puckett with $500 each Janel McHugh Memorial Washington General's Spirt Scholarships; and students, Ava Szuch (absent) and Addison Cleveland with $250 each Outstanding Citizenship Scholarships.

b. <u>Board President</u>. Michael Swiecki was thanked for his Presidency this year and was presented with a plaque of appreciation by Dr. Cost on behalf of the school district.

## B. SPECIAL ORDERS & REPORTS

1. None.

## C. HEARING OF THE PUBLIC

1. <u>2017-18 & 2018-19 Budgets Hearing</u>. Business Manager Laub distributed a copy of and showed a power point presentation on both the 2017-2018 Final Budget Revisions and the 2018-2019 Proposed Budget. Head Bookkeeper Sandy White was also present in the audience. It is noted for the record that no one addressed the Board of Education at this time.

2. <u>Petition of Visitors</u>. The hearing of the public was held. It is noted for the record that no one addressed the Board of Education at this time.

## D. ACTION AGENDA

1. <u>2017-18 FY Final Revised Budgets & 2018-19 FY Proposed Budgets</u>.
   Motion by Member Browning, supported by Member Kinney, move approval of the Resolution for Adoption of the 2017-18 Final Budget Revisions as proposed; and adoption of the 2018-19 Budget as proposed.
   Yeas: Members Browning, Kinney, Miello, Swiecki
   Nays: None
   Motion carried.

2. <u>Tax Levy Certification</u>.
   Motion by Member Browning, supported by Member Kinney, move adoption of the Resolution for the 2018-19 Tax Levy, authorizing a tax of 18.00 mills on the non-homestead property, and a tax of 6.00 mills on all property for debt obligations for the 2018-19 School Year.
   Yeas: Members Kinney, Miello, Browning, Swiecki
   Nays: None
   Motion carried.

3. <u>Resolution to Borrow Against State Aid</u>.
   Motion by Member Browning, supported by Member Kinney, move approval of the enclosed Resolution to participate in the Michigan Municipal Bonding Authority State Aid Note Program authorizing the Issuance of State Aid Anticipation Notes, for the 2018-19 school year.
   Yeas: Members Miello, Browning, Kinney, Swiecki
   Nays: None
   Motion carried.

4. <u>T-Mobile Site Lease Agreement</u>.
   Motion by Member Browning, supported by Member Kinney, move the Board Secretary sign the Resolution authorizing the District to enter into a Lease Agreement with T-Mobile Cellular to install a cellular antenna on the rooftop of Washington Elementary School, under the terms set forth.
   Roll Attached. Motion carried.

5.    Administrative Contract Adjustment.
       Motion by Member Browning, supported by Member Kinney, move approval to add 15
additional days to District Technology Director Jeff Trudell's Administrative Contract, and his rate of pay
be $102,395, effective for the 2018-19 School Year.
       Yeas: Members Browning, Kinney, Miello, Swiecki
       Nays: None
       Motion carried.

6.    Chromebooks/Licenses.
       Motion by Member Browning, supported by Member Kinney, move approval of 1500 HP Student
Chromebooks for a total of $371,700 from Sehi Computers; and 1500 GoGuardian Admin/Teacher
Chromebook Management 4 year licenses for a total of $41,085 from Tierney Brothers; with funds
coming from the Wayne County Enhancement Millage.
       Jeff Trudell spoke about these purchases.
       Yeas: Members Kinney, Miello, Browning, Swiecki
       Nays: None
       Motion carried.

7.    Laptops/Desktops.
       Motion by Member Browning, supported by Member Kinney, move approval of 110 HP Teacher
Laptops for a total of $118,977.10 from At Risk 31a Funds; 14 HP Administrator/Counselor Laptops for a
total of $30,800 from Fund Balance Spend Down monies; and 20 HP Administrative Assistant/Office
Desktop Computers for a total of $23,262.40 from Fund Balance Spend Down monies; all from InaComp
TSG.
       Jeff Trudell spoke about these purchases.
       Yeas: Members Miello, Browning, Kinney, Swiecki
       Nays: None
       Motion carried.

8.    Instructional Coaches.
       Motion by Member Browning, supported by Member Kinney, move to approve the contract with
The Institute for Excellence in Education to provide Instructional Coaches, in the amount of $126,000,
from the Fund Balance Spend Down monies.
       Yeas: Members Browning, Kinney, Miello, Swiecki
       Nays: None
       Motion carried.

9.    School Year/School Calendar/School Day.
       Motion by Member Browning, supported by Member Kinney, move approval of the 2018-19
School Year Calendar as presented.
       Roll Attached.  Motion carried.

10.   Organizational Meeting Date.
       Motion by Member Browning, supported by Member Kinney, move scheduling of the
Organizational Board of Education Meeting for Tuesday, July 24, 2018, at 7:00 pm, in the Council
Chambers of Wyandotte City Hall.
       Roll Attached.  Motion carried.

## E. COMMITTEE OF THE WHOLE/DISCUSSION AGENDA

1.      Work Session Update.  Dr. Cost announced a Work Session was held on Tuesday, June 12, 2018, at the Board of Education.  The following topics were discussed:  2017-18 & 2018-19 Budgets Review, Fund Balance Spend Down List, and Technology Department Restructuring.

2.      Other.  None

## F.  CONSENT AGENDA

1-4.   Bills and Vouchers/Two Job Sharing/Leaves of Absence/Resignation.
        Motion by Member Browning, supported by Member Kinney, move approval of Bills and Vouchers in the amount of $4,315,628.85; approval of 40/60 percent Job Sharing/Leaves of Absence for Jefferson Teachers Filomena Schivelbein and Rachel Rowell for the 2018/2019 School Year; approval of 50/50 percent Job Sharing/Leaves of Absence for Monroe Teachers Krissy Kobiljak and Nicole Riopelle for the 2018/2019 School Year; and acceptance of the resignation of Roosevelt High School Mathematics Teacher Katie Barbour effective 6/30/2018.
        Roll Attached.  Motion carried.

## G.  ANNOUNCEMENTS

From the Superintendent & Board Members: 1.  Dr. Cost and the Board Members wished Ken Laub a happy retirement.

## H.  ADJOURN

        Motion by Member Browning, supported by Member Kinney, the meeting be adjourned.  Roll Attached.  Motion carried and the meeting was adjourned at 8:23 pm.

                                                                Michael Swiecki, President

# EXHIBIT D

## SITE LEASE AGREEMENT

This **SITE LEASE AGREEMENT** (this "**Lease**") is effective the date of the last signature on this Lease (the "**Effective Date**") by and between Wyandotte Public School District ("**Landlord**") and T-Mobile Central LLC, a Delaware limited liability company ("**Tenant**").

Landlord and Tenant agree to the following:

**1. Property Description**. Landlord is the owner of the real property located at Washington Elementary School, 1440 Superior Blvd., Wyandotte, MI 48192, as further described on **Exhibit A** (the "**Property**"). The Property includes the premises which is comprised of approximately 240 square feet plus any additional portions of the Property which Tenant may require for the use and operation of its facilities as generally described on **Exhibit B** (the "**Premises**"). Tenant reserves the right to update the description of the Premises on **Exhibit B** to reflect any modifications or changes with the approval of Landlord, which shall not be unreasonably withheld or delayed. Together with Tenant's written notice to exercise the Option, Tenant shall provide any changes to the exhibits attached to this Lease for Landlord's review and approval, which shall not be unreasonably withheld, conditioned or delayed.

**2. Option.** Landlord grants to Tenant an option to lease the Premises on the terms and conditions described in this Lease (the "**Option**"). The Option shall commence on the Effective Date and shall continue for a period of one (1) year (the "**Option Period**"). The Option Period will be automatically extended for successive three (3) additional one (1) year period(s), unless Tenant provides written notice to the Landlord of its election to exercise or not renew its Option. For each Option Period, Tenant shall pay Landlord One hundred and no/100 dollars ($100.00).

**3. Landlord Cooperation.** During the Option Period and Term (as defined below), Landlord shall cooperate with Tenant's due diligence activities, which shall include, but not be limited to, access to the Property for inspections, testing, permitting related to the Permitted Uses (as defined below). Landlord authorizes Tenant to sign, file, submit and obtain all zoning, land use and other applications for permits, licenses and approvals required for the Permitted Uses from all applicable governmental and quasi-governmental entities (collectively, the "**Governmental Approvals**"), and to the fullest extent necessary.     Landlord's cooperation shall include the prompt execution and delivery of any documents necessary to obtain and maintain Government Approvals or utility services. Additionally, Landlord shall not take any actions which are in conflict with or interfere with Tenant's Governmental Approvals unless Landlord reasonably believes that such Governmental Approvals will negatively impact the Property. Tenant shall be solely responsible for securing any Governmental Approvals for its operations, including paying the payment all costs and expenses and shall not cause or permit any lien to be created against the Premises. Tenant agrees that during the Option Period or Option renewal period, Tenant's activities shall be limited to obtaining governmental approvals and testing. If any testing is completed on the Property, Tenant agrees to restore the Property to its pre-test condition within fifteen (15) days of the completion of all tests. Tenant shall not install equipment or complete any construction activities during the Option Period or any Option renewal period. Tenant agrees to provide Landlord with twenty four (24) hours advance notice of access to the Property during the Option Period, either written or verbal to Landlord's phone number 734-759-5000 , and to cooperate with Landlord in scheduling any tests or access to the Property to prevent interruption to school district activities.

**4. Antenna Facilities and Permitted Uses.** Tenant leases the Premises for its equipment, personal property and improvements associated with Tenant's wireless communications business (the "**Antenna**

**Facilities").** The Premises may be used for the construction, installation, operation, maintenance, repair, addition, modification, upgrading, removal or replacement of any and all Antenna Facilities (the "**Permitted Uses**") for no fee or additional consideration. Tenant shall have the right to replace, modify, or upgrade with reasonably similar size without Landlord's approval. All other modifications will be subject to Landlord's approval and limitations not to be unreasonably withheld or delayed. The Antenna Facilities shall remain the exclusive property of Tenant and shall not be considered fixtures. Tenant, at its expense, may use any and all reasonable means as Tenant deems necessary to control, secure or restrict access to the Antenna Facilities. Landlord hereby waives any and all lien rights it may have concerning the Antenna Facilities. If necessary to maintain service, Tenant shall have the right to locate a cell-on-wheels, or other temporary antenna facility on the Property. Landlord shall cooperate with the placement of the temporary facility at a mutually acceptable location.

5.      Tenant shall be solely responsible to ensure that Tenant's Antenna Facilities and related equipment shall not significantly affect the structural integrity of the Property, and that no such damage results to the Property due to installation of Tenant's Antenna Facilities and related equipment. If Landlord reasonably believes that the structural integrity of the Property will be affected by Tenant's Antenna Facilities and related equipment or any additional Tenant facilities on the Property after this Lease's Effective Date, Landlord may request that Tenant obtain an engineering analysis. Landlord agrees to cooperate with Tenant in acquiring the analysis of the Property. If an analysis of the Property is requested by Landlord, Tenant shall be responsible for coordinating that analysis by a licensed structural engineer or other party acceptable to Landlord, and Tenant shall furnish a copy of the analysis to Landlord with no representation or warranty by Tenant. The costs of the analysis shall be paid solely by Tenant. If such analysis determines that the Property is not structurally sound for the installation of Tenant's equipment, Tenant, at its sole election, may make the necessary improvements to the Property or terminate this Lease without further liability to Landlord or Tenant.

6.   **Lease Term.**

a) The Initial Term of the Lease shall be 5 (five) years commencing on the date of Tenant's exercise of the Option (the "**Commencement Date**"), and ending on the day immediately preceding the fifth (5th) anniversary of the Commencement Date (the "**Initial Term**"). The Initial Term, together with any Renewal Terms and Extended Periods are referred to collectively as the "**Term.**"

b) The Initial Term shall automatically renew for five (5) successive renewal terms of five (5) years each (each a "**Renewal Term**"), provided that Tenant is not in default under the terms of this Lease. Tenant may elect not to renew by providing ninety (90) days' notice prior to the expiration of the then current Term.

c) Upon the expiration of the final Renewal Term, Tenant shall have the right to continue to occupy the Premises and the Term shall automatically extend for up to nine (9) successive one (1) year periods (each, an "**Extended Period**"). Landlord may terminate the renewal of any Extended Period by delivery of notice at least six (6) months prior to the end of the then current Extended Period. Tenant may terminate any Extended Period at any time by delivery of notice to Landlord.

7.   **Rent/Other Charges.**

a) Upon the Commencement Date, Tenant shall pay Landlord rent in the amount of One-thousand dollars dollars ($1,000.00) per month (the "**Rent**"). Tenant shall deliver Rent to Landlord at the address

specified in Section 16, or by electronic payment. The first Rent payment shall be due within thirty (30) days after the Commencement Date. Subsequent Rent shall be payable by the fifth day of each month.

b) The Rent for each successive Renewal Term shall be an amount equal to One-hundred five percent (105%) of the Rent for the immediately preceding Term. The Rent for each Extended Period shall be an amount equal to one hundred one percent (101%) of the Rent for the immediately preceding Term.

c) Rent for any partial month shall be prorated on a per day basis, based on the number of days in the month in question. Landlord shall cooperate with Tenant regarding the use of any electronic rent payment systems or the provision of any associated documentation. Tenant may condition payment of Rent and any other sums payable under this Lease upon Tenant's receipt of a duly completed IRS form W-9, or similar governmental form.

d) Any charges payable under this Lease other than Rent shall be billed by Landlord to Tenant within twelve (12) months from the date the charges were incurred or due. Tenant shall pay Landlord a late payment charge equal to five percent (5%) of the total payment due if such payment is not received by the Landlord within ten (10) days from the due date of said payment.

(e) Within ten (10) days from the Commencement Date, Tenant shall pay to Landlord an initial fee of Two Thousand Five Hundred Dollars ($2,500.00) which represents a one-time administrative fee for the reasonable costs of negotiating this Lease (the "Initial Fee"). The Initial Fee shall be non-refundable in the event that the Lease is terminated for any reason other than for a default of the Landlord, including Tenant's failure to obtain all government approvals.

**8.** **Interference.** Tenant shall not interfere with the radio frequency communications of Landlord or any of Landlord's existing tenants as of the Effective Date. After the Effective Date, Landlord shall not install, or permit any third party to install, any equipment or structures that interfere with or restrict the operations of Tenant. Any such interference shall be deemed a material breach of this Lease by Landlord and Landlord shall remove the cause of the interference within forty-eight (48) hours of notice. Tenant shall have the right to exercise all legal and equitable rights and remedies to end the interference. Tenant's Antenna Facilities and related equipment shall not interfere with the communications configurations, frequencies or operating equipment which exists on the Property on the effective date of this Lease ("Pre-existing Communications"), and Tenant's Antenna Facilities and related equipment and operations shall comply with all non-interference rules of the Federal Communications Commission ("FCC").

**9.** **Utility Services.**

a) Tenant shall have the right to connect to, maintain, repair, upgrade, remove or replace existing utility related equipment and shall have the right to install new utility related equipment, including a generator, optical fiber facilities, and alternative energy related equipment, to service its Antenna Facilities, or cell-on-wheels on the Property at its sole cost and expense (collectively, the "**Utility Facilities**").

b) Tenant shall be responsible for all utilities charges for Utility Facilities including electricity and any other utility service used by Tenant on the Premises. Tenant shall install separate meters for Tenant's utility usage at its own expense. Tenant shall indemnify and hold harmless Landlord from all charges related to the Utility Facilities.

**10.** **Access and Easements.**

a) Landlord shall furnish, at no additional charge to Tenant, non-exclusive, unimpeded and secure access to the Premises on a 24-hours-a-day, 7-days-a-week basis to Tenant and Tenant's employees, agents, contractors and other designees. Notwithstanding the forgoing and except in the case of an emergency, Tenant shall provide Landlord not less than twenty four (24) hours notice to Landlord's telephone number at 734-759-5000 of its intent to be on the Property for non-construction purposes and shall cooperate with Landlord in ensuring that classroom and school related activities are not interrupted. In the case of construction activities, Tenant shall provide no less than seventy two (72) hours advance notice to Landlord's telephone number at 734-759-5000 whenever Tenant shall require entrance to the Premises for the purpose of construction or installation of equipment. Tenant shall comply with all applicable Board Policies in particular as it relates to access to the Premises and conduct on school premises, including but not limited to having proper identification and the district's non-smoking policy, which may be found within the applicable Board Policies posted on the Landlord's website.

b) Landlord grants Tenant, at no additional Rent or charge, non-exclusive easements on, over, under and across the Property for ingress, egress, communications, power and other utilities, construction, demolition and access to the Premises and any Utility Facilities (collectively, the "**Easements**"). Landlord shall not modify, interrupt or interfere with any communications, electricity, or other utility equipment and easements serving the Property, except with the prior written approval of Tenant.

**11. Termination.** Tenant may terminate this Lease without further liability, upon one hundred twenty (120) days prior written notice to Landlord, for any of the following reasons: (i) changes in local or state laws or regulations which adversely affect Tenant's ability to operate; (ii) a Federal Communications Commission ("**FCC**") ruling or regulation that is beyond the control of Tenant; (iii) technical or economic reasons; or (iv) if Tenant is unable to obtain any Governmental Approval required for the construction or operation of Tenant's Antenna Facilities. Upon ninety (90) days prior written notice to Landlord, Tenant may terminate this Lease for any or no reason. This Lease may be terminated by either party upon a Default by the otherParty which Default is not cured as defined under Section 13 of this Lease. Upon the expiration or termination of this Lease, Tenant shall remove Tenant's Antenna Facilities within one hundred twenty (120) days following such expiration or termination of this Lease. All costs and expenses for the removal and restoration shall be borne by Tenant, and Tenant shall indemnify and hold Landlord harmless for any damages caused by such removal and restoration.

**12. Casualty and Condemnation.** If the Premises, any Easements or Antenna Facilities are taken or condemned by power of eminent domain or other governmental taking, then: (a) Tenant shall be entitled to negotiate, compromise, receive and retain all awards attributable to (i) the Antenna Facilities, (ii) Tenant's leasehold interest in the Property, (iii) any moving or relocation benefit available to Tenant and (iv) any other award available to Tenant that is not attributable to Landlord's title to or interest in the Property. If the Antenna Facilities are not operational due to casualty or condemnation, Tenant shall have the right to abate the Rent for that period time. In addition, Tenant may terminate the Lease by written notice to Landlord.

**13. Default and Right to Cure.** A party shall be deemed in default under this Lease if it fails to make any payment, or to perform any obligation required of it within any applicable time period specified and does not commence curing such breach within thirty (30) days after receipt of written notice of such breach from the non-defaulting party ("**Default**"). This Lease, or Tenant's rights of possession shall not be terminated due to any Tenant Default unless: (a) the Default is material; or (b) Landlord shall have given Tenant not less than thirty (30) days prior written notice, after the expiration of the cure period described above, and Tenant fails to cure or commence the cure of such Default within the second thirty (30) day notice period.

**14. Taxes.** Landlord shall pay when due all real estate taxes and assessments for the Property. Notwithstanding the foregoing, Tenant shall timely pay for any personal property or other taxes assessed on the Tenant's Antenna Facilities or operations on the Premises solely and directly attributable to the presence or installation of Tenant's Antenna Facilities or operations on the Premises during the Term. Landlord shall provide prompt and timely notice of any tax or assessment for which Tenant is liable if such notice is sent to Landlord. Tenant shall have the right to challenge any tax or assessment and Landlord shall cooperate with Tenant regarding such challenge.

**15. Insurance and Subrogation and Indemnification.**

a) During the Term, Tenant will maintain Commercial General Liability insurance in amounts of Two Million and no/100 Dollars ($2,000,000.00) per occurrence and Five Million and no/100 Dollars ($5,000,000.00) aggregate with Landlord included as additional insured. Tenant may satisfy this requirement by obtaining the appropriate endorsement to any master policy of liability insurance Tenant may maintain. Tenant shall provide to Landlord a certificate of insurance evidencing the coverage required by this paragraph upon execution of this Lease. Notwithstanding the foregoing, thirty (30) days prior to the third, fourth or fifth Renewal Term, if any, Landlord may submit a written request to Tenant requiring a reasonable increase in the insurance coverage amounts set forth herein based upon the recommendations of Landlord's risk manager and set forth in writing to Tenant. Tenant shall each maintain "all risk" or "special causes of loss" property insurance on Tenant's Antenna Facilities and all other personal property.

b) To the extent permitted by law, Landlord and Tenant each agree to indemnify and hold harmless the other party from and against any and all administrative and judicial actions and rulings, claims, causes of action, demands and liabilities, including reasonable attorneys' fees, to the extent caused by or arising out of: (i) any negligent acts or omissions or willful misconduct in the operations or activities on the Property by the indemnifying party or the employees, agents, contractors, licensees, tenants or subtenants of the indemnifying party, (ii) any spill or other release of any Hazardous Substances (as defined below) on the Property by the indemnifying party or the employees, agents, contractors, licensees, tenants or subtenants of the indemnifying party, or (iii) any breach of any obligation of the indemnifying party under this Lease. The indemnifying party's obligations under this subsection are contingent upon its receiving prompt written notice of any event giving rise to an obligation to indemnify the other party and the indemnified party's granting it the right to control the defense and settlement of the same.

c) Tenant shall not be responsible or liable to Landlord or any third party for any claims, damages, costs, expenses, including liens, fines, penalties or other enforcement actions, attributable to any pre-existing violations of applicable laws, codes, ordinances or other regulations relating to the Property (collectively, "**Pre-Existing Violations**") to the extent that Tenant did not contribute to such conditions. To the extent Tenant is or may be required to cure such Pre-Existing Violations in order to obtain any Governmental Approvals for its Permitted Uses of the Premises, however, Tenant shall have the right, but not the obligation, to cure such Pre-Existing Violations.

d) The provisions of this section 15 shall survive the expiration or termination of this Lease.

**16. Notices.** All notices, requests, demands and other communications shall be in writing and shall be effective three (3) business days after deposit in the U.S. mail, certified, return receipt requested or upon receipt if personally delivered or sent via a nationally recognized courier to the addresses set forth below. Landlord or

Tenant may from time to time designate any other address for this purpose by providing written notice to the other party.

**If to Tenant, to:**
T-Mobile USA, Inc
12920 SE 38th Street
Bellevue, WA 98006
Attn: Lease Compliance/ Site ID
#DE05726D

**If to Landlord, to:**
Wyandotte Public School District
639 Oak Street
Wyandotte, MI 48192

**Per the W-9 Form Rent is to be paid to:**
Wyandotte Public School District
Board of Education, 639 Oak Street, Wyandotte, MI
48192

**17. Quiet Enjoyment, Title and Authority.** Landlord covenants and warrants that: (a) Landlord has full right, power and authority to execute and perform this Lease and to grant Tenant the leasehold interest and Easements contemplated under this Lease; (b) Landlord has good and unencumbered title to the Property, free and clear of any liens or Mortgages (defined below) which will interfere with Tenant's Permitted Uses and any rights under this Lease; (c) the execution and performance of this Lease shall not violate any laws, ordinances, covenants, or the provisions of any Mortgage, lease, or other agreement binding on Landlord; (d) Tenant's use and quiet enjoyment of the Premises will not be disturbed; and (e) Except to the extent such conditions or non-compliance is a result of Tenant's Antenna Facilities or operations on the Premises, Landlord will be responsible, at its sole cost and expense, for maintaining all portions of the Property in good order and condition and in compliance with all applicable laws, including without limitation, the roof, any support structure owned by Landlord, HVAC, plumbing, elevators, landscaping and common areas.

**18. Environmental Laws.** Landlord and Tenant shall comply with all federal, state and local laws in connection with any substances brought onto the Property that are identified by any law, ordinance or regulation as hazardous, toxic or dangerous (collectively, the "**Hazardous Substances**"). Tenant agrees to be responsible for all losses or damage caused by any Hazardous Substances that it may bring onto the Property and will indemnify Landlord for all such losses or damages. To the extent permitted by law, Landlord agrees to be responsible for all losses or damage caused by any Hazardous Substances on or entering the Property, except those brought onto the Property by Tenant, and will indemnify Tenant for all such losses or damages including the cost of any investigation or remediation, or other actions required to comply with applicable law. Landlord represents that it has no knowledge of any Hazardous Substances on the Property.

**19. Assignment.**

a) Except as noted under this subsection (a) Tenant shall have the right to assign, sublease or otherwise transfer this Lease upon the prior written consent of Landlord, which shall not be unreasonably withheld. Upon an assignment or transfer, Tenant shall be relieved of all liabilities and obligations and Landlord shall look solely to the transferee for performance under this Lease. Upon receipt of a written request from Tenant, Landlord shall promptly execute an estoppel certificate. Tenant shall have the right, without Landlord's consent, to assign its interest to its parent company, or any of its constituent partners, partners' related entities, subsidiaries or affiliates of Tenant or Tenant's parent, or to a successor entity in the event of merger, reorganization, consolidation, transfer, sale stock purchase or public offering upon written notice to Landlord.

It is expressly understood that Tenant shall not sublease any portion of the Premises to third parties without the prior written consent of Landlord and that Landlord shall be entitled to rental income for additional tenants under a sublease or lease agreement.

b) Landlord shall have the right to assign and transfer this Lease only to a successor owner of the Property. Only upon Tenant's receipt of written verification of a sale, or transfer of the Property shall Landlord be relieved of all liabilities and obligations and Tenant shall look solely to the new landlord for performance under this Lease. Until Tenant receives required information and documents, Tenant shall not berelieved of its responsibility to remit lease payments unless and to the extent that it is unable to utilize the Premises. Landlord shall not attempt to assign, or otherwise transfer this Lease separate from a transfer of ownership of the Property without the prior written consent of Tenant, which shall not be unreasonably withheld. In the event of an assignment, Landlord shall be relieved of all future liabilities and obligations and Tenant shall look solely to the assignee for performance under this Lease.

**20. Relocation.** Except in the event of an emergency, Landlord must provide Tenant at least ninety (90) days written notice of any repairs, maintenance or other work (the "**Work**") during the Term of the Lease which would require the temporary relocation of the Antenna Facilities. Landlord agrees that the Work will not interfere with or alter the quality of the services provided by the Antenna Facilities.

**21. Marking and Lighting Requirements.** Tenant shall be responsible for compliance with all marking and lighting requirements of the Federal Aviation Administration and the FCC. Tenant shall indemnify and hold Landlord harmless from any fines or other liabilities caused by Tenant's failure to comply with these requirements.

**22. Maintenance of Premises and Surrounding Areas.** Tenant at its own expense shall maintain the Premises in accordance with sound engineering standards and in compliance with all rules, regulations and requirements of all governmental bodies having jurisdiction. Tenant shall be responsible to keep the Easement free from debris caused by Tenant and shall promptly remedy any such conditions at its own expense. Tenant shall not be responsible for maintaining the Easement as defined this Lease except to the extent that Tenant causes damage to the Easement and shall promptly remedy any such damage. Landlord at its own expense shall maintain the Property, not including the Premises.

**23. Sale of Property by Landlord.** If at any time after expiration of the first Renewal Term of this Lease, Landlord enters into an agreement to sell or transfer all or any part of the Property to a purchaser other than Tenant, Landlord may assign this Lease. Notwithstanding the foregoing, in the event that the bona fide purchaser elects not to accept such assignment, in its sole discretion, Landlord may terminate this Lease upon ninety (90) days written notice to Tenant. In such event, Tenant shall remove its Antenna Facilities and any other equipment within ninety (90) days from the effective date of termination.

**24. Miscellaneous.**

a) The prevailing party in any litigation or other legal proceedings arising under this Lease (including any appeals and any insolvency actions) shall be entitled to reimbursement from the non-prevailing party for reasonable attorneys' fees and expenses.

b) This Lease constitutes the entire agreement and understanding of the parties, and supersedes all offers, negotiations and other agreements with respect to the subject matter and Property. Any amendments to this Lease must be in writing and executed by both parties.

c) Landlord agrees to cooperate with Tenant in executing any documents which Tenant deems necessary to insure and protect Tenant's rights in, or use of, the Premises. Landlord shall execute and deliver: (i) a Memorandum of Lease in substantially the form attached as Exhibit C; and (ii) if the Property is encumbered by a deed, mortgage or other security interest (each, a "**Mortgage**"), a subordination, non-disturbance and attornment agreement using Tenant's form.

d) This Lease shall be construed in accordance with the laws of the state or territory in which the Property is located, without regard to the principles of conflicts of law.

e) If any term of this Lease is found to be void or invalid, the remaining terms of this Lease shall continue in full force and effect. Any questions of particular interpretation shall be interpreted as to their fair meaning.

f) Each party hereby represents and warrants to the other that this Lease has been duly authorized, executed and delivered by it, and that no consent or approval is required by any lender or other person or entity in connection with the execution or performance of this Lease.

g) If either party is represented by any broker or any other leasing agent, such party is responsible for all commission fee or other payment to such agent.

h) This Lease and the interests granted herein shall run with the land, and shall be binding upon and inure to the benefit of the parties, their respective successors, personal representatives and assigns.

i) This Lease may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute a single instrument. Signed facsimile and electronic copies of this Lease shall legally bind the parties to the same extent as original documents.

j) Nothwithstanding any provisions to the contrary herein, Tenant shall not install any signs, including but not limited to those used for the purpose of advertising or marketing, on the Premises except for signs used for safety or regulatory purposes, such as warning signs.k) Tenant shall install, construct and maintain Tenant's Antenna Facilities and any related equipment or modifications thereto in conformity with all applicable government rules and regulations from all governing bodies having jurisdiction over Tenant's equipment and operations. In addition, Tenant's operations shall at all times be in compliance with all laws, rules, regulations, including but not limited to the Federal Communications Commission during the Term of this Lease. Failure to comply with applicable rules and regulations governing Tenant's equipment or its operations shall be considered a material default to be corrected under the terms of this Lease addressing the same. Tenant shall, at Tenant's expense, keep and maintain the Antenna Facilities now or hereafter located on the Property in commercially reasonable condition and repair during the Term of this Lease, normal wear and tear and casualty excepted. Upon termination or expiration of this Lease, the Premises shall be returned to Landlord to its prior condition, normal wear and tear and casualty excepted. Exclusive of any signage required for identification, safety or other regulatory obligation, Tenant shall not install any signage on the Premises without the Landlord's prior written approval.

[SIGNATURES ON FOLLOWING PAGE]

**LANDLORD: Wyandotte Public School District**

By: _____

Printed Name: _____

Title: _____

Date: _____

**TENANT:    T-Mobile Central LLC**

By: _____

Printed Name: _____

Title: _____

Date: _____

_____
                    T-Mobile Legal Approval

**[Notary block for Landlord]**

STATE OF MICHIGAN        )
                              ) ss.
COUNTY OF WAYNE        )

       This instrument was acknowledged before me on _____ by _____, [title] _____ of _____ a _____ [type of entity], on behalf of said _____ [name of entity].

       Dated: _____

_____
Notary Public
Print Name _____
My commission expires _____

(Use this space for notary stamp/seal)

Site Number:    DED5726D
Site Name:      Washington Elementary School
Market:         Detroit
                                      A-1                             Site Lease - version 5.8.17

*[Notary block for Tenant]*

STATE OF _____ )
                                                   ) ss.
COUNTY OF _____ )

     I certify that I know or have satisfactory evidence that _____is ·the person who appeared before me, and said person acknowledged that he signed this instrument, on oath stated that he or she was authorized to execute the instrument and acknowledged it as the _____of T-Mobile Central LLC, a Delaware limited liability company, to be the free and voluntary act of such party for the uses and purposes mentioned in the instrument.

     Dated: _____

_____
Notary Public
Print Name _____
My commission expires _____

(Use this space for notary stamp/seal)

Site Number:  DE05726DD
Site Name:    Washington Elementary School
Market:        Detroit

2

Site Lease - version 5.8.17

## EXHIBIT A
### Legal Description

Property address of Washington Elementary School, 1440 Superior Blvd., Wyandotte, MI 48192
Assessor's tax parcel number of 57017010034000

### The Property is legally described as follows:

PARCEL 1: LOT 14, BLOCK 336, AND ADJACENT VACATED STREET AND ALLEY, HURST AND POST'S SUBDIVISION, AS RECORDED IN LIBER 1, PAGE 298 OF PLATS, WAYNE COUNTY RECORDS. PARCEL 2: LOTS 34, 35 AND 38, HENRY SCHMIDT'S SUBD'N, AS RECORDED IN LIBER 51, PAGE 3 OF PLATS, WAYNE COUNTY RECORDS. AND, LOT 36, HENRY SCHMIDT'S SUBD'N, AS RECORDED IN LIBER 51, PAGE 3 OF PLATS, WAYNE COUNTY RECORDS. AND, LOT 37, HENRY SCHMIDT'S SUBD'N, AS RECORDED IN LIBER 51, PAGE 3 OF PLATS, WAYNE COUNTY RECORDS. AND, LOT 39, HENRY SCHMIDT'S SUBD'N, AS RECORDED IN LIBER 51, PAGE 3 OF PLATS, WAYNE COUNTY RECORDS. AND, LOT 40 AND ADJACENT VACATED STREET,HENRY SCHMIDT'S SUBD'N, AS RECORDED IN LIBER 51, PAGE 3 OF PLATS, WAYNE COUNTY RECORDS. PARCEL 3: LOT 84, MIZNER'S SUBD'N, AS RECORDED IN LIBER 20, PAGE 47 OF PLATS, WAYNE COUNTY RECORDS. AND, LOT 85, MIZNER'S SUBD'N, AS RECORDED IN LIBER 20, PAGE 47 OF PLATS, WAYNE COUNTY RECORDS. AND, LOTS 86 AND 87, MIZNER'S SUBD'N, AS RECORDED IN LIBER 20, PAGE 47 OF PLATS, WAYNE COUNTY RECORDS. PARCEL 4: WEST 10 LOT 19 AND EAST 17 FEET OF LOT 20, INCLUDES ADJACENT VACATED ALLEYS AND STREETS, LAWRENCE SUB., AS RECORDED IN LIBER 18, PAGE 20 OF PLATS, WAYNE COUNTY RECORDS. AND, WEST 23 FEET OF LOT 23, ALL OF LOTS 24, 27, 28, 29, 31, 32 AND 33, LAWRENCE SUB., AS RECORDED IN LIBER 18, PAGE 20 OF PLATS, WAYNE COUNTY RECORDS. AND, LOTS 25, 26 AND 30, LAWRENCE SUB., AS RECORDED IN LIBER 18, PAGE 20 OF PLATS, WAYNE COUNTY RECORDS

**EXHIBIT B**

Subject to the terms and conditions of this Lease, the location of the Premises is generally described and depicted as shown below or in the immediately following attachment(s).

However, it is expressly agreed and understood by and between the Landlord and Tenant that the exact and precise location of the Tenant's Antenna Facilities are subject to review and approval by the planning and/or zoning Boards having jurisdiction over the Property.

Notwithstanding anything to the contrary, the specific number and type of equipment described in the Exhibit is for illustrative purposes only and in no way limits Tenant's ability to alter, replace, add to, expand, enhance, modify, supplement, replace, refurbish, relocate or upgrade any such equipment within the Premises.

Equipment Configuration:

Six (6) panel antennas – up to 8' in height
Twelve (12) – up to 2 ¼" dia.
One (1) hybrid cable
Nine (9) RRU's
Three (3) OVP's
Ancillary equipment

See Attached 2 page Lease Exhibit created by Landtech Professional Surveying & Engineering, dated 11/2/17.

## EXHIBIT C

## Memorandum
## of
## Lease

## [CONFIRM HEADING/MARGINS/FORMAT CONFORM TO STATE AND LOCAL REQUIREMENTS]

After Recording, Mail To:
T-Mobile USA Inc
12920 SE 38th Street
Bellevue, WA 98006
Attn: Lease Compliance / DE05726D


APN: 57017010034000

### MEMORANDUM OF LEASE

A Site Lease Agreement (the "Lease") by and between Wyandotte Public School Districtand T-Mobile Central LLC, a Delaware limited liability company ("Tenant") was made regarding a portion of the following property (as more particularly described in the Lease, the "Premises"):

See Attached **Exhibit A** incorporated herein for all purposes.

Without limiting the terms and conditions of the Lease, Landlord and Tenant hereby acknowledge the following:

1. Capitalized terms used, but not otherwise defined herein, shall have the meanings ascribed to such terms in the Lease.

2. Pursuant to the Lease, Landlord has granted Tenant an option to lease the Premises (the "Option") on the terms and conditions described in the Lease. The Option is for an initial term of one (1) year commencing on the effective date of the Lease, and will be extended for up to three (3) additional and successive one (1) year periods unless Tenant provides written notice to exercise or not renew its Option.

3. Provided that the Option has been exercised by Tenant, the initial term of the Lease shall be for five (Lease term number) years and will commence on the date that Tenant exercises its Option.

4. Tenant shall have the right to extend the Lease for five (Renewal term number) additional and successive five(Additional renewal terms number (e.g. 5))-year terms which may be extended for up to nine (9) additional and successive one-year periods.

5. This memorandum is not a complete summary of the Lease. It is being executed and recorded solely to give public record notice of the existence of the Option and the Lease with respect to the Premises. Provisions in this memorandum shall not be used in interpreting the Lease provisions and in the event of conflict between this memorandum and the said unrecorded Lease, the unrecorded Lease shall control.

6. This memorandum may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto were upon the same instrument.

**IN WITNESS WHEREOF,** the parties hereto have respectively executed this memorandum effective as of the date of the last party to sign.

**LANDLORD: Wyandotte Public School District**

By: _____

Printed Name: _____

Title: _____

Date: _____

**TENANT:     T-Mobile Central LLC**

By: _____

Printed Name: _____

Title: _____

Date: _____

**[Notary block for Landlord]**

STATE OF MICHIGAN                    )
                                     ) ss.
COUNTY OF WAYNE                      )

    This instrument was acknowledged before me on _____ by
_____, [title] _____ of
_____ a _____ [type of entity], on behalf of said
_____ [name of entity].

    Dated: _____

    _____
    Notary Public
    Print Name _____
    My commission expires _____

(Use this space for notary stamp/seal)

***[Notary block for Tenant]***

STATE OF _____ )
                                                      ) ss.
COUNTY OF _____ )

     I certify that I know or have satisfactory evidence that _____ is the person who appeared before me, and said person acknowledged that he signed this instrument, on oath stated that he or she was authorized to execute the instrument and acknowledged it as the _____ of T-Mobile Central LLCDetroit, a Delaware limited liability company, to be the free and voluntary act of such party for the uses and purposes mentioned in the instrument.

     Dated: _____

                                        _____
                                        Notary Public
                                        Print Name _____
                                        My commission expires _____

(Use this space for notary stamp/seal)

Site Number:    DE05726DD
Site Name:     Washington Elementary School          C-4                           Site Lease - version 5.8.17
Market:         Detroit

## Memorandum of Lease - Exhibit A
## Legal Description

## The Property is legally described as follows:

#### LEGAL DESCRIPTION

The land referred to in this Commitment is described as follows:

PARCEL 1: Lot 14, Block 336, and adjacent vacated street and alley, HURST AND POST'S SUBDIVISION, as recorded in Liber 1, Page 298 of Plats, Wayne County Records.

PARCEL 2: Lots 34, 35 and 38, HENRY SCHMIDT'S SUBD'N, as recorded in Liber 51, Page 3 of Plats, Wayne County Records.

AND

Lot 36, HENRY SCHMIDT'S SUBD'N, as recorded in Liber 51, Page 3 of Plats, Wayne County Records.

AND

Lot 37, HENRY SCHMIDT'S SUBD'N, as recorded in Liber 51, Page 3 of Plats, Wayne County Records.

AND

Lot 39, HENRY SCHMIDT'S SUBD'N, as recorded in Liber 51, Page 3 of Plats, Wayne County Records.

AND

Lot 40 and adjacent vacated street, HENRY SCHMIDT'S SUBD'N, as recorded in Liber 51, Page 3 of Plats, Wayne County Records.

PARCEL 3: Lot 84, MIZNER'S SUBD'N, as recorded in Liber 20, Page 47 of Plats, Wayne County Records.

AND

Lot 85, MIZNER'S SUBD'N, as recorded in Liber 20, Page 47 of Plats, Wayne County Records.

AND

Lots 86 and 87, MIZNER'S SUBD'N, as recorded in Liber 20, Page 47 of Plats, Wayne County Records.

PARCEL 4: West 10 Lot 19 and East 17 feet of Lot 20, includes adjacent vacated alleys and streets, LAWRENCE SUB., as recorded in Liber 18, Page 20 of Plats, Wayne County Records.

AND

West 23 feet of Lot 23, all of Lots 24, 27, 28, 29, 31, 32 and 33, LAWRENCE SUB., as recorded in Liber 18, Page 20 of Plats, Wayne County Records.

---

(Continued)



AND

Lots 25, 26 and 30, LAWRENCE SUB., as recorded in Liber 18, Page 20 of Plats, Wayne County Records.

**Memorandum**
**of**
**Lease**

After Recording, Mail To:
T-Mobile USA Inc
12920 SE 38th Street
Bellevue, WA 98006
Attn: Lease Compliance / DE05726D


APN: 57017010034000

### MEMORANDUM OF LEASE

A Site Lease Agreement (the "Lease") by and between Wyandotte Public School District and T-Mobile Central LLC, a Delaware limited liability company ("Tenant") was made regarding a portion of the following property (as more particularly described in the Lease, the "Premises"):

See Attached **Exhibit A** incorporated herein for all purposes.

Without limiting the terms and conditions of the Lease, Landlord and Tenant hereby acknowledge the following:

1. Capitalized terms used, but not otherwise defined herein, shall have the meanings ascribed to such terms in the Lease.

2. Pursuant to the Lease, Landlord has granted Tenant an option to lease the Premises (the "Option") on the terms and conditions described in the Lease. The Option is for an initial term of one (1) year commencing on the effective date of the Lease, and will be extended

for up to three (3) additional and successive one (1) year periods unless Tenant provides written notice to exercise or not renew its Option.

3. Provided that the Option has been exercised by Tenant, the initial term of the Lease shall be for five (5) years and will commence on the date that Tenant exercises its Option.

4. Tenant shall have the right to extend the Lease for five (5) additional and successive five (5)-year terms which may be extended for up to nine (9) additional and successive one-year periods.

5. This memorandum is not a complete summary of the Lease. It is being executed and recorded solely to give public record notice of the existence of the Option and the Lease with respect to the Premises. Provisions in this memorandum shall not be used in interpreting the Lease provisions and in the event of conflict between this memorandum and the said unrecorded Lease, the unrecorded Lease shall control.

6. This memorandum may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto were upon the same instrument.

**IN WITNESS WHEREOF**, the parties hereto have respectively executed this memorandum effective as of the date of the last party to sign.

**LANDLORD: Wyandotte Public School District**

By: _____

Printed Name: _Catherine M. Cost_

Title: _Superintendent_

Date: _7/11/2018_

**TENANT:      T-Mobile Central LLC**

By: _____

Printed Name: ~~Mike Lord~~

Title: Director, Engineering & Operations

Date: _7/10/18_

**[Notary block for Landlord]**

STATE OF MICHIGAN          )
                           ) ss.
COUNTY OF WAYNE            )

This instrument was acknowledged before me on _July 11, 2018_ by _Catherine M. Cost_, [title] _Superintendent_ of _Wyandotte Public Schools_ a _public_ [type of entity], on behalf of said _Wyandotte Public Schools_ [name of entity].

Dated: _July 11, 2018_

_Christine Mary Hensley_
Notary Public
Print Name _Christine Mary Hensley_
My commission expires _June 28, 2020_

CHRISTINE MARY HENSLEY
NOTARY PUBLIC, STATE OF MI
COUNTY OF WAYNE
MY COMMISSION EXPIRES Jun 28, 2020
ACTING IN COUNTY OF

(Use this space for notary stamp/seal)

*[Notary block for Tenant]*

STATE OF __Michigan__ )
                           ) ss.
COUNTY OF __Wayne__ )

      I certify, that I know or have satisfactory evidence that __Mike Lord__ is the person who appeared before me, and said person acknowledged that he signed this instrument, on oath stated that he was authorized to execute the instrument and acknowledged it as the __Director, Engineering & Operations__ of T-Mobile Central LLC, a Delaware limited liability company, to be the free and voluntary act of such party for the uses and purposes mentioned in the instrument.

      Dated: __7/10/18__

_____
Jen Link
Notary Public
Print Name __Jen Link__
My commission expires __May 29, 2019__

JEN LINK
NOTARY PUBLIC, STATE OF MI
COUNTY OF OAKLAND
MY COMMISSION EXPIRES May 29, 2019
ACTING IN COUNTY OF __Wayne__

(Use this space for notary stamp/seal)

## Memorandum of Lease - Exhibit A
### Legal Description

## The Property is legally described as follows:

**LEGAL DESCRIPTION**

The land referred to in this Commitment is described as follows:

**PARCEL 1:** Lot 14, Block 336, and adjacent vacated street and alley, HURST AND POST'S SUBDIVISION, as recorded in Liber 1, Page 298 of Plats, Wayne County Records.

**PARCEL 2:** Lots 34, 35 and 38, HENRY SCHMIDT'S SUBD'N, as recorded in Liber 51, Page 3 of Plats, Wayne County Records.

AND

Lot 36, HENRY SCHMIDT'S SUBD'N, as recorded in Liber 51, Page 3 of Plats, Wayne County Records.

AND

Lot 37, HENRY SCHMIDT'S SUBD'N, as recorded in Liber 51, Page 3 of Plats, Wayne County Records.

AND

Lot 39, HENRY SCHMIDT'S SUBD'N, as recorded in Liber 51, Page 3 of Plats, Wayne County Records.

AND

Lot 40 and adjacent vacated street,, HENRY SCHMIDT'S SUBD'N, as recorded in Liber 51, Page 3 of Plats, Wayne County Records.

**PARCEL 3:** Lot 84, MIZNER'S SUBD'N, as recorded in Liber 20, Page 47 of Plats, Wayne County Records.

AND

Lot 85, MIZNER'S SUBD'N, as recorded in Liber 20, Page 47 of Plats, Wayne County Records.

AND

Lots 86 and 87, MIZNER'S SUBD'N, as recorded in Liber 20, Page 47 of Plats, Wayne County Records.

**PARCEL 4:** West 10 Lot 19 and East 17 feet of Lot 20, includes adjacent vacated alleys and streets, LAWRENCE SUB., as recorded in Liber 18, Page 20 of Plats, Wayne County Records.

AND

West 23 feet of Lot 23, all of Lots 24, 27, 28, 29, 31, 32 and 33, LAWRENCE SUB., as recorded in Liber 18, Page 20 of Plats, Wayne County Records.

---

(Continued)

AND

Lots 25, 26 and 30, LAWRENCE SUB., as recorded in Liber 18, Page 20 of Plats, Wayne County Records.

# EXHIBIT E

CITY OF WYANDOTTE
Department of Engineering & Building
3200 Biddle Ave., Ste. 200
(734) 324-4551

Permit #: 122 - 1480
Approved stpm
6/9/22

**Application for Alterations**

Date: 5/10/22

*Location, Ownership, and Detail must be correct, complete, and legible before a Building Permit will be issued.*

Building Located At: 1440 Superior Blvd.

Contractor's Name: TBD                           Address: _____

Applicant's Name: Eric Finger(for T-Mobile)      2905 Crestwood Dr., East Lansing, MI 48823

Phone #: 517-862-2254

Owner's Name: T-Mobile           Address: 28505 Schoolcraft Rd., Livonia, MI 48150

Owner's Phone #: 517-862-2254

Email Address: efinger@pyramidns.com

## STATE CLEARLY THE NATURE OF THE PROPOSED WORK:

Is this Permit to correct cited violations ☐ Yes ☒ No If Yes, date of violations_____

____ Window(s): No. ___ of windows to be replaced

____ Strip and Reroof ___House ___ Garage ____ Shed

____ Residing (including gutters and downspouts) ___ House ____ Garage ____ Shed

____ Outside Basement Waterproofing ONLY

____ City Sidewalks: ____ feet of City Sidewalks to be replaced

Additional Information T-Mobile installing antenna/radio on smokestack

installing ground equipment on new 8' x 8' platform.

Estimated Cost by Applicant: $ 10,000        BASE FEE $50
                                            PERMIT FEE $160 Hm

I certify that the proposed work is authorized by the property owner and I am authorized to make such application and further that the information hereon is accurate. Section 23a of the state construction code act of 1972, 1972 PA 230, MCL 125.1523A, prohibits a person from conspiring to circumvent the licensing requirements of this state relating to persons who are to perform work on a residential building or a residential structure. Violators of section 23a are subjected to civil fines.

W:bldgapp.doc

updated 01/21/2021

x Eric Finger
Digitally signed by Eric Finger
DN: cn=Eric Finger, o, ou,
email=eric.b.finger@gmail.com, c=US
Date: 2022.05.10 15:07:27 -04'00'

**Signature of Applicant**

# EXHIBIT F

City of Wyandotte
Department of Engineering & Building
3200 Biddle Avenue, Suite 200
(734) 324-4551

In accordance with Section 260.0 of the Zoning Ordinance, application is hereby made for a Certificate of Occupancy for a __NEW T-MOBILE CELL SITE__
(single, 2-family, multiple dwelling, garage, addition, kind of business, etc...)

Located at: _____

**PLOT PLAN**
Note: SHOW SIZE OF ALL BUILDINGS & YARD DIMENSIONS
ON PLOT. ALSO DESIGNATE VEHICLE STORAGE SPACE.

Inside Lot Line ( )        Side Street ( )        Or Alley ( )

Front Lot Line

SEE PLANS SUBMITTED BY LANDTECH
DATED 5/10/22 AND AS SHOWN ON INDEX
SHEET T-1

Alley: open ( ) vacated ( )

Rear Lot Line

Inside Lot Line ( )        Side Street ( )        Or Alley ( )

Owner: _____
Address: _____
City: _____
Phone No.: _____

Authorized Signature: _____
Address: _____
City: _____
Phone No.: _____

**For Office Use Only**

Zoning District: __RA__
Lot Size: _____
Max. Area Of Occupancy: _____
Area Of Prop. Struc.: _____
Parking Provided For: _____
Approved By: __Greg Mayhew__

Examined By: __GREG MAYHEW__      Date: __6/9/22__
Area in Sq. Feet: _____
       Area Of Exist. Struc.: _____
       Total Area: _____
       Parking Required: _____
Refused Because Of Non-Compliance to Section: _____

_APPROVED INSTALLATION OF WIRELESS COMMUNICATION FACILITY PROVIDED_
_PLANS COMPLY WITH ALL BUILDING PERMIT REQUIREMENTS AND THE REQUIREMENTS OF_
_MCL 125.3514, GENERATOR SHALL NOT EXCEED 55dba AS MEASURED AT_
_PROPERTY LINE_

A) Vacated alley with _____ feet non-buildable easement
B) Open alley.

# EXHIBIT G

**OFFICIALS**

Theodore H. Galeski
CITY ASSESSOR

Lawrence S. Stec
CITY CLERK

Todd M. Browning
CITY TREASURER



*Wyandotte*
MICHIGAN · 1854

GREGORY J. MAYHEW, P.E.
CITY ENGINEER

**MAYOR**
Robert A. DeSana

**COUNCIL**
Robert Alderman
Chris Calvin
Kaylyn Crayne
Todd Hanna
Rosemary Shuryan
Kelly M. Stec

February 16, 2023

RE:    Building Permit PBLD22-0354
       Wireless Communication Facility
       Washington Elementary School
       1440 Superior Blvd
       Wyandotte, Michigan

Basis of Permit Approval:

The referenced permit was issued June 14, 2022.

The application was reviewed for compliance with the 2015 Michigan Building Code, and the Michigan Zoning Enabling Act, Act 110 of 2006, MCL 125.3514 Wireless communications equipment as permitted use of property.

The wireless communication equipment was found to meet the requirements of MCL 125.3514, and therefore is a permitted use of property and not subject to special land use approval.

If you have any questions, kindly contact the undersigned by email at gmayhew@wyandottemi.gov, or by phone at 734-324-4554.

Very truly yours,

Gregory J. Mayhew
City Engineer

CC: Wyandotte School District, 639 Oak St., Wyandotte, MI 48192
     BS&A File: 1440 Superior Blvd./PBLD22-0354

3200 Biddle Avenue, Suite 200, Wyandotte, Michigan 48192 734-324-4551 · email: engineering1@wyandottemi.gov
Equal Housing Opportunity                                                    An Equal Opportunity Employer

# EXHIBIT H



# WYANDOTTE PUBLIC SCHOOLS

## Educate – Inspire - Empower

---

MEMORANDUM FROM THE SUPERINTENDENT'S OFFICE

Phone 734.759.6001                    Email costc@wy.k12.mi.us

**Questions gathered from the 3-3-2023 Informational meeting
held at Washington Elementary School**

1. When is the cell tower going to be turned on?  A:  We do not have a date from T-Mobile.  It will not be right away.
2. What is the radius of broadcast ability of the 5G signal?  A:  This depends greatly on the amount of structures trees and other objects within the tower's range.  There is no set answer.
3. Will there be testing?  A:  Based on the specifics of Washington (height of tower, layout, etc.) modeling has been done.  There will be testing (by a 3rd party) done after the tower is turned on as well as annually. This will be paid for by T-Mobile and the District will be provided the results.
4. When were homeowners notified? A:  There is no requirement for notification.  All agendas and minutes are posted publicly and can be found on the district website.
5. How many towers have caught fire? A:  We do not have this information
6. What about signs?  A:  Closer to the deployment date, signs will be hung per regulations.  This will be done by T-Mobile.
7. What are the model numbers of the antennas installed? Amplifiers MFG and model #'s.  A:  T-Mobile has this information
8. Was there a cell phone tower or antenna at Washington prior to the T-Mobile tower? A:  There was not.
9. Is Washington Elementary owned by the City or the District? A:  The District owns this property.
10. Are we able to receive a copy of the District insurance policy as it relates to the cell tower?  A:  T-Mobile insures the cell tower components.  The District policy covers the smoke stack.
11. Does our insurance police or T-Mobile's policy cover harm or adverse health effects from radiation?  A:  RF waves are non-ionizing and are everywhere including FM radio waves, microwaves, home routers and cell phones. It would be extremely difficult to pinpoint a main source of exposure.
12. Does the District or T-Mobile's insurance policy contain an "anti-pollution" clause?  A:  This is a term unfamiliar to us.
13. Is T-Mobile willing to amend the lease to certify the tower is safe?  A:  T-Mobile will pay a 3rd party to monitor the tower is within federal, state and local limits.
14. Is T-Mobile willing to place a monetary guarantee on this safe technology and if so how much?  A:  T-Mobile will have to answer this.

15. Why is the power to the tower on now if it isn't turned on?  A:  The ground equipment is very sensitive to changes in temperature.  The power is on to heat and cool the equipment as needed.
16. What about day-to-day monitoring?  A:  T-Mobile will be monitoring the performance of this tower, as all other towers, remotely.
17. Is the District able to terminate the lease if we see spikes in adverse health effects? A:  There is no provision for this as long as T-Mobile follows all regulatory provisions.
18. Is the District able to terminate the lease if T-Mobile is not in compliance with state, local or federal law?  A:  If T-Mobile has breached this, the lease will be re-visited by the District and T-Mobile.
19. Is T-Mobile willing to meet with our independent experts?  A:  This would be a question for T-Mobile.
20. Why wasn't the community informed about this decision prior to 2018?  A:  Information was posted, per the Open Meetings Act, both at the Board Office and on our website.
    This is how decisions are communicated to the community.
21. Since there is not enough research behind cell towers and children why can't we as a community pay the $1,000 per month instead?  A:  Due the contract that has been executed between T-Mobile and WPS.
22. My child is a special needs student. Many of these students have medical conditions and disabilities. How is the school going to attend to this and provide a safe accommodation for these students? A: Regulations for students with special needs are no different than students without.  No additional provisions are planned at this time.
23. When did the Board make this decision/approval?  A:  June, 2018.
24. Why is Washington a strategic location?  A:  There was a hole in coverage within this area. Washington's tower proved to be a satisfactory height and location.
25. Can the American Cancer Society confirm cell towers do not cause cancer?  A:  That would be a question to ask of the American Cancer Society.
26. Why weren't parents consulted/notified in 2017-2018?  A:  The opportunity was available at the meetings held to discuss and vote on the tower.
27. What were other considerations? McKinley School? Water tower? A:  We are not aware of the other considerations yet T-Mobile could answer this.
28. Is the huge generator for back-up in case of a power outage or will it run continuously?  A:  It is a backup (gas) generator in the event of a power outage.  It will only provide power for the tower when there is no electrical service.
29. What about noise?  A: The tower does not make a noise.   The generator will make a noise slightly louder than a home generator.
30. What about vibration? A: The tower does not make a vibration.  The generator will not vibrate.
31. Will the 5G disrupt our Wyandotte WIFI signals?  A:  it is not anticipated that any other disruptions will happen due to the Washington tower being turned on.
32. Why are fire houses no longer allowed to have tower on the stations?   A:  We do not have information regarding fire houses.
33. Student question- What if the antennas fall on one of the kids heads at recess? A:  The devices are each secured with numerous bolts.  This is to ensure none of the parts will fall.  They are also scheduled to be inspected.

34. Did any school board member or supervisor get money for this?  A:  No

35. When the District negotiated and signed the contract, what were their professional backgrounds?  A:  Prior to District officials signing the contract, the District's attorney approved the language.

36. Who made the determination regarding the safety of the tower?  A:  Based on the federal, state and local guidelines being followed, it was approved.

37. Will T-Mobile lease the tower to other carriers?  A:  No, the tower is school property and they are unable to do this.

38. What about balls from the playground entering in the mechanical area?  A:  T-Mobile will put a "top" over the fenced in area so no balls or children can enter.

# EXHIBIT I



# Wyandotte Public Schools
### "Educate – Inspire - Empower"

**BOARD OF EDUCATION**
Cynthia Kinney, President
Theresa Crnkovich, Vice President
Kathleen Kane, Secretary
Kelly Webber, Treasurer
Dana Browning, Trustee
Carolyn Martinez, Trustee
Frank Tarnowski, Trustee

**CENTRAL ADMINISTRATION**
Dr. Catherine Cost, Superintendent
734-759-6002; costc@wy.k12.mi.us
Tonya Brodie, Director of Human Resources
734-759-6022; brodiet@wy.k12.mi.us
Kenneth Laub, Director of Finance
734-759-6026; laubke@wy.k12.mi.us
Bernard A. Bowers, Jr., Director of Operations
734-759-6020; bowersb@wy.k12.mi.us

March 20, 2023

Good afternoon, WPS families,

I usually don't write long letters to you, but this time, I want you to have all of this important information.

You are likely aware that Wyandotte has been in the news lately regarding the cell tower at Washington Elementary. For those of you who are not, the Board of Education was approached by T-Mobile five years ago. After a legal review, the Board approved the contract per the Open Meetings Act. Construction was delayed until this September when I sent a letter to the Washington families. Not until just recently did the District receive pushback from the community.

There is a legal agreement between the District and T-Mobile, and the City has no authority over this. In order to make any changes or demands, the contract would have to be broken, which would lead to legal implications. Although the Mayor is eager to help, the City is not listed on the agreement.

An informational meeting was attempted on March 2, 2023, to discuss these details. The Board held a regularly scheduled meeting on March 14, 2023. They heard over 30 people present at public comment. The Board and I listened, and we want everyone to know that they were heard. This situation is difficult for all of us.

Since last week, the District has looked into what it would cost if we broke the contract with T-Mobile, and it is estimated to be in the millions of dollars.  The District would be sued by T-Mobile, and our insurance will not cover this. Based on the signed contract, our legal counsel has said we would be responsible for paying T-Mobile for damages, attorney fees, and court costs, which could be in the millions of dollars. These fees would come out of the general fund. That is why this impacts every family and every staff member, as there would be less available to the remaining classrooms and staff members.

Last week, I had numerous conversations with the Mayor and City Leadership to develop creative solutions. One idea was to relocate the tower, but as of late Friday, T-Mobile expressed no interest in pursuing this as it would cost over $1M in supplies, permits, construction, and employee costs. As a result of the contract in place, the District cannot force T-Mobile to relocate the tower. The Board and I will continue to look for feasible alternatives.

I have been working with Mr. Bowers to make changes to the generator fencing to balls and other recess equipment can't fall into the area.  We have also been looking to add back the green space that was lost to the children. This is a result of specific concerns that were brought to us.

Is the cell tower at Washington safe? An outside organization, Site Safe, provided information with respect to this specific project (see the attached pages). A model of Washington has been constructed, and RF measurements were calculated. These were all well, well below the legal limits, and would not cause harm to children. T-Mobile has assured me that we

will be notified before the tower is turned on. When it is turned on safety studies will be done with measurements inside and outside of Washington, which will then be shared with the Washington families.

Our next steps include the Board meeting with a T-Mobile representative on Tuesday, March 21, 2023, at 6:30 pm in an open meeting at the Board of Education building to ask questions and explore any other options. There is no set date for turning the tower on, as the final inspections still need to be conducted.

Those Washington families that would like to initiate a transfer to another school may do so beginning April 3, 2023. This can be done by filling out a form on the website, which will be under School of Choice. For those staff who would like to initiate a change in placement, that process will also begin this spring. See your supervisor for an exact timeline.

As new information becomes available, I will share it with all of you. Working together, we will find the best possible answer.

Sincerely,

Catherine M. Cost, Ed.D.
Superintendent

**SiteSafe**
*A QUALTEK Company*

8618 Westwood Center Drive, Suite 315
Vienna, VA 22182

Wyandotte Public Schools
639 Oak Street
Wyandotte, MI 48192

Date: March 13, 2023

Subject: T-Mobile Installation on Existing Smokestack Structure at Washington Elementary School
T-Mobile Site ID/Name: **DE05726D / Washington Elementary Smokestack**
Site Address: 1440 Superior Boulevard, Wyandotte, MI 48192 (Wayne County)

To whom it may concern:

This correspondence seeks to address concerns regarding the proposed antenna installation at the property referenced above. T-Mobile is deploying a new installation on a smokestack structure adjacent to the Washington Elementary School at 1440 Superior Boulevard, Wyandotte, MI 48192 in Wayne County. Site Safe, LLC ("Sitesafe") is a leader in the evaluation of such deployments for Federal Communications Commission (FCC) and Occupational Safety and Health Administration (OSHA) compliance. We have reviewed the proposed installation for compliance with FCC and OSHA regulations.

The FCC has established safety guidelines relating to potential radio frequency (RF) exposure from radio transmitters for the health, safety and welfare of the general public as a whole, including children. FCC regulations define two separate tiers of exposure limits: Occupational or "Controlled Environment" and General Public or "Uncontrolled Environment". The General Public limits are generally five times more conservative or restrictive than the Occupational limits. These limits apply to accessible areas where workers or the general public may be exposed to RF electromagnetic fields. General Public refers to any persons who have not received RF awareness and safety training.

The vertical antenna pattern of the typical panel antennas used by licensees such as T-Mobile project RF energy onto the horizon with very little energy being directed in a downward direction. The energy directed downward is usually 20-30 dB less than the energy in the main beam, which is a factor of 100-1000. With the T-Mobile antennas mounted at a centerline of 54' above ground level, and approximately 30' horizontally and 24' vertically away from the school building rooftop, this reduction would be in the higher end of this range. Additionally, roof/building materials significantly attenuate RF energy, typically by 10-20 dB, which is a factor of 10-100. Also, exposure drops off dramatically as you move away from a transmitting antenna. The Inverse Square Law states that when the distance to the transmitting source is doubled, the energy is quartered. Combining all of these factors together results in the levels of indoor exposure from outdoor facilities being insignificant. More specifically, due to the reductions discussed, the exposure levels on the school building rooftop, within the school building, and at any areas at ground level, including all of the school property grounds and playground, is well below the FCC's accepted General Public MPE limit.

Using calibrated instruments accepted throughout the industry, Sitesafe has performed RF exposure measurements inside of buildings containing similar antenna system installations and have never recorded



8618 Westwood Center Drive, Suite 315
Vienna, VA 22182

measurements close to approaching the General Public MPE limits, which is expected due to the factors detailed above.

Other than cellular facilities, there are countless sources of low-level RF present in the environment and/or within homes/buildings which are considered essential for modern life, such as computers/tablets, AM/FM/TV broadcast, Wi-Fi, satellite radio, police/fire/EMS radio systems, utility smart meters, wireless data services, cordless phones, smart TVs/appliances, baby monitors, etc. The levels of RF energy from antenna installations, such as this T-Mobile facility, found in the surrounding environment inside the building, at ground/street level, etc. are comparable to these items and are insignificant.

With regard to where the FCC exposure limits came from, the following provides an explanation:

> *The FCC guidelines for human exposure to RF electromagnetic fields were derived from the recommendations of two expert organizations, the National Council on Radiation Protection and Measurements (NCRP) and the Institute of Electrical and Electronics Engineers (IEEE). Both the NCRP exposure criteria and the IEEE standard were developed by expert scientists and engineers after extensive reviews of the scientific literature related to RF biological effects. The exposure guidelines are based on thresholds for known adverse effects, and they incorporate prudent margins of safety. In adopting the current RF exposure guidelines, the FCC consulted with the EPA, FDA, OSHA and NIOSH, and obtained their support for the guidelines that the FCC is using.*[1]

More specifically, there is a safety factor of 50 built into the General Public MPE limits. That is, the General Public MPE limits are intentionally overly conservative such that they are 50 times lower than levels deemed by the scientific community and agreed upon by the FCC to potentially cause health effects. As an FCC licensee, T-Mobile is required by law to comply with the FCC Rules and Regulations, and T-Mobile's proposed facility is in compliance.

For this installation, T-Mobile's proposed antennas are mounted in three sectors at a centerline of 54' above ground level at the top of an existing 53' smokestack structure adjacent to the Washington Elementary School. The nearest accessible surface to the T-Mobile antennas is the elementary school main rooftop which stands at approximately 30' above ground level (24' below the centerline of the T-Mobile antennas). The highest theoretical T-Mobile exposure level in any accessible areas of the adjacent rooftop is below 5% of the FCC's accepted General Public MPE limit, as expected due to the energy reductions previously discussed. Also, due to the energy reductions previously discussed, the theoretical exposure levels within the school building and at any areas at ground level, including all of the school property grounds and playground, is also well below the FCC's accepted General Public MPE limit.

The proposed T-Mobile installation will provide 4G (4th Generation) and 5G (5th Generation) service to the community. 4G is a standard that allows wireless access to the network at much higher speeds than the previous 1G, 2G and 3G standards. Similarly, 5G is a standard with even greater speeds and capabilities achieved by deploying newer more efficient antennas and equipment.

---

[1] https://www.fcc.gov/engineering-technology/electromagnetic-compatibility-division/radio-frequency-safety/faq/rf-safety#Q9



8618 Westwood Center Drive, Suite 315
Vienna, VA 22182

For this installation, 5G speeds will be afforded in existing frequency bands currently utilized at typical T-Mobile facilities at thousands of locations across the country. The dynamics of the RF signals transmitted and received from the antennas is not changing, but rather, the newer more efficient equipment to be used will provide additional coverage and capacity as well as afford lower latency, resulting in the processing of the data transmitted and received by the new equipment to be much quicker with faster uplink/downlink speeds that meet 5G standards. This equipment, like all other devices, are required by law to comply with the FCC regulations for power (in addition to the facility complying with the FCC regulations for RF exposure). Even at the maximum power available for T-Mobile's new equipment, T-Mobile will operate at a fraction of the allowable power and in compliance with the FCC Rules and Regulations.

Sincerely,

Anthony Handley
Director of Engineering
Site Safe, LLC

Additional RF information is available at the following sites:
https://www.fcc.gov/general/radio-frequency-safety-0
https://www.fcc.gov/engineering-technology/electromagnetic-compatibility-division/radio-frequency-safety/faq/rf-safety

OSHA has additional information available at:
https://www.osha.gov/SLTC/radiofrequencyradiation/index.html

# EXHIBIT J



# Wyandotte Public Schools

### "Educate – Inspire - Empower"

**BOARD OF EDUCATION**
Cynthia Kinney, President
Theresa Crnkovich, Vice President
Kathleen Kane, Secretary
Kelly Webber, Treasurer
Dana Browning, Trustee
Carolyn Martinez, Trustee
Frank Tarnowski, Trustee

**CENTRAL ADMINISTRATION**
Dr. Carla Harting, Interim Superintendent
734-759-6002; hartinc@wy.k12.mi.us
Tonya Brodie, Director of Human Resources
734-759-6022; brodiet@wy.k12.mi.us
Kenneth Laub, Director of Finance
734-759-6026; laubke@wy.k12.mi.us
Bernard A. Bowers, Jr., Director of Operations
734-759-6020; bowersb@wy.k12.mi.us

04/27/2023

To: Members of our School Community

Update: Washington Elementary/T-Mobile Cell Equipment

I want to continue to keep you updated on what we as a district are pursuing in our ongoing discussions concerning the cell phone equipment located at Washington Elementary.

We were notified that Michelle Sanders is no longer handling the issue. Our new contact person is Evelyn Sanguinetti. Attached is the letter we received from T-Mobile about this change.

We sent the following request to T-Mobile, through our attorney, Philip G. Clark from Thrun Law Firm, P.C. with a deadline for a response by April 26, 2023:

> *We met administratively this morning to review and discuss any current updates relevant to the T-Mobile situation at Washington Elementary. Based upon our discussion, several important pieces of information we have requested from T-Mobile, still have not been provided to us.*
> *They are as follows;*
>
> *1. Confirmation, including documentation, of State and City permit approvals relative to construction codes and zoning requirements for this specific project.*
>
> *2. The final inspections required prior to activation, will be conducted and approved by what entity-State or City of Wyandotte?*
>
> *3. At the meeting of March 28, 2023 school board workshop, which included T-Mobile representatives, a request was directed to the T-Mobile team, to provide the cost to remove the cell equipment from the smokestack. We were informed at that time, we would have that information within a week. We have not received it as of today.*
>
> *4. You forwarded a listing of multiple relocation sites for the tower, to T-Mobile. We would like to know if T-Mobile responded and identified any alternative location(s).*
>
> *Under the circumstances the district is dealing with on a daily basis, it is critical that we have responses to these questions no later than Wednesday April 26.*

**639 Oak Street ● Wyandotte, Michigan ● 48192 ● 734.759.5000 ● FAX 734.759.6009●www.wyandotte.org**
It is the policy of the Wyandotte Board of Education that no person shall, on the basis of race, color, religion, national origin or ancestry, sex, age, disability, height, weight, or marital status be excluded from participation in, be denied the benefits of, or be subjected to discrimination with respect to any educational program, activity, or employment.

Our Attorney received the following response from T-Mobile.

> *Thank you for your email of April 24, 2023, requesting answers to several questions regarding T-Mobile's wireless facility. T-Mobile remains committed to maintaining an open dialogue and answering questions relating to the use and operation of our wireless facility.  I believe we've demonstrated that we're responsive and forthcoming regarding our site and related 5G technology. As requested, attached are copies of the original and renewed building permits issued by the City of Wyandotte and T-Mobile will request a final inspection prior to the site being activated.*
>
> *While we appreciate the alternate locations provided by the District, upon evaluation and review, these locations are not viable due to construction and zoning requirements, and network needs.*
>
> *T-Mobile looks forward to partnering with the District as set forth in our letter dated March 27th.*
>
> *Sincerely,*
>
> *Evelyn Sanguinetti*
> *Sr. Siting Advocacy Manager – Central Region*
> *Evelyn.Sanguinetti1@T-Mobile.com*

We did not receive a response to #3 and will be contacting T-Mobile again for the cost to remove the cell equipment from the smokestack. I am including the T-Mobile letter from March 27th and one we received from April 20th.

Lastly, we are also reviewing our options with an attorney who specializes in telecommunications. If it is determined this attorney can assist us, we will bring this to the School Board for the required approval.

As stated in the past, we will continue these conversations and provide updates when possible in hopes to find a resolution that will work for everyone.

Sincerely,

Carla S. Harting

Carla Harting, Ph.D.
Interim Superintendent
Wyandotte Public Schools



March 27, 2023

Catherine M. Cost, Ed.D.                    Cindy Kinney
Superintendent                              President
Wyandotte Public Schools                    Wyandotte Public Schools
639 Oak Street                              639 Oak Street
Wyandotte MI 48192                          Wyandotte MI 48192

RE: 2018 lease agreement between T-Mobile and Wyandotte Public School District ("District") for operation of the cell site located at 1440 Superior Blvd., Wyandotte MI

Dear Superintendent Cost and President Kinney,

T-Mobile values the open communication we've continued to have with the school board members and community of Wyandotte. It was our pleasure to attend the March 21st public meeting and share more on our plans. While we followed the school board's guidance to have our representatives leave the meeting after our presentation to allow the meeting to continue, we remain available to answer any additional questions concerning the site and look forward to continuing to work with the school board to navigate next steps.

In response to the school board's requests, and in an effort to get this site up and running to support connectivity in this community:

1. T-Mobile will delay turning on the cell site until after the school year ends on June 9, 2023.
2. T-Mobile will notify you, the school board and the District in writing at least one week before starting the process to bring the site on-air, which will take up to 30 days.
3. In addition to the predictive analysis we shared with Superintendent Cost on March 14, 2023, that showed that RF emissions at the site are far below FCC limits for public exposure, T-Mobile will conduct pre- and post- on-air radio frequency (RF) emissions testing with a third-party professional. We welcome you and members of the school board to join us on-site during this testing.
4. T-Mobile will conduct annual RF emissions testing confirming compliance with applicable FCC guidelines and provide the results to the District.
5. T-Mobile will explore options to visually conceal the antennas and share those options with you, the school board, and the District.
6. T-Mobile will evaluate removing the permanent generator from the site. We will leave the pad in place so that in the event of a power outage, a portable generator can be brought in to restore service for the community.
7. T-Mobile will partner with your staff to design additional protective fencing for the ground equipment and generator pad at the site.

### T·Mobile·



We look forward to continuing to work with the you, the school board, District and Wyandotte community to best meet your needs to deliver the reliable connectivity you depend on. Please do not hesitant to contact us with any additional questions.


Sincerely,

*Michelle Sanders*

Michelle Sanders
On behalf of T-Mobile

**T··Mobile**

12920 SE 38th Street, Bellevue, WA  98006

www.t-mobile.com



April 20, 2023

Cindy Kinney
School Board President
Wyandotte Public Schools
639 Oak Street
Wyandotte MI 48192

**Re:** T-Mobile Wireless Facility Located at 1440 Superior Blvd, Wyandotte MI 48192
**Site No.:** DE05726

Dear President Kinney,

I am the new Central Region Senior Siting and Advocacy Manager and will be the point person regarding the T-Mobile Wireless Facility Located at 1440 Superior Blvd, Wyandotte MI 48192.  We continue to be appreciative of the ongoing open communication with the Wyandotte school board members and their partners. Michelle Sanders recently had a conversation with Phillip Clark from Thrun Law Firm, and I want to follow up with some additional information regarding 5G technology.

A critical point to start with is that 5G is a platform that provides fast speed and reliable connectivity for data that travels on it. 5G is not a specific antenna, piece of equipment, or "new" technology or spectrum band. 5G is an operating standard that utilizes spectrum that wireless communications have used for decades. 5G is the evolution of wireless that started with 1G and the first cell phone, 2G and texting, 3G that gave phones online access and 4G which brought fast download speeds to video streaming and live video from your phone, growth in apps for almost everything we do like shopping, ride sharing, banking, and so much more. And now 5G is faster and has more capacity for data and wireless traffic than ever before. A strong and fast 5G network fuels innovation and businesses, brings investments and economic opportunities, supports public safety and first responders, and empowers education and learning in communities throughout the country.

T-Mobile's 5G uses repurposed radio waves within our already-existing low-band spectrum holdings that were used for decades to transmit broadcast TV. Our mid-band spectrum will be used to transmit prior generations of wireless technology (*e.g.*, 2G, 3G, 4G). The physical facilities such as antennas used for 4G and 5G are often the same. It might be helpful to think of 5G as a software upgrade that will allow customers to experience our network in better and unprecedented ways.

There's been a lot of discussion around radio frequency (RF). RF emissions are sent by everything that operates with electricity, including common consumer electronics used every day such as TVs, radios, PCs/laptops/tablets, baby monitors, Wi-Fi routers, and household appliances. T-Mobile broadcasts signals over frequencies regulated and licensed by the FCC and will operate the subject site in compliance with FCC rules and regulations regarding maximum permissible exposure ("MPE") limits and guidelines. The MPE limits established by the FCC are designed to protect public health with a very large margin of safety and have been endorsed by the EPA and FDA.

And as T-Mobile previously noted, the predictive analysis shared last month showed RF emissions at the site are far below FCC limits for public exposure. We'll conduct pre- and post- on-air RF emissions testing at this site by



12920 SE 38th Street, Bellevue, WA  98006
www.t-mobile.com



a third party along with annual RF emissions testing to confirm with applicable FCC guidelines. Results will be provided to the school district.

If you have additional questions about 5G, please see the following links and online resources which contain science-based, authoritative information on this topic:

- FAQs from experts on 5G and EME:  https://www.wirelesshealthfacts.com/
- FCC's Radio Frequency Safety website:  www.fcc.gov/oet/rfsafety
- T-Mobile's 5G Plan:  https://www.t-mobile.com/5g

Sincerely,

*Evelyn Sanguinetti*

Evelyn Sanguinetti
T-Mobile

## T Mobile